## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. ____ |
| STONEHILL COLLEGE, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## COMPLAINT

Plaintiff, John Doe, for his Complaint against Defendant, Stonehill College, Inc. ("Stonehill"), alleges and states the following:

## I.    STATEMENT OF THE CASE

The mission statement of Stonehill College states that "Stonehill College, a Catholic institution of higher learning founded by the Congregation of Holy Cross, is a community of scholarship and faith, anchored by a belief in the inherent dignity of each person. Through its curriculum of liberal arts and sciences and pre-professional programs, Stonehill College provides an education of the highest caliber that fosters critical thinking, free inquiry and the interchange of ideas.  Stonehill College educates the whole person so that each Stonehill graduate thinks, acts, and leads with courage toward the creation of a more just and compassionate world."

John Doe learned first-hand that this was a false and misleading mission statement.  John Doe learned that this was a misrepresentation on the part of Stonehill when he became a

1

respondent in a Title IX investigation as a student at Stonehill.  As a result of the allegations of Jane Roe, John Doe was subjected to a biased, unfair investigative and adjudicatory process which was void of due process, impartiality and a presumption of guilt was assumed.   In addition, John Doe had no opportunity for a hearing, or to confront his accuser in a hearing, or through written questions.   As a result of this unlawful investigation and adjudication of alleged sexual misconduct, John Doe was wrongfully expelled from Stonehill.   That is how John Doe learned  that there was no courage on the part of Stonehill College to conduct a fair and impartial investigation and adjudication in connection with alleged sexual misconduct, and there certainly was no justice or compassion exhibited by Stonehill College, its investigators or administrators.

In fact, Stonehill College has been the subject of multiple investigations by the Department of Education as a direct result of failing to follow its contractual duties in the investigation and adjudication of gender based discrimination and sexual misconduct allegations. Consequently, during the same time that Stonehill College was investigating the allegations lodged against John Doe for alleged violation of Stonehill College's Policy S1.14 *Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence*, the Department of Education was breathing down the neck of Stonehill College for its failure to follow Department of Education guidelines relating to Title IX, 20 U.S.C. § 1681, *et seq*.

Notably, just weeks prior to Jane Roe's allegation of sexual misconduct against John Doe, the #METOO movement took hold across the nation.  Clearly this movement struck a chord with the accuser, Jane Roe, because on October 20, 2017, she updated her status on her Facebook page in support of #METOO.  Then, upon information and belief, it is at this time that Jane Roe, made an allegation of sexual misconduct against another male student at Stonehill College.

2

According to Jane Roe, in her intimate discussions with John Doe, she explained that the student whom she accused of sexual misconduct was still on campus, and Stonehill College did not punish him.  Within one month of Jane Roe's accusation against another male student at Stonehill College, and after multiple intimate interactions with John Doe of the same nature and scope, Jane Roe made the allegation against John Doe.  Jane Roe's allegation was a written statement she prepared because she allegedly did not want to be interviewed by the Title IX Coordinator.  Jane Roe's written statement falsely claimed that she and John Doe were "surface" friends and did not have any pre-existing intimacy of the nature and scope alleged in her complaint.

Due to the pressure of the Department of Education, and the need to obtain a finding of responsibility on the part of the accused, Stonehill College breached its contractual and ethical obligations to John Doe by finding him responsible and imposing the harshest sanction of expulsion.  John Doe now seeks injunctive relief and damages against Stonehill.

## II.    <u>THE PARTIES AND PSEUDONYMS</u>

1.    Plaintiff, John Doe, is a natural person and a resident of the Town of Orono, County of Penobscot, State of Maine.

2.    John Doe is not Plaintiff's legal name.    Due to the nature of the charges Stonehill brought against John Doe, and Stonehill's subsequent finding that John Doe was "responsible" for the alleged conduct charged, John Doe's reputation has been severely damaged and the finding has significantly delayed his ability to obtain an undergraduate degree.  Therefore, John Doe is proceeding under a pseudonym to avoid further damage to his reputation and future

prospects beyond the damage that Stonehill has already inflicted, and which Stonehill continues to inflict.

3.      The Complaint also identifies the person who filed the sexual misconduct complaint against John Doe with Stonehill, as "Jane Roe."    Jane Roe is not the true name of the complainant.    Jane Roe is also not, at present, a party to this Complaint.    She is referred to herein as "Jane Roe" in order to protect her reputation until such time as this Court may determine that such protection is no longer required or warranted.

4.      Defendant, Stonehill College, Inc., is a non-profit institution located in and organized under the laws of the Commonwealth of Massachusetts for the purpose, *inter alia*, of providing educational services.    Stonehill is located in the Town of Easton, County of Bristol, Commonwealth of Massachusetts.

## III.    VENUE

5.      Venue is proper in this Court pursuant to 28 USC § 1391(1) inasmuch as Defendant, Stonehill, is located in Easton, Massachusetts and a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in the District of Massachusetts.

## IV.    JURISDICTION

6.      This Court has original jurisdiction over John Doe's claims pursuant to 28 USC § 1332(a)(1) based on the diversity of citizenship between John Doe, a resident of Maine, and Stonehill College, a legal entity organized under the laws of the Commonwealth of Massachusetts and located in Easton, Massachusetts, and on the grounds that the amount in controversy exceeds the sum or value of $75,000.

7.      This Court also has jurisdiction over John Doe's claims pursuant to 28 USC § 1331 in that certain of John Doe's claims allege that Stonehill engaged in unlawful sex discrimination

against John Doe in violation of 20 USC §1681, *et seq*., also known as Title IX of the Education Amendments Act of 1972 (hereinafter "Title IX") and has supplemental jurisdiction pursuant to 28 USC § 1367 over John Doe's claims arising under the laws of Massachusetts.

**V.    STATEMENT OF FACTS**

**A.  STONEHILL MISSION/JOHN DOE ENROLLMENT**

8.      Stonehill was founded in 1948 by the Congregation of Holy Cross and its educational mission is guided by the Roman Catholic Church and it represents itself as developing students who will become "global citizens who value knowledge, integrity, and, compassion while they seek a more just society."

9.      Stonehill represents to the public and to prospective students, that "[t]he presence of Catholic intellectual and moral ideals places [Stonehill] in a long tradition of free inquiry, the engagement with transcendent theological and philosophical ideals and values, the recognition of the inherent dignity of each person, and the sense of obligation to commit oneself to moral ends."

10.     John Doe had long planned to attend college and viewed a college degree as essential to realizing his professional and personal aspirations.

11.     In his junior year in high school, John Doe applied to several colleges including Stonehill.  He applied to Stonehill because he believed Stonehill would challenge him intellectually and academically.  He also believed Stonehill's religious traditions, in particular, its adherence to the spiritual ethic of the Congregation of Holy Cross, would welcome and encourage his personal religious beliefs.

12.     John Doe also believed that the athletic program at Stonehill would allow him to continue his participation in athletics, which he had pursued throughout high school, including, in particular, his participation in football.

13.     John Doe recognized that, if Stonehill accepted him, his attendance at Stonehill would impose significant financial burdens on him because neither John Doe individually, nor John Doe's family, had the ability to pay Stonehill's annual tuition of $59,430.00 without taking out substantial loans.   Because John Doe believed Stonehill's representation that it was committed to its mission, principles, and, to each student, he believed a Stonehill education would be worth the significant financial burden on him.

14.     In the spring of 2017, Stonehill advised John Doe that he had met Stonehill's admission requirements and had been admitted into the Class of 2021, with classes to begin in September of 2017.

15.     John Doe obtained loans in the total amount of $33,251.00 to pay for Stonehill for his education for the 2017-2018 Academic Year.

16.      Stonehill knew that John Doe had assumed significant financial obligations to attend Stonehill during the 2017-2018 academic year.

17.     John Doe arrived at the Stonehill campus on August 7, 2017.   He arrived early because he had joined the Stonehill football team.  John Doe attended practices and team meetings from shortly after his arrival until shortly after Jane Roe made the allegations against him.  John Doe could not handle the pressures of defending the accusations against him, attending practices and preparing for semester exams, so he chose to quit the football team.

18.     On September 5, John Doe began taking classes at Stonehill.   He had a full course load of sixteen (16) credit hours.  He had tentatively decided to major in biochemistry.   He intended to attain his undergraduate degree in four years and graduate in the Spring Semester of 2021.   To that end, John Doe had enrolled in eighteen (18) credit hours for the Spring 2018 semester.

Upon graduation, he intended to find a job and begin his professional career in the bioscience field.

19.     Throughout the Fall 2017 Semester, John Doe conscientiously attended classes for each of his courses, kept up with his studies, and, met deadlines for his coursework.

20.     The schedule the football team demanded was rigorous with practices nearly every day and games each Saturday.    This schedule continued through the last game on November 11. Even after the last game of the season, the football team continued to hold meetings and require that team members adhere to a workout schedule.

B.     INTRODUCTION TO JANE ROE

1.     Relationship between John Doe and Jane Roe

21.     In May or June of 2017, John Doe joined a Stonehill Facebook group for the Class of 2021.    Jane Roe was a member of the Stonehill Class of 2021 FaceBook Group ("FaceBook Group").  During the summer of 2017, Jane Roe reached out to John Doe through the FaceBook Group.     Thereafter, Jane Roe and John Doe began to communicate through the FaceBook Group, Snapchat and text message.

22.     In one of her early messages, Jane Roe told John Doe that she had recently broken up with her boyfriend.

a.     Initial Social Interaction

23.     Stonehill assigned John Doe to Corr Hall as his dormitory and assigned Jane Roe to O'Hara Hall as her dormitory.

24.      Shortly after John Doe arrived at Stonehill, a mutual female friend, also a member of the Class of 2021, introduced Jane Roe to John Doe.

7

25.     Over time, John Doe and Jane Roe saw a lot of each other and John Doe believed that they were friends.

26.     They often communicated through social media, including Facebook and Instagram, but most frequently they used Snapchat.

27.     As John Doe got to know Jane Roe better, he found that she lacked self-confidence and frequently told him that she was afraid and felt vulnerable.   John Doe tried to give Jane Roe moral support and help her build up her self-esteem by complimenting her and encouraging her.

28.     Jane Roe also told John Doe that she was fearful of walking the Stonehill campus at night.   John Doe often offered to walk Jane Roe to her dormitory if she was feeling apprehensive.   At times, Jane Roe would accept John Doe's invitation, and on several occasions he accompanied her from some point on or near the campus.

29.     On October 22, 2017, Jane Roe sent John Doe a series of Facebook messages,  including the following:

A.      Jane Doe said she had become "wicked anxious" and was "having a really tough time.  John Doe responded and told her that he was "here for support" but Jane Roe, responded by saying, she "just [felt] really down," that this feeling was "beyond normal."

B.      Jane Roe then told John Doe, "sorry this isnt ur problem."   John Doe responded to this message by saying, "No, no.  Please talk to me about this if it makes you feel better.  I really like to help and I understand what it is like to feel like that."

C.      Although John Doe continued to encourage Jane Roe, she eventually told him, "I'm not ok," "i  can't be ok."   "its not gonna be ok', nothings ok."  By this point, John Doe was becoming concerned about Jane Roe's mental health and stability and he tried to

8

encourage her further by saying, "[Jane] you're a strong smart person.   You do whatever you set out to do"  "You'll be ok.  I believe in you."

D.      Jane Roe acknowledged his message of support, but said, "no its beyond normal like its beyond what a , (sic) strong person can handle, im over this  im done."   At this point, John Doe was very concerned that Jane Roe might hurt herself and responded by saying, "[m]aybe you should get help?  There's people on campus you can reach out to" and he provided her with a telephone number to a campus helpline, telling her it was the number to the "wellness center at the chapel."

E.      Jane Roe eventually told John Doe. "ill figure it out i guess" to which John Doe responded, "I believe that you will (smiley face emoji) You can always talk to me if you need to.  Even if I can't answer right away."

F.      Jane Roe acknowledged John Doe's encouragement and offer of support, but added, "im just way too much of a mess and i dont wanna make it worse" to which John Doe responded, "[a]ll you can do is try your best, and don't be afraid to ask for help."

G.      Jane Roe then told him that she was "always afraid to ask for help" but John Doe encouraged her again saying, "[d]on't be.  It's ok to need help.   I need help all the time." In telling Jane Roe that he needed help "all the time," John Doe said this to encourage Jane Roe to help her overcome her reluctance to seek help.

H.      Jane Roe's response to John Doe's message of support was disturbing.   In response to his suggestion that she seek help, she answered, "I cant" and then added "im done."

30.     Jane Roe's repeated statements to John Doe about feeling insecure and the foregoing FaceBook Messenger exchange between Jane Roe and John Doe left John Doe very concerned

for Jane Roe's emotional stability.   Jane Roe never told him what, in particular, caused her to initiate the October 22 FaceBook Messenger exchange and he did not try to elicit that from her. Instead, he decided to be as supportive and encouraging to her as possible.   He viewed her as a psychologically fragile person who was unlikely to seek professional help for the problems she faced and who, if she felt sufficiently overwhelmed, might harm herself.

31.     According to a Snapchat log, from their first exchange until up to the time Jane Roe brought her complaint of sexual misconduct against John Doe, they had exchanged hundreds of Snapchat messages, with Jane Roe sending approximately 135 messages to John Doe, and John Doe sending approximately 121 to Jane Roe.

32.     A couple of occasions over  the weekends, Jane Roe sent late night messages to John Doe asking if he would like to hang out with her.   The messages were sent so late at night that John Doe had already gone to bed and did not see them until the next morning.

33.     John Doe visited Jane Roe in her room in O'Hara Hall several times over the course of the Fall 2017 semester.  They did not, at first, engage in any sexual intimacy.  Instead they talked about their college studies.  Jane Doe said that her college studies were less demanding than her high school work and that she had more time on her hands.   She showed John Doe some artwork she had made.  She also showed him photographs of her friends.

34.     At some point, Jane Roe told John Doe that she had accused a male Stonehill student of sexually assaulting her and that he was still a student at Stonehill, although she provided no details about the assault.   John Doe never attempted to independently confirm Jane Roe's assertion and does not know whether she did, in fact, make such an accusation.

**b. Pre-Incident Sexual Intimacy**

10

35.     Eventually, their relationship grew to include sexual intimacy.   John Doe and Jane Roe became sexually intimate for the first time in late October of 2017.

36.     John Doe visited Jane Roe in her room in the O'Hara Dormitory many times.  Although Jane Roe had started the semester with a roommate, her roommate moved out in late September and, as a result, Jane Roe had no roommate.

37.     Their sexual intimacy involved kissing each other with John Doe rubbing and stroking Jane Roe's back, thighs and breasts.

38.     As their intimate relationship progressed, John Doe also used his fingers to stimulate Jane Roe's clitoris.   John Doe did not ask Jane Roe's permission before beginning to stimulate her in this way.   She physically communicated her consent by removing her clothing, allowing him to fondle her and to rub her bare skin, and by making her vagina more accessible to him.   After initiating the digital stimulation, John Doe asked Jane Roe if she wanted him to proceed.   She said that she did.

39.     From John Doe's observation, his digital stimulation of Jane Roe caused her intense physical pleasure.   When Jane Roe reached the point where she no longer wanted John Doe to stimulate her, she would ask him to stop and John Doe would stop.

40.     On the first occasion when they were sexually intimate as alleged above, Jane Roe told John Doe that she wanted him to stop because she had once been sexually assaulted.   She did not provide any details about the assault.   John Doe did stop as requested.

41.     On the second occasion when Jane Roe and John Doe were sexually intimate, they were again in Jane Roe's room in O'Hara Hall. The second encounter involving sexual intimacy occurred when Jane Roe contacted John Doe through Snapchat and asked if he wanted to come to her dormitory room.  After he arrived, they became sexually intimate in the same way and to

the same extent as they had before.   John Doe did ask for her permission to proceed and she gave him the same physical cues as on the first incident and, when she wanted him to stop, she told him to stop, and he did.

42.     As on the first sexual encounter, John Doe believed Jane Roe's physical reaction to his digital stimulation meant that Jane Roe had experienced intense physical pleasure.

43.     On at least one more occasion, John Doe and Jane Roe engaged in sexual intimacy in the same way and to the same extent as in the first two sexual encounters.

44.     For the third sexual encounter, they were once again in Jane Roe's room in O'Hara Dormitory.   Again, John Doe did not ask for Jane Roe's permission, but she presented the same physical cues from prior interactions that she wanted him to proceed to digitally stimulate her. Once again, John Doe gained the impression through Jane Roe's reaction to his digital stimulation of her that Jane Roe had experienced intense physical pleasure.

45.     In addition to the aforementioned instances of sexual intimacy, John Doe and Jane Roe continued to develop their friendship.   Jane Roe continued to voice fear, lack of confidence, and concern about her physical security on campus.   John Doe always encouraged her to believe in herself and supported her emotionally.     Oftentimes, Jane Roe voiced these concerns and apprehensions to John Doe through social media—usually Snapchat—and John Doe usually responded through the same medium.

46.     In these instances of sexual intimacy, John Doe and Jane Roe established a pattern of verbal communication and physical cues by which Jane Roe indicated her consent to digital stimulation and John Doe understood that she had consented.

47.     At no time in their relationship, did Jane Roe ever offer to stimulate John Doe sexually or attempt to do so.   At no time did they engage or attempt to engage in sexual intercourse.

### 2.     November 18-19, 2017 Incident

48.     On the evening of Saturday, November 18, 2017, John Doe was on the Stonehill campus with a friend, a male member of the Class of 2021.   This male student was later interviewed by Stonehill's Title IX investigators and was referred to as Witness No. 1.

49.     Sometime between about 12:00 a.m. and 1:00 a.m. on Sunday, November 19, while in Witness No. 1's company, John Doe received a Snapchat message from Jane Roe saying that she was at the New Hall dormitory, which was located near John Doe's dormitory, Corr Hall, and told him that she was scared to walk back alone from New Hall to her dormitory room at O'Hara Hall.   John Doe asked her if she would like him to walk her back to O'Hara Hall and she said she would.

50.     Within a couple of minutes, John Doe approached New Hall and sent a Snapchat message to Jane Roe asking her whether she was near the entrance.   She did not respond.

51.      When Jane Roe did not respond, John Doe started walking in the direction of O'Hara Hall.   On the way, Jane Roe responded to him by Snapchat explaining that she had been on a telephone call with her ex-boyfriend who was in Europe and had talked with him while she walked back to O'Hara Hall.  John Doe told her that he was already on his way to her room, but she did not respond.

52.     Jane Roe's room was on the second floor of O'Hara Hall.   When John Doe arrived on the second floor, he saw a crowd of students near the door to Jane Roe's room blocking his access to her door.   As the way to Jane Roe's door cleared, John Doe went to her door and knocked.   John Doe later learned that a female student who was also a member of the Class of 2021 was in this group of people.   Jane Roe later told Title IX Investigators that this female

student was a witness and the Title IX Investigators interviewed her, designating her as Witness No. 2.

53.     Jane Roe's door had a peephole.  John Doe placed himself so that she could see him through the peephole and assumed that she checked it and confirmed that it was John Doe before opening her door.  When Jane Roe opened door, she invited John Doe into her room.   She was wearing a t-shirt and pajama shorts.

54.     John Doe asked Jane Roe how she was doing and she said that she was tired and she laid down on her bed.  John Doe laid down beside her with his back to the wall and with Jane Roe on the outside of the bed.

55.      Jane Roe told John Doe that she had been to a party at New Hall and that there was a large crowd at the party.   She became nervous because of the size of the crowd but didn't have any friends who would walk back with her.

56.     During this conversation, John Doe and Jane Roe were face to face and John Doe could smell her breath.  He did not detect any alcohol on her breath nor did she show any signs of having consumed any alcohol.

57.     Jane Roe then told John Doe that she was cold and rose from the bed, removed her t-shirt in front of him—she was wearing a bra—and put on a tank top and a fleece pullover.

58.     Jane Roe then returned to her bed and lay down next to John Doe.   In the same way he had on earlier occasions, he began to rub her back and then moved his hand to her vagina and began to digitally stimulate her.   She began to make moaning noises which, based on their prior sexual interaction, John Doe knew meant that she was experiencing intense pleasure.   When John Doe stopped, Jane Roe rolled onto her back and made her vagina more accessible to him.

14

Based on their prior sexual interaction, John Doe believed that Jane Roe did this deliberately in order to make it easier for him to continue stimulating her.

59.     As John Doe continued to stimulate Jane Roe, she continued to make moaning noises. During this time, John Doe asked Jane Roe if she liked his stimulation of her, but she did not answer; she just continued to make the moaning noises.

60.     Also during this time, John Doe also noticed that the lining of her vaginal chamber had become moist.   John Doe understood that this also indicated that his stimulation of her was causing her intense pleasure.  John Doe continued to stimulate Jane Roe.

61.     After a little while, John Doe asked Jane Roe if she wanted him to stop.  She did not respond.   John Doe thought it was strange that Jane Roe did not respond.   She then turned onto her side with her back to him and began breathing heavily.

62.     John Doe was puzzled by Jane Roe's failure to answer him and by her turning away from him asked her if she was "okay".   She answered him saying, "it's not you.  It's ok."

63.     At this point, Jane Roe rolled over towards John Doe and pinned him against the wall.   It seemed to him that she had gone to sleep.  John Doe did not want to wake her, so he very carefully maneuvered his way around her, got up, and left her room.

64.     John Doe estimated that approximately 30 minutes or more passed from the point where Jane Roe invited him into her room and the time he left Jane Roe's room.

### 3. Morning of November 19—Post Sexual Intimacy Communications

65.     John Doe returned to his dormitory room at Corr Hall about 2:30 a.m.   He believes that at about 5:45 a.m. that same morning—the morning of Sunday, November 19—he received Snapchat messages from Jane Roe which said things like, "what just happened"?; "that wasn't consensual,; and, "that wasn't ok".

15

66.   John Doe was alarmed by Jane Roe's messages because they were completely inconsistent with the sexual intimacy they had engaged in earlier that morning.   In addition, although John Doe did not know whether this was true, Jane Roe had told him that at some point she had accused another male student of some form of sexual misconduct towards her.   He now became concerned that she would accuse him, too.

67.    Jane Roe's messages to John Doe became more accusatory and insistent.   It was clear to John Doe that she was blaming him and was unwilling to accept any responsibility for herself. John Doe believed that she wanted him to accept full responsibility.

68.   John Doe thought Jane Roe was completely wrong.   She had given him all the physical cues she had given on the earlier occasions in which they had been sexually intimate.    It was also clear to him that she had enjoyed his stimulation of her.   He could not explain why now, after the fact, she was asserting that she had not consented to his stimulation of her.

69.   John Doe was also concerned that Jane Roe's unwarranted accusation might indicate that she was emotionally and mentally fragile and that if he refused to accept responsibility, she might have an emotional crisis.

70.   After receiving Jane Roe's increasingly insistent and accusatory messages, John Doe finally sent her two Snapchat messages in which he took complete responsibility for any miscommunication between them.    In one message he wrote: "Please forgive me for being a drunken idiot.  I'd never want to hurt you."   In a second message, he said, "I'm so really sorry I know I fucked up, I totally misread the situation.  What can I do to make it right?"

71.   Neither Snapchat message that John Doe sent to Jane Roe was true.   John Doe had not been drinking on the evening of November 18-19.  He was entirely sober.   John Doe also did not mistake the physical cues Jane Roe sent him that she wanted him to digitally stimulate her.

16

These were the same cues she had manifested in their past sexual encounters.  Moreover, as with past experiences, the moistening of the lining of her vaginal chamber accompanied by her moaning in pleasure told him that she was, in fact, enjoying his stimulation of her.

72.     John Doe knew that Jane Roe lacked self confidence and often felt vulnerable, and believed that for some reason she did not want to accept responsibility for having engaged in sexual activity with him.     He decided that he should send her a message accepting sole responsibility so that she would feel better about herself.

73.     Both Snapchat messages were consistent with John Doe's knowledge that, before he began stimulating Jane Roe, she had consented and wanted him to begin and to continue.   The only responsibility that John Doe told Jane Roe that he accepted was not immediately appreciating and understanding her withdrawal of consent, if in fact she had withdrawn her consent.

### 4.     Jane Roe's Complaint, Issuance of No Contact Order, and Destruction of Content of Snapchat Messages

#### a.     Written Notice to John Doe of No Contact Order

74.     On information and belief, at some point on November 20, 2017, Jane Roe filed a complaint of sexual misconduct against John Doe—specifically, nonconsensual digital penetration of Jane Roe's vagina.   Jane Roe's complaint was received by Lily Krentzman, Title IX Coordinator for Stonehill College.

75.     At no time has Stonehill produced Jane Roe's initial complaint, as filed or otherwise recorded, to John Doe.

76.     On November 20, Michael Labella, Director of Community Standards, wrote to John Doe advising that Labella had received an "incident report dated November 18 (sic), 2017 in which [John Doe] was allegedly involved."

77.     Labella's Letter confirmed an earlier directive that John Doe could have no contact with Jane Roe and Jane Roe could have no contact with John Doe.

78.     Labella's Letter did not describe the incident but, instead, stated that, "[d]ue to the nature of the incident, until a more formal process takes place to address it, I am implementing a no-contact order between you and [Jane Roe]."

79.     Labella's Letter advised John Doe that the No Contact Order was sweeping - "including but not limited to, in person, via email, telephone, through third party and/or any form of social media."

80.     Labella's Letter warned John Doe that, if he failed to abide by the terms of the Order, he would be exposed to "**additional** disciplinary action" (emphasis supplied).  Labella thus implied that Stonehill had already determined that John Doe was to be disciplined, but that if he violated the Order, Stonehill could impose more penalties upon him.

81.     Labella's authority to issue the No Contact Orderand the standards governing the issuance of the No Contact Order that Labella sent were set forth in S1.14 Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence, Obtaining Protection and Supportive Resources, Protective Measures, Including Interim Measures, Exhibit A, ("Sexual Misconduct Policy").

82.     On information and belief, Labella's issuance of the No Contact Order was not based on an assessment of the particular and individualized facts of the case, but, rather, was based solely on the nature of the allegation Jane Roe had made against John Doe.

83.     On information and belief, Labella did not consider whether a less extensive interim measure would serve the purpose of the No Contact Order as issued.

### b. Stonehill's Practice in Issuing No Contact Orders-Destruction of John Doe's Snapchat Messages with Jane Roe

84.     On information and belief, where a complainant accuses a respondent of violating the Sexual Misconduct Policy, Stonehill routinely issues a No Contact Order without consideration for the particular facts or circumstances underlying the complaint.

85.     On information and belief, Stonehill has learned that, in order to comply with No Contact Orders, the accused student will very frequently, if not invariably, block the complainant from the accused student's social media accounts and applications and that, when the accused student does this, the accused student will immediately lose certain types of social media messages including, in particular, Snapchat messages.

86.     On information and belief, at the time Stonehill issued the No Contact Order to John Doe and Jane Roe, it knew that Stonehill students frequently communicated by Snapchat and that it was likely that, at least to some extent, John Doe and Jane Roe had communicated by Snapchat and might have communicated by Snapchat on the subject matter of Jane Roe's complaint. Stonehill knew that, in that event, there would be a high likelihood that those Snapchat messages would be highly probative of the veracity of Jane Roe's accusations against John Doe.

87.      On information and belief, Stonehill also knew that, as the accuser, Jane Roe would have had the opportunity to have already saved any Snapchat messages she deemed important to her accusation.

88.     Although, on information and belief, Stonehill knew and understood all of the foregoing about the consequences for John Doe and Jane Roe's Snapchat messages should John Doe, in

response to and in compliance with the No Contact Order, block Jane Roe on his Snapchat application, Labella's Letter  did not warn John Doe that if he blocked Jane Roe on his Snapchat account without taking steps to preserve any Snapchat messages between them, including messages between them on the evening of November 18-19 and the morning of November 19, those messages would be lost.

89.     The No Contact Order also failed to advise John Doe that John Doe should take steps to preserve his records of his social media and other communications with Jane Roe to ensure that Title IX Investigators whom Stonehill planned to assign to investigate Jane Roe's complaint had access to all relevant information.

90.      When John Doe was advised that Stonehill had issued a No Contact Order barring him and Jane Roe from communicating with one another, he blocked Jane Roe from his Snapchat service.   Later, John Doe realized that, when he blocked Jane Roe, he lost all the Snapchat messages between them, including those of the night of November 18-19 and the morning of November 19.

**5.     Jane Roe Meeting with Title IX Coordinator, Lily Krenztman, Submission of Prepared Statement.**

91.     On information and belief, Jane Roe had informed Krenztman on November 20 that John Doe had engaged in sexual misconduct with her and that sexual misconduct consisted of nonconsensual digital stimulation which involved his penetration of her vagina.

92.     On November 21, 2017, Jane Roe met with Lily Krentzman, Stonehill's Title IX Coordinator.  Krentzman wrote a "Memo to file" ("Memo to File") documenting the meeting.

93.     The Memo to File stated that Jane Roe had come to Krentzman's office at 3:00 p.m. at which point Krentzman "explained the process of a Title IX investigation and asked if she wanted to go through the process and file a formal complaint.".   Jane Roe said that she did.

94.     The Memo to File stated that Jane Roe was "too nervous to speak" and that, because she was too nervous to speak, Jane Roe had already prepared a written statement of her encounter with John Doe which she gave to Krentzman.   In three paragraphs, the Memo to File then  set forth Jane Roe's account of her previous relationship with John Doe and of the incident in her dormitory room in the early morning hours of November 19.

95.     According to the Memo to File, the only information that Jane Roe provided about her pre-incident relationship with John Doe was that "a boy on the football team & I had previously made out sober twice in my room."

96.     As documented in the Memo to File, as to the incident of the evening of November 18-19, Jane Roe asserted the following:

A.      That on the evening of November 18, she was at New Hall on the Stonehill campus and that John Doe had offered to walk her back from New Hall to her dormitory.

B.      That John Doe did not respond to her messages asking him to accompany her so, "I assumed he wasn't coming."   Jane Roe then called her former boyfriend, whose first name she included, and whom she termed "my ex" and "he stayed on the phone with me while I walked over the bridge to O'Hara [Hall]."

C.       That when she got back to her room she was "very drunk".   She changed into her pajamas and was planning to go to bed when she heard a knock at the door.   She opened it and John Doe was there.

D.      That John Doe asked how she was doing and she said, "fine I'm just still drunk." She stated John Doe "let himself further into my room" and that she told him that she was "drunk" and "tired" and did not "want to do anything."

E.      That when John Doe did not "take the hint" so Jane Roe "was like alright I'm going to bed" and she "laid down & closed my eyes hoping he would take THAT hint" but, instead, John Doe laid down beside her. (Underscore and capital letters in original).

F.      That John Doe tried to kiss her but Jane Roe "literally didn't let him.  I said, stop, I'm drunk.  I don't want to do anything with you."   Jane Roe stated that John Doe questioned whether she was, in fact, drunk, and she responded "well I am, and I don't want to do anything."

G.      That John Doe started "rubbing my back and my thigh and I started falling asleep, which is very scary for me because sleep is such a vulnerable state."

H.      That John Doe moved his hand "down my thigh quickly and brushed against my vagina which left me completely shocked, awake, startled, and, taken aback."

I.       That she then "pushed him away" and he "put his hand in my pajama shorts and started rubbing and I said, ' I don't want to…' and then he started fingering me."

J.      That she was "too drunk to fight him off" and added that, "I think he thought that since I was wet I wanted it which made it ok? That I wanted it?  Even though my words directly contradicted it?" (Underscore in original).

K.      That she said "stop, I don't want this, like three or four more times" and that John Doe "kept adding more fingers.  I don't know how many but it hurt."

L.     That she "jumped to some sort of last ditch effort to save myself & started crying & hyperventilating until I 'fell asleep' (I didn't fall asleep, I was so panicked) He finally left."

97.     The Memo to File noted that Jane Roe's account concluded with John Doe's name and that "[t]here was a star drawn beside his name."

98.     At no point does the Memo to File document an assertion from Jane Roe that, before and during the November 19 encounter with John Doe, she was intoxicated to the point of incapacitation within the meaning of the Sexual Misconduct Policy.

99.     After reciting Jane Roe's statement, Krentzman's Memo to File noted that Jane Doe "had to leave for class for a test and told me that she was going to be leaving for home right from the class.   I told her I would be in touch with any questions."

100.     The Memo to File concluded by noting Jane Roe was "aware that a mutual no contact order is in place."

101.     On information and belief, Krentzman asked Jane Roe no questions about her pre-incident relationship with John Doe, her actions in the evening of November 18-19, her interaction with John Doe in the early morning hours of November 19, how she had become intoxicated, her level of intoxication, whether John Doe was intoxicated, or any other questions about the incident, itself.

102.     On information and belief, despite advising Jane Roe that she might follow up with questions, Krentzman never did.

103.     On November 22, 2017 and by letter of even date, Michael Labella, Stonehill's Director and Title IX Deputy /Office of Community Standards, formally notified John Doe that Stonehill was commencing an investigation into a report from Jane Roe that, "on Saturday, November 18

(sic), 2017 in [Jane Roe's] room in O'Hara Hall, between 1:00 am and 2:00 am in [Jane Roe's] room in O'Hara Hall" John Doe violated the Stonehill's S1.14 Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence Policy by engaging in "nonconsensual sexual intercourse" with Jane Roe.

104.    Labella's Letter to John Doe was a form letter which included information specific to the allegations Jane Roe had made against John Doe including the designation of the offense at issue.

105.    In his letter, Labella explained that Jane Roe's complaint alleged that John Doe had engaged in "act(s) of sexual/gender-based misconduct or interpersonal violence."

106.    In his letter, Labella, on behalf of Stonehill, made the following representations to John Doe, all of which are set forth in the Sexual Misconduct Policy:

A.    That Stonehill would use "an investigative model" to evaluate Jane Roe's complaint;

B.    That Stonehill would direct a Title IX investigator or investigators to conduct an investigation of Jane Roe's complaint;

C.    That the Title IX investigators were "specifically trained to handle this type of incident;"

D.    That the Title IX investigators would "interview[] anyone with knowledge of the incident;"

E.    That the investigation that the Title IX investigators would conduct would be "prompt, thorough, and dedicated to impartial fact-finding."

F.    That the Title IX investigators would "offer to meet with you, to discuss the facts gleaned in the matter" and, "if no further evidence is presented," would submit a report to

24

the Associate Vice President for Student Affairs/Dean of Students ("AVPSA/Dean of Students") which would contain "factual findings and a recommendation of responsibility as to the original claim and/or any lesser offense."

G.      That the Title IX investigators would allow "both parties (the Complainant and the Respondent) sufficient time between receipt of the written notice and any initial meeting in order to prepare for meaningful participation in the investigation;"

H.      That after the Title IX investigators submitted their report to the AVPSA/Dean of Students, the AVPSA/Dean of Students would "determine if the facts gleaned from the investigation do indeed align with the findings and recommendation of responsibility offered by the Investigator(s);"

I.      That following this review and analysis of the Title IX investigators' report, the AVPSA/Dean of Students would "then issue a formal decision in the matter, including sanctions;"

J.      That John Doe would be notified when "the investigation is complete" and that John Doe would be "scheduled to meet with the [AVPSA/Dean of Students]."

107.    In his letter, Labella advised that Title IX Investigators, David Bamford and Shayla Jordan, had been assigned to conduct the investigation.

108.    In his letter, Labella advised John Doe that he could avail himself of college counseling resources and provided links to websites with more information on those services, though Labella also cautioned that not all the counseling services were confidential.

109.    In his letter, Labella advised that John Doe should view Labella, himself, "as a resource" and that John Doe could contact him anytime to assist him in what Labella described as a "very

stressful time for you."    In offering himself as a resource, Labella did not say whether he would or could hold any communications with John Doe in confidence.

110.    In his letter, Labella confirmed that Stonehill's No Contact Order with Jane Roe remained in place.

111.    Although Labella's letter included many standards and processes, some of them taken verbatim, in part from Stonehill's Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence Policy (effective June 27, 2017), the letter did not identify them as excerpts from that Policy by placing them in quotation marks, or by providing citations to the sections of that Policy where John Doe could find them.

112.    In his letter, Labella also did not advise John Doe that the Sexual Misconduct Policy characterized his allegedly nonconsensual digital stimulation of Jane Roe—as "nonconsensual sexual intercourse"—a description which connotes forcible sexual intercourse or sexual intercourse with someone who is incapacitated.

113.    Labella also did not inform  John Doe that, based on an unstated, unpublished Stonehill policy, in imposing sanctions for students found "responsible" for having engaged in nonconsensual sexual intercourse, Stonehill would make no distinction between the extent of the sexual interaction, including whether the sexual interaction involved actual sexual intercourse or some other form of sexual contact, whether the sexual interaction was commenced with consent that was later withdrawn, or any other factor bearing on the degree or intensity of the misconduct, but would, subject to his appellate rights, immediately expel John Doe and include the expulsion as a *permanent*  part of his Stonehill Education Record.

114.    Labella also did not inform John Doe that Stonehill's unstated and unpublished policy of expulsion and permanent record notation would be imposed without consideration and irrespective of its impact on John Doe's educational aspirations and opportunities

### C.  TITLE IX OF EDUCATION AMENDMENTS OF 1972 AND DEPARTMENT OF EDUCATION TITLE IX GUIDANCES ACT AND DEPARTMENT OF EDUCATION LETTERS OF GUIDANCE

#### 1.  Title IX of the Education Amendments Act of 1972 and Stonehill's Receipt of Title IX Monies.

115.    In 1972, Congress enacted Title IX of the Education Amendments Act of 1972 which was codified at 20 USC § 1681, *et seq.* ("Title IX").

116.    Title IX provides in pertinent part that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 USC § 1681(a)(1).

117.    Regulations implementing Title IX were issued and set forth at 34 CFR, Part 106.

118.    On information and belief, at the time of the incident between John Doe and Jane Roe on November 18-19, 2017, Stonehill received Title IX funding from the Department of Education and was subject to the requirements of Title IX as well as rules and guidances issued by the Department of Education pursuant thereto.

## 2. 1997-2001 Department of Education/Office of Civil Rights Guidance

119.   In 1997, the Department of Education, Office of Civil Rights ("OCR") issued a notice designated, "Sexual Harassment Guidance:  Harassment of Students by Employees, Other Students, or Third Parties" which was published in the Federal Register at 62 Fed. Reg. 12034-01 ("1997 Title IX Guidance").

120.   The 1997 Guidance was revised and reissued in 2001 and published in the Federal Register at 66 Fed. Reg. 5512-01.   ("2001 Title IX Guidance").

121.   Both the 1997 and 2001 Title IX Guidance set forth the obligations of Title IX recipients to eliminate sex discrimination in educational programs including sexual harassment which "can be a form of sex discrimination."   The Guidance set forth Title IX Regulatory Compliance Responsibilities which described the investigations and adjudications of complaints that Title IX recipients were required to conduct be: "prompt and equitable;" "prompt, thorough, and, impartial;" and "adequate, reliable, and impartial."

122.   The 2001 Guidance set forth a list of prohibited actions which Title IX recipients were required to observe.

123.   The 2001 Guidance also included a detailed description of standards and means by which Title IX recipients could weigh the credibility of the statements made by the complainant and the respondent for the purpose of determining "who is telling the truth."   These standards and means included, but were not limited to, the following:

   A.  Determinations should be based on the "totality of the circumstances."

   B.  To evaluate the credibility of the accuser and the accused, the 2001 Guidance
       provided the following examples:

1. "[T]he consistency and level of detail provided by the accuser and the accused should be compared to determine who was telling the truth."
2. The absence of "corroborative evidence where it should logically exist."
3. Prior findings that the "alleged harasser" has harassed others "may support the credibility" of the accuser.
4. Prior findings that the accuser has "been found to have made false allegations against other individuals" could "weaken[]" the accuser's claims.
5. Evidence that shortly after the incident witnesses said that the accuser "appeared to be upset"; that the accuser reported the incident and told others about the incident shortly after it occurred.

124. In 2006, OCR issued a "Dear Colleague" letter with some revisions to the 2001 DOE Title IX Guidance. ("2006 Dear Colleague Letter"). The 2006 Dear Colleague Letter did not go through the comment and review process and was not published in the Federal Register.

**3. Office of Civil Rights Dear Colleague Letter of April 4, 2011**

125. On April 4, 2011, the OCR issued a "Dear Colleague" letter to Title IX recipients expanding on the DOE Title IX Guidance ("2011 Dear Colleague Letter").

126. The 2011 Dear Colleague Letter was not subject to the public review and comment process, but was issued to Title IX recipients, including Stonehill, in letter form.

127. The 2011 Dear Colleague Letter required Title IX recipients to implement measures to investigate, evaluate, adjudicate, and resolve complaints of "sexual violence." It defined "[s]exual violence" as "physical acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." *Id.* at 1.

128.    The 2011 Dear Colleague Letter also advised Title IX recipients that, unless otherwise noted, the term "sexual harassment" also "includes sexual violence." *Id*. at 1, n.1.

129.    The 2011 Dear Colleague Letter required Title IX recipients to take the following steps:

   A.  Appoint a Title IX Coordinator.  *Id.* at 7.

   B.  Adopt grievance procedures that "afford[ed] the complainant a prompt and equitable resolution." *Id.* at 8.

   C.  Prohibit informal mediation to resolve a complaint where the accuser has alleged sexual assault even where such mediation was entirely voluntary.  *Ibid.*

   D.  Adopt a "preponderance of the evidence" standard for all complaints of sexual harassment or violence.  *Id.* at 11.

   E.  Adopt a prohibition on allowing the "alleged perpetrator" to question the accuser directly.   *Id.* at 12.

   F.  Resolve sexual harassment complaints within 60 days barring extenuating circumstances.  *Ibid.*

130.    The 2011 Dear Colleague Letter stated that Title IX recipients "should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting."  *Id.* at 10.

131.    Based on a single OCR case, the 2011 Dear Colleague Letter advised that "the prosecutor's office informed OCR that the police department's evidence gathering usually takes three to ten calendar days…"  *Id.* at 10. n. 25.

**4.  Department of Education/Office of Civil Rights Questions & Answers, April 29, 2014**

132.   On April 29, 2014, OCR issued "Questions and Answers on Title IX and Sexual Violence" (2014 Q&A").  Acting pursuant to 72 Fed. Reg.  3432, the Office of Management and Budget determined that the 2014 Q&A was a "significant guidance document."

133.   The 2014 Q&A included the following guidance and requirements for Title IX recipients:

    A.  It defined "sexual violence" to include "physical acts perpetrated against a person's will or where the person is incapable of giving consent (e.g. due to the person's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent)." 2014 Q&A at §A-1.

    B.  It confirmed the 60 day time frame set forth in the 2011 Dear Colleague Letter for resolving complaints of sex discrimination including sexual violence as defined in the 2014 Q&A.  *Id*. at §§C-5, F.8.

    C.  It reiterated the 2011 Dear Colleague Letter requirement that Title IX recipients apply a "preponderance of the evidence" standard to complaints of sexual harassment (which, it further advised, included "sexual violence") and made clear that it was mandatory.  *Id.* at § C-5(8), p. 13; F-1, p. 26.

    D.  It provided that Title IX recipients must provide "notice of potential sanctions against perpetrators."  *Id*. at § C-5(10), p. 13.

    E.  It advised that Title IX recipients were not required to provide separate grievance procedures for the investigation, evaluation, and adjudication of sexual harassment complaints as long as the process was "prompt and

31

equitable" and the "preponderance of the evidence" standard was applied. *Id.* at § C-6.

F. It advised that because criminal charges can result in incarceration, but that Title IX sexual harassment charges can never result in incarceration and, therefore, "the alleged perpetrator" of a Title IX violation was entitled to fewer protections than a criminal defendant. *Id.* at § F-2, p. 27.

G. It advised that the Title IX recipients "[m]ust not require the complainant to be present at the hearing as a prerequisite to proceed with the hearing." *Id.* at § F-5.

H. It advised that, "OCR strongly discourages a school from allowing the parties to question or cross examine each other during a hearing on alleged sexual violence." *Id.* at § F-6.

I. It set forth standards and factors for Title IX recipients to consider in imposing "interim measures" on the "complainant and the alleged perpetrator." *Id.* at § G-2.

J. It set forth factors that Title IX recipients should consider in imposing any sanction or remedial action. *Id.* at § H-1.

K. It advised that Title IX recipients were not required to provide appellate processes for decisions on sexual harassment complaints but, where a Title IX recipient provided for such a process, it recommended that appellate bases include 1) procedural error; 2) previously unavailable evidence that "could significantly impact the outcome of a case;" and 3) "where a sanction is substantially disproportionate to the findings." *Id.* at § I-1.

32

### D. STONEHILL POLICIES S1.14—OPPOSITION TO SEXUAL AND GENDER-BASED MISCONDUCT AND INTERPERSONAL VIOLENCE AND S1.3—COMMUNITY STANDARDS AND STUDENT CONDUCT PROCESS IN GENERAL

134.    Stonehill's Sexual Misconduct Policy sets forth the standards and processes for investigating, evaluating, adjudicating, and resolving complaints within its jurisdiction that are separate and distinct from the standards and processes Stonehill has established under its policy designated    "S1.3—Community Standards and Student Conduct Process" ("Community Standards Policy").   (Exhibit B).

135.    In addition to setting forth standards of conduct, both policies establish investigative, evaluative, adjudicatory processes for accepting, reviewing, deciding, and, sanctioning prohibited conduct.

### E. STONEHILL'S DEVELOPMENT AND ADOPTION OF ITS POLICY S1.14—OPPOSITION TO SEXUAL AND GENDER-BASED MISCONDUCT AND INTERPERSONAL VIOLENCE.

136.    Since before the issuance of the 2011 Dear Colleague Letter, Stonehill was and at the present time remains, a recipient of Title IX funding from the Department of Education.

137.    On information and belief, before the issuance of the 2011 Dear Colleague Letter, Stonehill investigated, evaluated, adjudicated, and resolved complaints of sexual misconduct between students under the Community Standards Policy or similar policy in which the accused student had the opportunity to present a defense to a panel in a hearing and have questions posed to the accuser.

138.    On information and belief, sometime after OCR issued the 2011 Dear Colleague Letter, Stonehill separated the investigation, evaluation, adjudication, and resolution of sexual

33

misconduct claims involving students from the Community Standards Policy, or similar policy, and adopted the Sexual Misconduct Policy or similar predecessor thereto.

139.    Both policies were fundamentally based on an accusatory as opposed to inquisitorial system of investigation, evaluation, and adjudication, which included the following components of an accusatory system:

      A.   That the process must be initiated by a complaint;

      B.   That the accused had a right to review the complaint; and

      C.   That Stonehill had to prove the student "responsible" for the conduct charged in the complaint by a preponderance of the evidence.

140.    Aside from these common features, Stonehill's  Sexual Misconduct Policy differed materially from Stonehill's Community Standards Policy in that the former relied on investigators to investigate the charge, determine the scope of the investigation, interview witnesses, obtain documentary evidence, evaluate and interpret the evidence gathered and recommend findings of fact and policy standards, including recommendations as to "responsibility" to the Associate Vice President for Student Affairs/Dean of Students.   The decision as to responsibility and sanction was assigned to the AVPSA/Dean of Students.

141.    By contrast, the Student Community Standards Policy did not employ investigators but, rather, used a hearing panel process in which the accuser and the accused were entitled to present evidence, including witnesses, to a panel which, received and reviewed evidence, questioned witnesses (including allowing questioning by the accuser and the accused through the panel chair), and adjudicate the issue of responsibility.

142.    Upon a finding of responsibility, the determination of the appropriate sanction was assigned to the AVPSA/Dean of Students.

143.    The 2011 Dear Colleague Letter did not require Stonehill to separate the investigation, evaluation, adjudication, and resolution of sexual misconduct claims from the standards and processes it applied to non-sexual misconduct claims.   However, on information and belief, Stonehill chose to separate them in order to secure greater institutional control over sexual misconduct claims and to minimize the risk of OCR investigations or adverse publicity, or both, over of its handling of sexual misconduct claims.

144.    The Sexual Misconduct Policy included a table that illustrated the process Stonehill follows upon receipt of a complaint of sexual misconduct ("Sexual Misconduct Complaint Table"). Exhibit A, <u>Table.</u>  The Sexual Misconduct Complaint Table set forth the following steps in graphic form:

> A.  The Complaint may be reported to various persons and entities including the campus police, the Title IX Coordinator, the Town of Easton Police, Residence Life, or through an Online Incident Report Form;
>
> B.  The Complaint separated the process where no criminal investigation has been reported from one where a criminal investigation has been reported;
>
> C.  "Trained Title IX Investigator(s)" would interview "the complainant(s), respondent(s), and witnesses;"
>
> D.  "Upon completion of the investigation, the Investigator(s) will offer to meet with the complainant and the respondent separately to discuss (post fact-finding but before a recommendation has been made with regard to responsibility) the facts gleaned in the matter and to offer the final opportunity to the parties to ensure that both have been afforded the opportunity to present all relevant witnesses and evidence before the finding is reached;"

    E.   Outcome meeting w/Dean of Students; and

    F.   Potential appeal w/Vice President for Student Affairs."

145.    The Sexual Misconduct Policy in effect as of June 27, 2017 gave Stonehill maximum control over its investigation, evaluation, adjudication, and resolution of sexual misconduct claims.

### F.    STONEHILL POLICY S1.14—OPPOSITION TO SEXUAL AND GENDER-BASED MISCONDUCT AND INTERPERSONAL VIOLENCE

146.    On information and belief, in response to the 2011 Dear Colleague Letter, Stonehill separated its investigation, evaluation, adjudication, and resolution of claims of sexual misconduct and issued the investigator-based Sexual Misconduct Policy**.**

### 1.    Statement of Intent of Sexual Misconduct Policy.

147.    Stonehill's Sexual Misconduct Policy sets forth a "Statement of Intent" which, *inter alia*, includes "an environment free from sexual and gender-based harassment, sexual assault, interpersonal violence, dating violence, stalking, sexual exploitation, complicity and retaliation." ExhibitA, <u>Statement of Intent</u>.

148.    The Statement of Intent states that Stonehill will "take prompt and equitable action" to "eliminate [misconduct prohibited by the Sexual Misconduct Policy], prevent its recurrence, and remedy its effects."  *Ibid.*

149.    The Statement of Intent states that "[s]tudents found responsible for violating this Policy will face sanctions up to and including dismissal from the College."  *Ibid.*

150.    The Statement of Intent states that Stonehill "designed this Policy to be in compliance with Title IX of the Higher Education Act of 1972 ('Title IX')" as well as the Clery Act and the 2013 Reauthorization of the Violence Against Women Act.  *Ibid.*

151.    The Statement of Intent states that, "[s]exual/gender-based misconduct or interpersonal violence, as defined in this document, constitutes forms of sex discrimination prohibited by Title IX, a federal civil rights law." *Ibid.*

152.    The Statement of Intent states that Stonehill will "disseminat[e] clear procedures for responding to sexual/gender-based misconduct or interpersonal violence reported or reasonably known to the College." *Ibid.*

153.    The Statement of Intent states that Stonehill "deliver[] primary prevention and awareness programs and ongoing training and education campaigns" relating to various aspects of sexual and gender-based misconduct. *Ibid.*

154.    The Statement of Intent states that Stonehill will "engag[e] in an impartial, prompt, fair, and equitable investigative process to resolve reports of sexual/gender-based misconduct or interpersonal violence." *Ibid.*

155.    The Statement of Intent states that Stonehill will provide "a written explanation of the rights and options available to every student or employee that has been the victim of violations of this Policy, regardless of when or where the conduct occurred." *Ibid.*

156.    In addition, the Statement of Intent states that the Sexual Misconduct Policy "[p]rovides information on how reports [of violations of the Policy] are assessed, investigated, and resolved." *Ibid.*

**2.    Primacy of the Sexual Misconduct Policy Jurisdiction**

157.    Title IX Deputy, Michael Labella, determined that Jane Roe's complaint came within Stonehill's Sexual Misconduct Policy, set forth at S1.14 of Stonehill's rule of conduct.

158.    The Sexual Misconduct Policy provides that it has primacy over the Student Conduct Policy.    The Gender-Based Misconduct Policy states that, where a complaint includes an

allegation of misconduct or interpersonal violence that is "not sexual/gender-based misconduct in nature but is related to sexual gender-based misconduct or interpersonal violence," complaints of such conduct "will be investigated and decided under this Policy." Exhibit A, Jurisdiction. The Sexual Misconduct Policy also has primacy over reports of harassment and discrimination. *Id.* at Notice of Non-Discrimination & Notice of Coordination with Opposition to Sexual Harassment and Other Forms of Discrimination Policy Section of the Gender-Based Misconduct Policy.

**3.    Standards for Conduct Violative of Gender-Based Misconduct Policy.**

159.    The "Examples and Definitions" Section of the Sexual Misconduct Policy includes descriptions of conduct including Gender-Based Harassment, Dating Violence, Domestic Violence, Stalking, and Sexual Misconduct.    *Id.* at Examples and Definitions.

160.    Among the definitions set forth in the Sexual Misconduct Policy are the following:

  A.  The term "Sexual Misconduct" is a comprehensive term covering "Non-Consensual Sexual Intercourse;" "Non-Consensual Sexual Contact;" "Sexual Exploitation," and "Sexual Harassment." *Ibid.*

  B.  Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact are defined as follows:

   1.  The term "Non-Consensual Sexual Intercourse" is "the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." *Ibid.*

   2.  The term "Non-Consensual Sexual Contact" is defined as "includ[ing]  but is not limited to, the touching of the private parts of another person, without the

38

consent of the victim, including instances where the victim is incapable of giving consent because of their (sic) age or because of their (sic) temporary or permanent incapacity." *Ibid.*

161. The Sexual Misconduct Policy also includes a description of the word "consent" which is both a definition and a standard of conduct, and which states in part that "[c]onsent means informed, freely and voluntarily given agreement, communicated by clearly understandable words or actions, to participate in each form of sexual activity." *Ibid.* The Sexual Misconduct Policy provides that consent is "mutually understandable when a reasonable person would consider the words or actions of the parties to have demonstrated agreement between them to participate in the sexual activity." *Ibid.* The Sexual Misconduct Policy also states that, "consent to sexual activity can be withdrawn at any time at which point all sexual activity for which consent has been given must cease." *Ibid.*

162. The Sexual Misconduct Policy includes an "Additional Clarification Regarding Sexual Misconduct" which sets forth Stonehill's guidance on consensual sexual interaction and includes a list of "[e]xamples of behavior that demonstrate lack of consent and may constitute assault." *Ibid.*

163. The Sexual Misconduct Policy includes a description and definition of "Incapacitation" which, in part, means "a state beyond drunkenness or intoxication" and is "a state in which an individual is unable to give consent because they (sic) lack the ability for self-care, i.e., the person lacks the capacity to understand the 'who, what, when, why or how' of the sexual interaction." *Ibid.*

164. The Sexual Misconduct Policy also includes a section entitled "Related Massachusetts Legal Definitions" which notes that instances of sexual misconduct and interpersonal violence

are "governed in accordance with this Policy" and adds that students who believe they have been the victim of a crime "may choose to pursue a criminal investigation through local law enforcement in addition to the adjudication of the case by the College."   *Id.* at <u>Related Massachusetts Definitions</u>.

165.   To assist students who may be considering making a report to law enforcement, the Sexual Misconduct Policy lists definitions of offenses, including criminal offenses, as defined by the laws of the Commonwealth of Massachusetts.   These definitions include Domestic Violence, Dating Violence, Sexual Assault, which is further defined as "Rape"; Consent, and, Stalking.  *Ibid.*

166.   Under the heading "Sexual Assault" the Sexual Misconduct Conduct Policy states that the Commonwealth of Massachusetts "defines rape as (1) the penetration of any orifice by any body part or object (2) by force and (3) without consent.   Rape also includes instances where the victim is incapacitated ("wholly insensible so as to be incapable of consenting") and the perpetrator is aware of the incapacitation."   *Ibid.*

167.   In setting forth this definition of "rape" under the laws of the Commonwealth of Massachusetts, the Sexual Misconduct Policy broadened and misstated the scope of conduct constituting "rape" under those laws.   *Cf., Ibid.*, [Mass. .G.L 265 § 22. *See Commonwealth v. Enimpah*, 966 N.E. 2d 840, 842 (Mass. App. Ct. 2012).

168.   The Sexual Misconduct Policy includes a provision entitled "Amnesty" which explains persons may be reluctant to report "sexual/gender-based misconduct or interpersonal violence" out of concern that "they, themselves, or witnesses to the misconduct may be charged with violations of the alcohol and other drug policy."   Exhibit A at <u>Statement of Rights of those Involved in Incidents of Sexual/Gender-Based Misconduct or Interpersonal Violence, Amnesty</u>.

The Amnesty provision states that, "[w]hile these behaviors are not condoned by the College, the need to address instances of sexual/gender-based misconduct or interpersonal violence will take precedent (sic).  Accordingly, the College will not pursue disciplinary actions against a student who reports, in good faith, to be the victim of, or witness to, sexual/gender-based misconduct or interpersonal violence." *Ibid.* By contrast, there is no such amnesty provision in the Student Conduct Policy.

### 4.   Investigative, Evaluative, and Adjudicatory Process under Sexual Misconduct Policy

#### a.   Role of Title IX Coordinator

169.   Stonehill's Sexual Misconduct Policy sets forth a statement under the Role of Title IX Coordinator Deputies & Investigators section of the Policy ("Role of Title IX Coordinator Section") which includes*, inter alia*, the statement that Stonehill's Title IX Coordinator…is responsible for the oversight of this Policy and any procedures related to it."   It provides further that "[t]he Title IX Coordinator is responsible for overseeing and resolving all Title IX reports and identifying and addressing any patterns or systemic concerns that arise during the review of such reports." *Id*., Role of Title IX Coordinator, Deputies & Investigators.

170.   The Community Standards Policy defines "Title IX Coordinator" as "[t]he individual responsible for monitoring the overall implementation of Title IX for the College and conducting compliance with Title IX in all areas covered by the implementing regulations."   Exhibit A, Glossary of Terms at § 29.

171.   The Role of Title IX Coordinator Section also provides that the Title IX Coordinator is responsible for overseeing "prompt, fair, equitable investigations and resolution of reports of

violations of this Policy at the College." Exhibit A, <u>Role of Title IX Coordinator, Deputies & Investigators</u>.

172.    The Community Standards Policy defines "Title IX Investigator" as "[t]he individual who conducts investigations pursuant to Policy S1.14, prepares reports on Title IX compliance activities, and issues findings of fact to the appropriate decision makers."   ExhibitA, <u>Glossary of Terms</u>, § 30.

173.    The Role of Title IX Coordinator Section provides that, "Title IX investigators will conduct thorough and impartial investigations into the facts of a case, including interviewing the complainant, the respondent, or others who may have relevant information and collecting any other evidence deemed relevant to the case." Exhibit A, <u>Role of Title IX Coordinator, Deputies & Investigators</u>.

### b.    Reporting Sexual Misconduct Policy Violations

174.    The Sexual Misconduct Policy provides that the Title IX Coordinator or Deputy will assess a complaint to determine whether it comes within the Gender-Based Misconduct Policy and, if so, will assign the complaint for investigation to a Title IX Investigator.   *Id.*, <u>Reporting Sexual/Gender-Based Misconduct or Interpersonal Violence</u>, <u>Report to the College</u>.

175.    The Sexual Misconduct Policy states that "every staff member and investigator involved in the intake or resolution of complaints will be annually trained on how to conduct an investigation and hearing process that protects the safety of individuals and promotes individual accountability."  *Id*. at <u>Reporting Sexual/Gender-Based Misconduct or Interpersonal Violence</u>, n. 2.

176.    The Sexual Misconduct Policy acknowledges that a complaint involving conduct covered by the Policy could also be the subject of a criminal investigation.   In that event, the Gender-

Based Misconduct Policy recognizes a right in the complainant to "request that the Campus Police attend [the Title IX Investigators'] interviews.   *Id.* at <u>Reporting Sexual/Gender-Based Misconduct or Interpersonal Violence</u>, <u>Report to College</u>.

177.    The Sexual Misconduct Policy states that, "the College will not wait for the outcome of any criminal investigation, but can delay the administrative investigation for up to 10 days to allow law enforcement to conduct initial fact finding.   In the event further delay is required, the parties will be notified as appropriate after ten days."   *Ibid.*

   **c.   Standards, Processes, and Rights under Sexual Misconduct Policy**

      **i.      Imposition of Interim Measures**

178.    The Sexual Misconduct Policy authorizes the Title IX Coordinator and the Deputy Title IX Coordinator to impose "interim measures."      *Id.* at <u>Obtaining Protection and Supportive Resources;</u> see also, *Id.* at <u>The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.</u>   The Title IX Investigators may recommend "interim measures" to the Title IX Coordinator or the Deputy Title IX Coordinator.   *Ibid.*

179.    The Sexual Misconduct Policy provides "interim measures" may be "both remedial (designed to address a complainant's safety and well-being and continued access to educational opportunities) or (sic) protective (involving action against a respondent)."   *Id*. at <u>Obtaining Protection and Supportive Resources</u>.

180.    The Sexual Misconduct Policy provides that "interim measures" must be "designed to eliminate the sexual/gender-based misconduct and interpersonal violence, prevent its recurrence, and remedy its effects." *Ibid.*

181.    Lists of possible "interim measures" appear at two different points in the Sexual Misconduct Policy.   Notably, the lists are not identical.      *Id*. at <u>Obtaining Protection and</u>

43

Supportive Resources; see also, *Id.* at The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

182.    As set forth above, the Sexual Misconduct Policy requires the Title IX Coordinator or Deputy Title IX Coordinator to make preliminary determinations as to the merits of the complaint and to impose preliminary "remedial measures" on the complainant, the respondent or both.

183.    The Sexual Misconduct Policy recognizes that it may not be possible to keep the "interim measures" that may be imposed confidential but that Stonehill will attempt to maintain confidentiality "to the extent practicable."   *Id.* at The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

184.    Aside from the foregoing standard, the provisions of the Sexual Misconduct Policy that address "interim measures" do not require the consideration of the impact of the interim measures on the accused student.   *Id.* at Obtaining Protection and Supportive Resources; see also, *Id.* at The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

### C.  Conduct of Investigation—Title IX Investigators

185.    The Sexual Misconduct Policy states that investigation of complaints will be "prompt, thorough, and dedicated to impartial fact finding."   *Id.* at The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

186.    The Sexual Misconduct Policy  provides that "[f]ormal rules of process, procedure or rules of evidence, such as those applied in criminal or civil courts, are not used in Title IX investigations, however, the College does utilize a preponderance of the evidence standard when conducting investigations" and provides further that, "[t]he preponderance of the evidence

standard is based in civil law and requires the investigator to determine whether the evidence shows that it is more likely than not that the alleged incident occurred." *Ibid.*

187. The Sexual Misconduct Policy includes a process for "informal resolution" but provides that "complaints alleging sexual misconduct including sexual assault and nonconsensual sexual touching and other forms of physical violence, are not appropriate for informal resolution and must proceed directly to a formal investigation." *Ibid.*

188. The Sexual Misconduct Policy requires that reports of violations of the Gender-Based Misconduct Policy "will be referred to one or more of the College's Title IX Investigators, who will investigate the allegation." *Ibid.*

189. The Sexual Misconduct Policy states that Title IX Investigators are also authorized to recommend to the Title IX Coordinator or Deputy the imposition of "interim restrictions" including "no contact orders." *Ibid.*

190. The Sexual Misconduct Policy states that "[c]omplainants and respondents are permitted to submit to the Title IX Investigator potential witness names and questions to be asked during the investigative process" and provides further that, "the Investigator will assess the appropriateness and relevance of the questions and the witness names submitted." *Ibid.*

191. The Statement of Rights provides further that the Complainant and Respondent are "allowed to submit potential witness names for consideration and be informed of all witnesses being interviewed [and are] allowed to submit questions to the investigators to ask during the investigation." *Ibid.*

192. The Sexual Misconduct Policy provides that the Complainant and the Respondent have the right to "[b]e allowed to submit potential witnesses' names for consideration and be informed

of all witnesses being interviewed." *Id.*, <u>Statement of Rights for those Involved in Incidents of Sexual/Gender-Based Misconduct or Interpersonal Violence</u>.

193.    The Sexual Misconduct Policy provides further that the Complainant and the Respondent have the right to "[b]e accompanied by an advisor of choice to any meeting or disciplinary proceeding in which the complainant or respondent is required to be present" and provides further that "[a]n advisor may not directly address the Title IX Investigators or otherwise participate in the investigation." *Ibid.*

194.    The Sexual Misconduct Policy states that, "[u]pon completion of the investigation, the Investigator will offer to meet with the complainant and the respondent separately to discuss (post fact finding but before a recommendation had been made with regard to responsibility) the facts gleaned in the matter and to offer a final opportunity to the parties to ensure that both have been afforded the opportunity to present all relevant witnesses and evidence before the finding is reached." *Id*. at <u>The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence</u>.

195.    The Sexual Misconduct Policy states further that after the "facts that will be used to reach the outcome are shared with the parties, the final report will be submitted to the Associate Vice President for Student Affairs/Dean of Students." *Ibid.*

196.    The Sexual Misconduct Policy states further that the report submitted by the Title IX Investigator "will contain factual findings and a recommendation of responsibility as to the original claim and/or any lesser offense." *Ibid.*

197.    The investigation phase under the Sexual Misconduct Policy is limited to the Title IX Investigators' investigation of the complaint, including the acquisition of evidence relevant to the

complaint, the evaluation of the evidence acquired, and the preparation of a report analyzing the evidence, followed by a recommendation of responsibility to the AVPSA/Dean of Students.

198.    The Sexual Misconduct Policy limits the Title IX Investigators to the investigation, itself. The Title IX Investigators have no authority to obtain information on the academic standing of the parties, their educational aspirations, the financial obligations they may have incurred to attend Stonehill, the implications of a given sanction on their ability to continue their education, their involvement in community activities or extracurricular activities, or any other such matters. The Sexual Misconduct Policy makes it clear that obtaining such information is the responsibility of the AVPSA/Dean of Students because only the AVPSA/Dean of Students has the authority to devise and impose sanctions.

### D.  Adjudication and Sanction—AVPSA/Dean of Students

199.    The Sexual Misconduct Policy states that, after receiving the report from the Title IX Investigator,  the Associate Vice President for Student Affairs/Dean of Students "will determine if the facts gleaned in the investigation do indeed align with the findings offered by the Investigator and will then issue a formal decision in the matter, including sanctions." *Ibid.*  The Sexual Misconduct Policy terms the AVPSA/Dean of Student's decision as the "initial outcome".

200.    The Sexual Misconduct Policy states that the Complainant and the Respondent will be notified of the initial outcome and that, "[t]he notice of outcome will include the outcome, [and] the reason for the outcome" *Ibid.*

201.    The Sexual Misconduct Policy provides that the AVPSA/Dean of Students is also empowered to impose sanctions on the student whom the AVPSA/Dean of Students has found "responsible."

202.    The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence Section of the Sexual Misconduct Policy does not identify or otherwise list the factors that the AVPSA/Dean of Students must consider or the standards the AVPSA/Dean of Students must apply in determining the sanction to be imposed in a particular case.

203.    In particular, the Sexual Misconduct Policy does not require the AVPSA/Dean of Students to apply Title IX standards to assist in determining an appropriate sanction.    The Sexual Misconduct Policy also does not require the AVPSA/Dean of Students to consider the impact of separating the responsible party from his or her education.

204.    In particular, nowhere does the Sexual Misconduct Policy state that any student found responsible for having engaged in any form of conduct coming within the broad definition of "nonconsensual sexual intercourse" must be expelled with the consequence that this finding will become a permanent part of Stonehill's Education Record on that student.

### E.    Appellate Standards and Processes—Vice President for Student Affairs

205.    The Sexual Misconduct Policy provides that either a respondent or a complainant may appeal "a decision resulting from a Title IX investigation no later than four business days after receiving the decision in writing."    The appeal must be made to the Vice President for Student Affairs.    *Id.* at Appeals.

206.    The Sexual Misconduct Policy lists the following grounds for an appeal:

> A.  "Failure to follow the process or procedures outlined in this Policy, which resulted in significant prejudice such that it impacted the outcome.    Minor deviations from the designated procedures will not be the basis for sustaining an appeal unless significant prejudice results."

48

B. New Information that was not known to the parties at the time of the investigation."   *Ibid.*

### F.   COMPLAINTS AGAINST STONEHILL'S HANDLING OF TITLE IX SEXUAL HARASSMENT COMPLAINTS WERE FILED WITH THE DEPARTMENT OF EDUCATION/OFFICE OF CIVIL RIGHTS

207.    On or about March 2016, several complaints were pending in the Office of Civil Rights ("OCR") with the Department of Education ("DOE") against Stonehill.

208.    At the time of the incident alleged against John Doe by Jane Roe, Stonehill was under scrutiny of the OCR relating to their handling of sexual misconduct allegations on campus.

209.    Upon information and belief, Stonehill felt pressure to expedite the investigation and find a male student responsible for sexual misconduct due to the pressure and scrutiny of the other pending OCR investigations, and the #METOO movement, which occurred approximately one month before Jane Roe's complaint against John Doe.

### G.   DEPARTMENT OF EDUCATION ISSUANCE OF QUESTIONS & ANSWERS ON CAMPUS SEXUAL MISCONDUCT AND WITHDRAWAL OF 2011 Dear Colleague Letter AND 2014 Q&A.

210.    On September 22, 2017, OCR issued a Dear Colleague Letter ("2017 Dear Colleague Letter") which withdrew the 2011 Dear Colleague Letter and the 2014 Q&A and also issued a Question & Answer on Campus Sexual Misconduct.

211.    OCR also noted that, "[l]egal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for placing 'improper measures upon universities to adopt procedures that do not afford fundamental fairness.'"   2017 DCL at 1, see also, *Ibid.* at n. 1.   It noted further that, "[a]s a result, many schools have established procedures that do not afford fundamental fairness."   *Ibid.* see also *Ibid.* at n. 2.

212.    OCR noted that the 2011 Dear Colleague Letter and the 2014 Q&A had imposed significant regulatory burdens on Title IX recipients "without affording notice and the opportunity for public comment."   2017 Dear Colleague Letter at 2.

213.    OCR advised that OCR had withdrawn the 2011 Dear Colleague Letter and the 2014 Q&A and that DOE "will not rely on those withdrawn documents in its enforcement of Title IX." *Ibid.*

214.    In conjunction with the 2017 Dear Colleague Letter, OCR also issued Questions & Answers on Campus Sexual Misconduct ("2017 Q&A").  OCR determined that the 2017 Q&A was a "significant guidance document" under 72 Fed. Reg. 3432 (Jan. 25, 2007).    See 2017 Q&A at 7.

215.    The 2017 Q&A noted that "[l]egal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for placing 'improper pressure upon Universities to adopt procedures that do not afford fundamental fairness.'"  *Id*. at 1, citing, Open Letter from Members of the Penn Law School Faculty, Sexual Assault Complaints:  Protecting Complainants and the Accused Students at Universities."  *Id.* at 1, n.1.

216.    The 2017 Q&A noted that, "as a result [of compliance with the 2011 Dear Colleague Letter and 2014 Q&A], many schools have adopted procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and, are in no way required by Title IX law or regulation.'"   *Id*. at 1, citing, statement of 28 members of the Harvard Law School faculty; citing also, the ABA Criminal Justice Section Task Force on Due Process Rights and Victim Protections, Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct (2017), the

American College of Trial Lawyers, Task Force on Response of Universities and Colleges to Allegations of Sexual Violence, White Paper on Campus Sexual Assault (2017). *Id*. at n. 2.

217.    The 2017 Q&A found that the 2011 Dear Colleague Letter and the 2014 Q&A had "led to the deprivation of rights for many students—both students denied fair process and victims denied an adequate resolution of their complaints." *Id*. at 1-2.

218.    The 2017 Q&A advised Title IX recipients that "[w]hen a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided." *Id.* at 5, n. 19.

219.    Where Title IX recipients were considering the issuance of "interim measures" pending the investigation, evaluation, adjudication, and resolution of a sexual harassment complaint, the

220.    Q&A required that the interim measures be "individualized and appropriate [and] based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving a student of his or her education." *Id.* at 3.

221.    The 2017 Q&A advised that there was "no fixed time frame under which a school must complete a Title IX investigation." *Id.* at 3.

222.    The 2017 Q&A provided that, "[i]n every investigation conducted under the school's grievance procedure, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial,  determination as to whether sexual misconduct occurred and, if so, whether a hostile environment has been created that must be redressed." *Id.* at 4.

223.    The 2017 Q&A required that the investigation result in the production of a "written report summarizing the relevant exculpatory and inculpatory evidence" and required that "[t]he reporting and responding parties and appropriate officials…have timely and equal access to any

information that will be used during informal and formal disciplinary meeting and hearings." *Id.* at 4.

224.    The 2017 Q&A provided  that "[t]he investigators or separate decision-makers, with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of misconduct, a decision should be reached separately as to each allegation of misconduct."  *Id.* at 5.

225.    The 2017 Q&A required that "[t]he decision-makers must offer each party the same meaningful access to any information that will be used during the formal or informal disciplinary meetings and hearings, including the investigation report." *Id.* at 5.

226.    The 2017 Q&A required Title IX recipients to "prevent institutional interests from interfering with the impartiality of the adjudication." *Id.* at 5.

227.     When Title IX recipients impose sanctions on the responsible party, the 2017 Q&A provided that, "[d]isciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of conduct while considering the impact of separating a student from his or her education." *Id.* at 6.

228.    The 2017 Q&A required that, "[a]ny disciplinary decision must be made as a proportionate response to the violation."  *Ibid.*, citing 34 CFR § 106.8(b), 2001 Guidance, at (VII)(A).

229.    The 2017 Q&A reconfirmed that, "[i]n its annual security report, a postsecondary institution must list all possible sanctions that the institution may impose following the results of an institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking." *Ibid*, citing, 34 C.F.R. § 668.46(k)(1)(iii).

230.   The 2017 Q&A required that Title IX recipients provide "written notice of the outcome of disciplinary proceedings to the reporting and responding party concurrently."   It provided further that the "notification must include any initial, interim, or final decision by institution; any sanctions imposed by the institution; and rationale for the result and the sanctions." *Ibid.*

231.   On information and belief, Stonehill was aware of and had reviewed the 2017 Q&A before issuing its revision of the Sexual Misconduct Policy on December 5, 2017.  Even so, Stonehill largely ignored the 2017 Q & A.

## H.   STONEHILL'S TITLE IX INVESTIGATION OF JANE ROE'S ACCUSATION AGAINST JOHN DOE

232.   By e-mail dated November 27, Shayla Jordan, Title IX Investigator, advised John Doe that she and David Bamford, also a Title IX Investigator, had been appointed to investigate Jane Roe's complaint.

### 1.   Title IX Investigators' Interview of Jane Roe

233.   On information and belief, on November 29, 2017, the Title IX Investigators interviewed Jane Roe.

234.   The Title IX Investigators did not provide John Doe with prior notice that they had scheduled an interview with Jane Roe.

235.   The Title IX Investigators did not provide John Doe with the opportunity to submit questions that the Title IX Investigators would pose to Jane Roe.

236.   At the time the Title IX Investigators interviewed Jane Roe, they had not yet provided John Doe with a copy of the charge that Jane Roe had brought against John Doe or any summary of the charge, including the Krentzman Memo to File of November 21, 2017.

237.    The Title IX Investigators later summarized their interview with Jane Roe in the Parts 1 and 2 of the Final Report that they prepared for the AVPSA/Dean of Students.    Based on that summary, on information and belief, at their meeting on November 29, 2017, the Title IX Investigators advised Jane Roe of the following:

        A. that they had a copy of the written statement of the incident that Jane Roe had provided to Krentzman;

        B. that they had determined that Jane Roe's allegation against John Doe came within the Sexual Misconduct Policy; and

        C. that John Doe would be allowed to see a copy of Jane Roe's written statement.

238.    Also based on Parts 1 and 2 of the Final Report and on information and belief, Jordan asked Jane Roe to tell her and Bamford "about the incident that led to the complaint against [John Doe]."    On information and belief, Jane Roe responded to Jordan's question by saying that "her written statement contained her account of the incident and that she preferred not to re-tell the details of the incident."

239.    Also based on Parts 1 and 2 of the Final Report and on information and belief, Jane Roe made the following oral statements to the Title IX Investigators about her pre-incident social and sexual experience with John Doe:

        A.    That, although she had known John Doe before the incident, they were only "surface level friends" and that "she would say 'hello' if they saw each other on the campus."

        B.    That she had "made out" with John Doe on "two occasions" in her dormitory room and that those occasions had occurred in late September or early October;

240.     Based on Parts 1 and 2 of the Final Report and on information and belief, Jane Roe made the following oral statements to the Title IX Investigators  about the night of the incident:

    A.   That she had been at New Hall earlier in the evening;

    B.   That before she returned to her room at O'Hara Hall, she had been drinking alcoholic beverages and that, by the time she returned to her room, she was drunk and that she placed herself as a "six" on an intoxication scale of one to ten;

    C.   That either in her first interview by the Title IX Investigators on November 29, 2017 or in her second interview on December 28, 2017, Jane Roe asserted that before and during her November 19 encounter with John Doe, she was intoxicated to the point of incapacitation within the meaning of the Sexual Misconduct Policy and, therefore, irrespective of her actions that evening, could not have consented to any kind of sexual relations with John Doe;

    D.   That she had returned to her room at O'Hara Hall at about 1:15 a.m.;

    E.   That "she confirmed" that John Doe knocked on the door of her dormitory room; and

    F.   That, based on John Doe's messages to her, she believed that he, too, had been drinking alcoholic beverages and that, on the same ten point scale of intoxication, she believed that he was a "one" or a "two" but that she did not observe anything in his behavior to indicate that John Doe had been drinking.

241.     Based on Parts 1 and 2 of the Final Report and on information and belief, Jane Roe made the following oral statements about her sexual encounter with John Doe:

    A.   That she began to "cry, hyperventilate, and pretend to 'fall asleep'" and that after she took these actions, John Doe "left quickly."

242.   Based on Parts 1 and 2 of the Final Report and, on information and belief, Jane Roe made the following oral statements about the messages she and John Doe exchanged later in the morning of November 19:

    A.   That she and John Doe communicated by Snapchat;

    B.   That she "was able to save two of the messages;"

    C.   That the remainder of the messages "disappeared" when John Doe blocked her and that she believed that John Doe blocked her in response to the "campus 'no contact order;"

    D.   That she provided the Title IX Investigators with screenshots of two Snapchat messages that John Doe had sent her later in the morning of November 19; and

    E.   That the two Snapchat messages were part of a "back and forth" between Jane Roe and John Doe in which he also wrote, "I'm sorry, what can I do?" to which she responded with a message to the effect that, "you hurt me, sorry, can't change that."

243.   Based on Parts 1 and 2 of the Final Report and on information and belief, the Title IX Investigators complied with Jane Roe's desire not to inquire into any of the details of her sexual encounter with John Doe.   Instead, they asked questions about Jane Roe and John Doe's relationship before the incident and their communications after the incident.

244.   By complying with Jane Roe's desire on this point, the Title IX Investigators effectively limited themselves to the Memo to File that Krentzman had prepared of Jane Roe's written statement.

245.    Based on Parts 1 and 2 of the Final Report and, on information and belief, at the November 29 meeting, Jane Roe provided the Title IX Investigators with a Snapchat log "indicating her account activity" but that the log did not contain "specific messages or images."

> **2.    Basis for Title IX Investigators' Failure to Provide John Doe with Prior Notice of their Interview of Jane Roe and their Failure to Provide him with any Version of Jane Roe's Charge against him until after the Title IX Investigators had Interviewed Jane Roe.**

246.    On information and belief, before the Title IX Investigators arranged with Jane Roe to meet with them, they had reviewed the Krentzman Memo to File.

247.    On information and belief, the Title IX Investigators understood that Jane Roe had declined to discuss with Krentzman the details of the sexual misconduct Jane Roe had charged against John Doe.

248.    On information and belief, before their meeting with Jane Roe, the Title IX Investigators decided that, if Jane Roe declined to answer their questions about the details of sexual misconduct she had charged against John Doe, they would comply with her desire on this point and would not question her about it.

249.    On information and belief, the Title IX Investigators knew that, under the Sexual Misconduct Policy, they were required to provide John Doe with prior notice of their interview with Jane Roe.

250.    On Information and belief, the Title IX Investigators knew that they must also provide John Doe with the opportunity to submit questions which he would ask them to pose to Jane Roe.

251.    On information and belief, the Title IX Investigators knew that, in order to make it possible for John Doe to prepare informed questions for them to pose to Jane Roe, they would

have to provide him with a copy of some version of Jane Roe's charge against him, including the Krentzman Memo to File.

252.    On information and belief, the Title IX Investigators knew that Jane Roe and John Doe were the only witnesses to the sexual interaction between them.

253.    On information and belief, the Title IX Investigators knew that John Doe was likely to submit questions about the nature, extent, and timing of the sexual interaction between Jane Roe and John Doe as well as how and when Jane Roe consented to his sexual stimulation of her.

254.    On information and belief, because the Title IX Investigators had determined that they would not ask questions of Jane Roe about the sexual misconduct she had charged against John Doe, they did not want John Doe to pose questions to Jane Roe about their sexual interaction on the night in question.

255.    On information and belief, the Title IX Investigators wanted to avoid having to choose between posing questions to Jane Roe about John Doe's alleged sexual misconduct, or declining to pose John Doe's questions about the alleged sexual misconduct.

### 3.    Title IX Investigators' Interview of John Doe

256.    By email dated November 30, Jordan asked John Doe for dates on which she and Bamford could interview him.   John Doe and the Title IX Investigators agreed that they would interview John Doe on December 8, 2017.

257.    On information and belief, the Title IX Investigators provided Jane Roe with notice of the interview they had scheduled with John Doe and provided her with the opportunity to submit questions beforehand which they could pose to John Doe.

258.    John Doe retained Joseph Baldacci, Esq. of Bangor, Maine to assist him in responding to Jane Roe's charge.

259.    On December 8, John Doe and Attorney Baldacci met with Jordan and Bamford.  No other person was present.     On information and belief, the meeting was not recorded, though Jordan and Bamford appeared to take notes.

260.    The Title IX Investigators advised John Doe that they had already interviewed Jane Roe.

261.    John Doe had brought a written statement with him to the meeting with the Title IX Investigators and read the statement verbatim to Jordan and Bamford.

262.    In his statement, John Doe made the following statements about his pre-incident relationship with Jane Roe:

> A.   That he and Jane Doe had met before the start of the Fall 2017 Semester;
>
> B.   That they had a friendly relationship which included Snapchat and text messages;
>
> C.   That Jane Doe would sometimes tell John Doe that she was "nervous and or scared;"
>
> D.   That Jane Roe told him that she had accused another Stonehill student of sexually assaulting her and that student was still at the school;
>
> E.   That on occasions prior to the November 19 incident, Jane Roe had invited John Doe to her room and that they had kissed and John Doe had "finger[ed]" her and that, "occasionally [Jane Roe] had asked [John Doe] to stop" which he did.

263.    John Doe provided the Title IX Investigators with the following account of the evening of November 18-19, 2017:

> A.   That on the night of November 18, Jane Roe sent a message to John Doe that she was scared to walk back to her dormitory and John Doe responded by

saying that he would walk her back. She then said that she was walking back by herself;

B. That John Doe responded to this message by asking if she was "ok" and telling her that he was on his way;

C. That John Doe went to Jane Roe's dormitory, knocked on Jane Roe's door, she opened the door, and, she invited him into her room;

D. That they laid down on Jane Roe's bed and talked and, after a while, John Doe began "fingering" Jane Roe;

E. That John Doe asked Jane Roe if she liked what he was doing and, although Jane Roe did not answer, she "rolled over from her stomach to her back toward [John Doe] and was cuddling [him];"

F. That at no point did Jane Roe "pull away, ask [John Doe] to stop" "or protest in any manner;"

G. That [a]fter about a minute, [John Doe] stopped because [Jane Roe] was not responding to [his] questions;

H. When John Doe stopped, Jane Roe "rolled on her side and curled up in a fetal position" and this "scared and shocked [him];"

I. That John Doe asked Jane Roe if she was "ok" and she said, "It's not you. It's ok;"

J. That Jane Roe then "rolled onto her back, closed her eyes, and went to sleep," at which point John Doe left.

264. John Doe made the following statement about communications with Jane Roe after their sexual intimacy of earlier that morning:

A.  That later that morning, Jane Roe sent John Doe a message in which she "seemed to be upset" and John Doe responded by saying "whatever I thought would make her feel better" which included John Doe "saying 'I'm sorry;'

B.  That when he told Jane Roe he was "sorry", John Doe meant that he was "empathetic towards her and sorry that [Jane Roe] felt that way;" and

C.  That since that exchange of messages, John Doe had no further communication with Jane Roe.

265.   The Title IX Investigators advised John Doe that Jane Roe had identified a witness, Witness No. 2, who, Jane Roe believed would confirm that John Doe was, in fact, in O'Hara Hall at Jane Roe's door on the night in question but that, because John Doe had acknowledged that he was in Jane Roe's room that night, they were not certain that they needed to interview Witness No. 2.

266.   John Doe told the Title IX Investigators that on the evening of November 18, he was in the company of Witness No. 1 and that he was with Witness No. 1 when he received Jane Roe's Snapchat message asking for his assistance in walking from New Hall to O'Hara Hall.    He said that Witness No. 1 would confirm that John Doe had not been drinking that night. During this interview, John Doe was told by investigators that based upon this information they would not need to interview Witness No. 2.

267.   When John Doe advised the Title IX Investigators that Witness No. 1 had been in his company until shortly before John Doe left to meet Jane Roe and that Witness No. 1 would confirm that John Doe had not been drinking alcohol beverages on the night of the incident, the Title IX Investigators indicated that they were not certain that they would interview Witness No.

1.  John Doe believed that Title IX Investigators did not plan to interview either Witness No. 1 or Witness No. 2.

### 4.      Stonehill's Issuance of Revised Sexual Misconduct Policy

268.    By e-mail dated December 6, Jordan forwarded the revised S1.14 Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violation Policy ("December 2017 Sexual Misconduct Policy") to John Doe and Attorney Baldacci.   Jordan advised that the new policy contained changes that "pertain[ed] to the timeframes for the process (page 18) and the parties' rights to review pertinent evidence and investigation report (page 21)."   Although Jordan referred to the revised policy as though it had been paginated, it had not been paginated.

269.    The December 2017 Sexual Misconduct Policy set forth time frames within which complaints of conduct violating the Policy would be resolved.  Exhibit C, December 2017 Sexual Misconduct Policy, The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

270.    The December 2017 Sexual Misconduct Policy provided that, "[w]hile the College endeavors to follow [pre-set] timeframes, the fairness and thoroughness of the process is paramount." *Ibid.*

271.    The December 2017 Sexual Misconduct Policy also included a new right listed among the "rights" afforded to complainants and respondents which provided that, "[t]he College assures all students involved in incidents of sexual/gender-based misconduct or interpersonal violence will (10) Be allowed to review and respond to the investigative report before it is submitted to the Assistant Vice President for Student Affairs/Dean of Students." *Id.* at Statement of Rights for those Involved in Incidents of Sexual/Gender-Based Misconduct or Interpersonal Violence.

62

272.    In her December 6, 2017 e-mail, Jordan did not state whether Stonehill took the position that the December 2017 Sexual Misconduct Policy now governed the investigation of Jane Roe's complaint or whether, because the alleged misconduct occurred before the issuance of the new Policy, the June 2017 Sexual Misconduct Policy governed Jane Roe's complaint.

273.    On information and belief, the Title IX Investigators considered that the new "right" enumerated at Number 10 in the list of rights Stonehill extended to complainants and respondents, as set forth in the December 2017 Sexual Misconduct Policy, applied to their investigation of Jane Roe's claim and that they were required to ensure that Jane Roe and John Doe were accorded this right.

### 5.    Title IX Investigators' Interview of Witness No. 1

274.    Based on Parts 1 and 2 of the Final Report and on information and belief, on or about December 13, 2017, the Title IX Investigators interviewed Witness No. 1.

275.    On information and belief, the Title IX Investigators provided Jane Roe with prior notice of their interview with Witness No. 1 and provided her with the opportunity to submit questions for the Title IX Investigators to pose to Witness No. 1.

276.    The Title IX Investigators did not provide John Doe with prior notice that they had scheduled an interview with Witness No. 1.

277.    The Title IX Investigators did not provide John Doe with the opportunity to submit questions to Witness No. 1.

278.    Based on Parts 1 and 2 of the Final Report and on information and belief, Witness No. 1 made the following statements and representations to the Title IX Investigators:

> A.   That he was with John Doe at Corr Hall, John Doe's dormitory, on the evening of November 18 from 9:00 p.m. and that at about 10:30 p.m., they left Corr Hall and

went to The Courts, a recreational area on campus surrounded by town-home type

residences.

B.   That at about 11:45 p.m., John Doe received a message and then told Witness No.

1 that he had to leave because he was meeting a friend.

C.   That Witness No. 1 does not drink alcoholic beverages and that, while John Doe

was in his company that night, John Doe did not drink alcoholic beverages, either.

And that, when John Doe left his company that night, he was "straight."

**6.      Title IX Investigators' Interview of Witness No. 2**

279.    By e-mail dated December 14, 2017, Bamford advised John Doe that he and Jordan had

decided to interview Witness No.  2, noting that Jane Roe had identified Witness No. 2 to the

Title IX Investigators.

280.    As alleged above, in the meeting on December 8, Bamford and Jordan had told John Doe

that Jane Roe had identified Witness No.2 as being able to confirm that John Doe was in O'Hara

Hall that night but that, since John Doe had acknowledged that he was there that night, they did

not believe that they needed to interview Witness No.  2.

281.    In his December 14 e-mail, Bamford did not explain why he and Jordan had decided to

interview Witness No. 2; in particular, he did not state that they had decided to interview her on

some subject or subjects other than her ability to confirm that John Doe was in O'Hara Hall on

the night in question.

282.    In his December 14, 2017, e-mail, Bamford did not reveal to John Doe when he and

Jordan would be interviewing Witness No. 2.   John Doe later learned that the Title IX

Investigators had interviewed Witness No. 2 on the same day Bamford notified John Doe of their decision to interview Witness No. 2.

283.    On information and belief, the Title IX Investigators provided Jane Roe with prior notice of their decision to interview Witness No. 2 and provided Jane Roe with the opportunity to submit questions for the Title IX Investigators to pose to Jane Roe.

284.    Based on Parts 1 and 2 of the Final Report and on information and belief, the Title IX Investigators interviewed Witness No. 2 on December 14, 2017 and Witness No. 2 provided them with the following information:

      A.  That she recalled John Doe being at Jane Roe's residence hall door on the night in question but did not recall the time, but it was late at night;

      B.  That she saw John Doe at Jane Roe's door and heard him knock on the door;

      C.  That she did not interact with John Doe and was not able to say whether he was intoxicated or not, but that he "was standing up fine;"

      D.  That she entered the room of a friend and, when she emerged into the corridor a few minutes later, John Doe was no longer in the corridor and she did not know where he had gone;

      E.  That later that morning, Witness No. 2 had seen Jane Roe and made a comment to her about John Doe having been at Jane Roe's door earlier that morning;

      F.  That "about a week before," Witness No. 2 had spoken with Jane Roe about Jane Roe and John Doe but that Witness No. 2 "had no other information."

### 7. Title IX Investigators Notice to John Doe that Investigation was Closed/Status of Investigation.

285. By e-mail dated December 20, 2017, on which Jordan copied Bamford, Jordan advised John Doe that she and Bamford had "concluded the interview phase of our investigation" and that, "[a]s a next step, we would like to meet and review the case before we create our investigative report."

286. The Sexual Misconduct Policy separates the fact-finding phase of an investigation, including interviews, from the post-investigation review of facts with the complainant and the respondent. Exhibit A at The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence; see also, *Id.* at Statement of Rights of those Involved in Incidents of Sexual/Gender-Based Misconduct or Interpersonal Violence.

287. Jordan's December 20 e-mail to John Doe was, therefore, required by and sent in accordance with the Sexual Misconduct Policy which provides that, "[u]pon completion of the investigation, the Investigator will offer to meet with the complainant and respondent separately to discuss (post finding but before a recommendation has been made with regard to responsibility) the facts gleaned in the matter and to offer a final opportunity for the parties to ensure that both have been afforded the opportunity to present all relevant witnesses and evidence before the finding is reached." *Ibid.*

288. On information and belief, when the Title IX Investigators sent the December 20 e-mail to John Doe, they knew that the Sexual Misconduct Policy did not provide for an "interview phase" of an investigation and that, in fact, they were advising John Doe that the investigation, including interviews, had been completed and that the Title IX Investigators would soon be preparing a report. *Ibid.* They also knew that, based on the Sexual Misconduct Policy's

66

description of the investigative and evaluative process, John Doe would understand their December 20 e-mail as stating that the investigation was complete.

289.    On information and belief, when the Title IX Investigators advised John Doe that the "interview phase" of the investigation was complete, they knew that neither the "interview" phase nor the investigation, itself, was complete.    To the contrary, they knew that their interviews with Jane Roe, John Doe had revealed material discrepancies between Jane Roe and John Doe's account of their pre-incident social relationship and degree of sexual intimacy and that, because they had failed to provide John Doe with the required notice of their interview with Jane Roe and had also failed to provide him with a copy of the Memo to File before their November 29 interview of Jane Roe, they had not presented Jane Roe with John Doe's assertion that, before the incident, they had a significant social relationship and that, on at least two or three occasions, they had been sexually intimate in the same manner and to the degree as they had been in the course of the incident of which Jane Roe had complained.

290.    In particular, on information and belief, as of December 20, the Title IX Investigators knew that, at the time they advised John Doe that they had closed the investigation, they knew that the following discrepancies between Jane Roe's November 29 account and the Memo to File, and John Doe's December 8 account, remained unresolved as reflected in the following excerpts of the Memo to File:

> A.  In her interview with the Title IX Investigators, Jane Roe had asserted that she and John Doe had never been more than "surface level" friends—someone she would say "hello" to if she saw him on campus and that in the Memo to File she had mentioned nothing about their pre-incident social relationship, but John Doe had asserted that they had gotten together on several occasions—some of them in

Jane Roe's dormitory room at O'Hara Hall—and that they frequently communicated by social media, particularly, Snapchat.

B. In the Memo to File and, on information and belief, in her November 29 interview with the Title IX Investigators, Jane Doe had asserted that she and John Doe had "only made out sober twice" in her dormitory room. Whereas, John Doe asserted that they had a significant pre-incident social relationship which had eventually progressed to the point where, on several occasions before the incident, they had engaged in the same level of sexual intimacy that they both agreed had occurred on the night in question.

291.   On information and belief, the Title IX Investigators understood that the discrepancies between Jane Roe and John Doe's accounts of their pre-incident social relationship and their pre-incident sexual relationship, were material.   In particular, on information and belief, the Title IX Investigators knew that, if Jane Roe was correct and the degree of sexual intimacy between them in the early morning hours of November 19 was the first time they had had that degree of sexual intimacy, then Jane Roe's assertion that, when John Doe "brushed [her] vagina", she was "shocked, startled, and taken aback" would likely have warranted credence.  On information and belief, they also understood that, if John Doe was correct about the degree and frequency of their pre-incident sexual intimacy, Jane Roe's assertion would likely have warranted less credence and might warrant no credence at all.

292.   On information and belief, the Title IX Investigators also understood that, if John Doe was right about their pre-incident degree of intimacy, it would have also raised broader and serious questions about the reliability of Jane Roe's accusation.

293.     On information and belief, from their training and experience, the Title IX Investigators understood that in a dispute over whether both parties have consented to sexual activity it is rare that there are ever more than two witnesses—the complainant and the respondent—to the sexual activity itself, and that, therefore, they must investigate instances in which the credibility of the parties may be tested over points in dispute.

294.     On information and belief, the Title IX Investigators understood that they could not complete their investigation and prepare their report without attempting to determine whether Jane Roe or John Doe was telling the truth about their pre-incident experiences with sexual intimacy and that, therefore, at the very least, they would have to interview Jane Roe once again and present John Doe's assertions to her.

295.     On information and belief, at the outset of the investigation, the Title IX Investigators had decided that they would not provide John Doe with notice of any interview they would conduct with Jane Roe, and that their decision on this point, although inconsistent with and in violation of the standards and procedures of the Sexual Misconduct Policy, it was consistent and in conformity with Stonehill's unpublished policy.

296.     In order to complete the investigation by conducting a second interview with Jane Roe without alerting John Doe to the second interview and providing him with the opportunity to submit potentially detailed questions to the Title IX Investigators to pose to Jane Roe, the Title IX Investigators misled John Doe into believing that they would be conducting no more interviews and further interactions with Jane Roe would be limited to a "review of case facts," preliminary to their creation of the investigative report.

297.     Based on Parts 1 and 2 of the Final Report and on information and belief, on December 28, 2017, the Title IX Investigators met with Jane Roe for the second time.

298.    Based on Parts 1 and 2 of the Final Report and on information and belief, in that meeting, the Title IX Investigators did not confine their meeting to "review of the case facts," as they represented in their December 20, 2017 E-mail, nor did they confine their meeting to "discuss…the facts gleaned in the matter" and to offer Jane Roe "the opportunity to present all relevant witnesses and evidence before a finding is reached."   ExhibitA, <u>The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence</u>.

299.    Based on Parts 1 and 2 of the Final Report and on information and belief, the Title IX Investigators used the December 28 meeting with Jane Roe as a second interview in which they presented her with John Doe's assertions about their pre-incident social and sexual relationship and posed questions to her based on John Doe's assertions.

300.    Based on Parts 1 and 2 of the Final Report and on information and belief, when confronted with John Doe's assertions, Jane Roe recanted the statement that she made in her November 29 meeting with the Title IX Investigators that, before the November 19 incident,  she and John Doe had not been more than "surface level friends" and they had only "made out sober twice" and admitted that she and John Doe had been close friends, and that on at least two occasions and possibly more, she and John Doe had engaged in the very same level of sexual activity as was the subject of her complaint.

301.    On information and belief, the Title IX Investigators knew that Jane Roe was relying on her assertion that she was intoxicated to support her contentions as to the following points:

> A. That she was "too drunk" to engage in sexual activity and that twice she told John Doe that she did not want to engage in sexual activity because she was drunk;

B. That the level of intoxication she claimed, six on a ten-point scale, implied that John Doe could not have failed to realize that she was intoxicated;

C. That her level of intoxication was such that she was "too drunk to fight [John Doe] off;"

D. That her level of intoxication might explain why, faced with a reportedly aggressive sexual assault, she did not call for help but, rather, cried, hyperventilated, and pretended to fall asleep; and

E. That either in her first interview of November 29, 2017, or her second interview of December 28, 2017, she asserted that before and during her November 19, 2017, encounter with John Doe, she was intoxicated to the point of incapacity within the meaning of the Sexual Misconduct Policy.

302.   Based on Parts 1 and 2 of the Final Report and on information and belief, the Title IX Investigators also knew that, although the Memo to File stated that Jane Roe claimed that she was intoxicated before and during her encounter with John Doe, John Doe had told the Title IX Investigators that said she did not appear to have been drinking alcoholic beverages at all.

303.   Because the Title IX Investigators knew that Jane Roe was relying on her alleged state of intoxication to explain her unwillingness to engage in sexual activity with John Doe; her inability to resist John Doe's sexual advances; her failure to more effectively resist John Doe or seek assistance from other dormitory residents; and, excuse herself of any responsibility whatsoever through her claim of incapacitation, they had a duty to investigate and determine whether Jane Roe was, in fact, intoxicated on the evening of November 18-19, 2017.   The Title IX Investigators did not conduct such an investigation.

304.    On information and belief, the Title IX Investigators knew Jane Roe had asserted that, earlier on in the evening of November 18-19, 2017, she had been at New Hall and that she had consumed alcohol there.

305.    On information and belief, the Title IX Investigators knew that Jane Roe was not yet 21 years of age and that her admission that she had been drinking alcohol at New Hall constituted a violation of the Student Conduct Code.

306.    On information and belief, the Title IX Investigators knew that, even though Jane Roe had asserted that she had attended a social event at New Hall, had consumed alcohol there, and, had become "drunk" or incapacitated, she had not identified a single witness who could confirm that she had been at New Hall, had consumed alcohol there, and by the time she left, had become "drunk" or incapacitated.

307.    On information and belief, the Title IX Investigators knew that they could determine whether Jane Roe had been consuming alcohol on the evening of November 18-19, 2017 and, if so, whether she was "drunk" as she claimed, or "incapacitated" as she claimed, by asking Jane Roe to identify witnesses who would confirm that she was at New Hall on the evening of November 18-19, 2017; that she had consumed alcohol at New Hall; that she had become intoxicated, and that  her state of intoxication was evident.

308.    On information and belief, the Title IX Investigators knew that if Jane Roe could not identify any such witness or witnesses, it would shed doubt on her assertions that she had become incapacitated by alcohol. It could also shed doubt on her assertion that she had consumed any alcoholic beverages on the evening of November18-19 2017.

309.    On information and belief, the Title IX Investigators knew that, even if Jane Roe failed to identify any witnesses who could confirm her claims of alcohol consumption, visible

72

intoxication, or, even incapacity, they, themselves, could seek information on the activities at New Hall on the evening of November 18-19, 2017, and determine if any witnesses remembered Jane Roe attending the New Hall event, whether they remembered her consuming alcohol, whether they remembered whether she had become either "drunk" or incapacitated.

310.    On information and belief, at all times the Title IX Investigators knew that investigating Jane Roe's assertions as to her pre-incident alcohol consumption and state of intoxication would not be difficult and was extremely important to properly assess her credibility, as well as the credibility of John Doe's assertion that she did not appear to have been drinking alcoholic beverages on the night of the incident.

311.    On information and belief, the Title IX Investigators made a deliberate decision not to investigate Jane Roe's claims of alcohol consumption and intoxication because they were concerned that their investigation would reveal evidence that would disprove or significantly undermine Jane Roe's claims on all these points.

312.    On information and belief, the Title IX Investigators also knew that, according to Jane Roe, herself, as documented in the Memo to File, she had spoken to a person she described as her former boyfriend as she was walking from New Hall to O'Hara Hall on the late evening-early morning of November 18-19, 2017.

313.    On information and belief, the Title IX Investigators knew that the person, if the person with whom Jane Roe spoke was, in fact, her former boyfriend, would be familiar with her manner of speech and how she expressed herself; and that he would likely have been able to tell whether, in the course of their conversation, he detected any evidence in her speech that she appeared to be under the influence of alcohol and, if so, whether she appeared to be mildly or seriously impaired.

73

314.    On information and belief, the Title IX Investigators also knew that it was possible that, in the course of their conversation, Jane Roe had mentioned what she had been doing that evening and might have made references to her consumption of alcohol, whether or not she was, in fact, intoxicated.

315.    On information and belief, the Title IX Investigators also knew that the substance of the conversation between Jane Roe and her former boyfriend might be relevant to her alleged unwillingness to become sexually intimate with John Doe or, in the alternative, might have caused her to regret having been sexually intimate with John Doe after having consented to such intimacy.

316.    On Information and belief, the Title IX Investigators also knew that, if Jane Roe had consented to sexual intimacy with John Doe and had, during or after that sexual intimacy come to regret that intimacy, it could explain Jane Roe's comment to John Doe, as John Doe related to the Title IX Investigators in his December 8 interview, that, "It's not you. It's ok."

317.    On information and belief, the Title IX Investigators also understood that if they pressed Jane Roe for the identity of the person she called it would also be possible that she would have no name and that, in fact, the call never occurred.

318.    On information and belief, the Title IX Investigators at all times knew that the person whom Jane Roe said she called possessed information important to either corroborating or disproving certain material aspects of the statement attributed to her in the Memo to File and made a conscious and deliberate decision not to seek that information.

319.    On information and belief, the Title IX Investigators at all times knew and understood that if Jane Roe spoke to her former boyfriend and later consented to sexual intimacy with John Doe, it could explain John Doe's assertion that, when Jane Roe began physically withdrawing

from him and he asked her what was wrong, she responded by saying, "It's not you.   It's ok" and that, therefore, the Investigators made a conscious and deliberate decision to omit John Doe's assertion out of the Final Report.

**8. Notice to John Doe of Conclusion of Investigation and Request for Meeting to Review Facts.**

320.     In response to Jordan's e-mail of December 20, 2017, John Doe forwarded an E-mail dated December 27, in which John Doe advised that he was not in Massachusetts and that Attorney Baldacci was out of the country.  John Doe advised that he needed to speak to Attorney Baldacci, but that he was willing to review the facts with the Title IX Investigators over the telephone.

**9. Title IX Investigators' Second Interview of Jane Roe/Review of Facts**

321.     On information and belief, at or about the same time Title IX Investigator Jordan notified John Doe that the investigation was complete, and that Title IX Investigators wanted to meet with John Doe to review the facts, the Title IX Investigators sent a similar notification and request to Jane Roe.

322.     On information and belief, when the Title IX Investigators advised John Doe that they had closed the investigation, they knew that they had not resolved the discrepancy between Jane Roe's assertion that, before the incident, she had only a "surface friendship" with John Doe and had only "made out sober" with him on two occasions, and John Doe's assertion that they had engaged in an extensive social interaction including prior instances of sexual intimacy at the same level and under the same circumstances as the allegedly nonconsensual sexual intimacy they were investigating.

323.    In short, on information and belief, when the Title IX Investigators advised John Doe that the investigation was closed, they knew it could not be closed because they had to conduct a second interview with Jane Roe.

324.    Therefore, on information and belief, on or about December 28, 2017, the Title IX Investigators met with Jane Roe and reviewed the factual information they had obtained in the course of the investigation.

325.    Although under the Sexual Misconduct Policy, the Title IX Investigators' meeting with Jane Roe was required to be limited to a review of the facts that the Title IX Investigators had developed in the course of the investigation, the Title IX Investigators conducted a further interview with Jane Roe.

326.    The Title IX Investigators did not provide notice to John Doe that they were going to conduct a second interview with Jane Roe, nor did they provide him with the opportunity to submit questions to her.

327.    On information and belief, in the course of their further interview of Jane Roe, the Title IX Investigators questioned her about the assertion in her written statement that, before the incident in question, she and John Doe had "only made out sober twice in my room" and John Doe's contradiction in his December 8 interview that before that incident John Doe and Jane Roe had been sexually intimate on other occasions and that intimacy included his digital stimulation of her.

328.    On information and belief, during this further interview, when confronted with John Doe's assertion, Jane Roe retracted the assertion she had made in the written statement she had submitted to Krentzman that she had only "made out" with John Doe and admitted that, before

the incident in question, she and John Doe had been sexually intimate and that intimacy included his digital stimulation of her.

329.    On information and belief, in addition to interviewing Jane Roe again, the Title IX Investigators also reviewed their factual findings with Jane Roe.

### 10. Review of Title IX Investigators' Fact Finding with John Doe and Attorney Baldacci

330.    On January 12, 2018, the Title IX Investigators reviewed their factual findings with John Doe and Attorney Baldacci by telephone.

331.    The Title IX Investigators had not provided any written materials to John Doe and Attorney Baldacci.  Instead, the Investigators read (findings that they described as "undisputed facts" and "disputed facts") over the telephone to John Doe and Attorney Baldacci.

332.    They advised John Doe and Attorney Baldacci that they would prepare a report of the "undisputed facts" and "disputed facts" and forward it to them.

### 11.    John Doe Review of Part 1 of Title IX Investigators' Investigative Report

333.    By letter dated January 23, 2018 ("January 23 Letter"), the Title IX Investigators forwarded Part 1 of the Investigative Report to John Doe and Attorney Baldacci.  The January 23 Letter was a form letter that had been drafted to include information specific to the investigation of Jane Roe's complaint.    The January 23 Letter made the following representations and assertions:

> A. That the Title IX Investigators had taken "seriously the responsibility to seek and evaluate all available and relevant evidence."
>
> B. That the Title IX Investigators Part I of the Investigative Report included "information collected by the investigator(s), including interviews with the

77

Reporting Parting (sic), the Responding Party, witnesses, if any, and other evidentiary materials."

C. That John Doe had "the right to review the Investigative Report and provide any additional information to the investigator(s) that [John Doe] feel[s] is relevant in writing to the investigator(s)." John Doe was given seven calendar days to provide the "additional information."

D. That, after seven days, the investigators "will compile a final report, including the investigative findings, which will be forwarded to the Dean of Students for final deliberation under the College's established policies."

334.    Part 1 of the Investigators' Report ("Part 1 Report") was divided into the following sections and subsections:   1) Executive Summary; 2) Sexual Misconduct as defined by Sexual Misconduct Policy; 3) Consent, as defined by the Sexual Misconduct Policy; 4) Incapacitation, as defined in the Sexual Misconduct Policy; 5) Involved Parties—a) Jane Roe; b) John Doe. c) Witness No. 1, designated as "[w]itness prior to alleged incident; and, Witness 2, designated as "[w]itness prior to alleged incident"; 6) Procedural History; listing dates from Jane Doe's filing of the complaint on November 20, 2017 to January 23, 2017, the date on which the Title IX Investigators forwarded the Part 1 Report to the parties; 7) Findings of Facts with the following subheadings:   a) Summary of Interviews with Reporting Party; b) Summary of Interviews with Responding Party; c) Summary of Witness No. 1 Interview; and, d) Summary of Witness No. 2 Interview.

335.    The "relevant policy definitions" listed in Part 1 was incomplete because it omitted the three relevant provisions:

A. It omitted definition of "Amnesty" provision, which was relevant because Jane Roe had asserted that she had consumed alcohol on the evening of November 18 and she was not yet 21 years of age.    Exhibit A at Prohibited Conduct, Alcohol and Drugs, ¶ 5.01; Exhibit A, Statement of Rights for those Involved in Incidents of Sexual/Gender-Based Misconduct or Interpersonal Violence, Amnesty.

B. It omitted the prohibition on "[a]cts of dishonesty, including but not limited to, furnishing false information to any faculty member, College official, or department..:    Exhibit A, Prohibited Conduct, § 3. Acts of Dishonesty.   This provision applied to the investigation because John Doe denied Jane Roe's charge, thus raising the question of whether Jane Roe's charge was true, and also because in the charge she filed against John Doe, Jane Roe misrepresented and lied about their prior social and sexual history.

C. It omitted the prohibitions on "abuse of the Student Conduct Process;" in particular, "[f]alsification, distortion, or misrepresentation in conjunction with the Student Conduct Process" and "[s]ubmitting or corroborating a false incident report or withholding information."   Exhibit A at Authority, §§ 7(b), (c).   These provisions applied because John Doe denied Jane Roe's charge, thus raising the question of whether Jane Roe's charge was true, and also because in the charge she filed against John Doe, Jane Roe misrepresented and lied about their prior social and sexual history.

336.    Part 1 identified Witnesses Nos. 1 and 2 as witnesses "prior to the incident."   This description of the two witnesses was consistent with John Doe's understanding of Witness No. 1's knowledge—the witness he had suggested to the Title IX Investigators—who had been with

John Doe on the evening of November 18-19 and was also consistent with the Title IX Investigators' description of the knowledge possessed by Witness No. 2—the witness suggested by Jane Roe—who, she had told them, would be able to confirm that John Doe had been in O'Hara Hall on the night in question.

337.    Part 1 included a "Procedural History" which stated that, on November 20, 2017, Krenztman had "received a report of alleged sexual misconduct, specifically, digital penetration of the vagina from the Reporting Party."

338.    On information and belief, the November 20 report from Jane Roe to Krenztman is not the Memo to File that Krentzman produced on November 21.   On information and belief, Jane Roe's November 20 report was reduced to writing by Jane Roe, a Stonehill official, or both and once existed and may still exist in written form and has at all times been in the possession of Stonehill.   At no time did Stonehill produce Jane Doe's November 20 report to Krentzman, to John Doe.

339.    The Procedural History omitted Krentzman's November 21 meeting with Jane Roe.

340.    The Procedural History identified the dates on which the Title IX Investigators had interviewed Witness No. 1 and Witness No. 2.   When John Doe saw that the Title IX Investigators, apparently, Bamford alone, had interviewed Witness No. 1 on December 13, 2017, he learned for the first time that they had interviewed Witness No. 1.   The Procedural History also stated that Bamford, alone, had interviewed Witness No. 2.

341.    The Procedural History stated that both Title IX Investigators met in person with Jane Roe on December 28. 2017.  The Procedural History characterized this meeting as a "review of facts."    This description and Part 1, itself, concealed the fact that the Title IX Investigators' "review of facts" with Jane Roe was also a second interview in which they confronted Jane Roe

with John Doe's contradiction of her description of their pre-incident social and sexual history as well as his denial of her assertion that she was drunk to the point of incapacitation.

342.   This is the first time, John Doe and Attorney Baldacci understood that a second face to face meeting had occurred between Jane Roe and the Title IX Investigators.

343.   Part 1 included a section entitled "Findings of Fact" which consisted of four subsections entitled "Summary of Interviews with Reporting Party;" Summary of Interviews with Responding Party;" Summary of Interview of Witness #1 Interview," and "Summary of Witness #2 Interview."

344.   The information that comprised the summary of Jane Roe's interviews came from two separate interviews.  The first interview was held on November 29 and the second interview was held on December 28.   John Doe had no notice of either interview and was not present.   As a result, with one exception, Jane Roe's "clarification" of her pre-incident sexual intimacy with John Doe, John Doe is not certain what information set forth in the Jane Doe summary came from the first interview and what information came from the second interview.

345.   The Part 1 "Summary of Interviews with Reporting Party" made it clear that, as with Krentzman, the Title IX Investigators had complied with Jane Roe's desire not to discuss any of the details of her sexual interaction with John Doe on the night in question.

346.   Although the summary includes Jane Roe's assertion that she was intoxicated and her assertion that John Doe, too, had consumed alcoholic beverages, it omitted any description of the initiation of their sexual interaction, the progress of their sexual interaction, the verbal and physical indications she gave to John Doe to either not commence or to cease sexual interaction.

347.   After recounting Jane Roe's version of John Doe's entry into her dormitory room, the summary then stated, ""[t]he Reporting Party said that after she began to cry, hyperventilate, and

pretend to "fall asleep," the Responding Party left 'relatively quickly.'"  This account seems off considering Jane Roe's initial written charge claims she was incapacitated, and is wholly inconsistent with John Doe's account.  Therefore, the Title IX Investigators had a duty to address and investigate these inconsistencies further.  They did not.

348.   Because the Title IX Investigators had complied with Jane Roe's desire not to discuss the details of her sexual interaction with John Doe on the night in question, the only version of the incident available to them was Krentzman's Memo to File.    Therefore, they appended the Krentzman Memo to File to Part 1 as "Attachment 1."

349.   Part 1 included one statement from Jane Roe that she could not have given in the November 29 interview but could only have given in the December 28 interview—that is, her recantation of her assertion that, before the incident of November 19, she and John Doe were only "surface friends" and had done nothing more than "made out sober twice in [Jane Doe's] room."   As set forth in Part 1, Jane Doe's post-November 29 recantation read as follows: "She clarified that the previous encounters in her room involved consensual sexual contact, including digital penetration of her vagina."

### 12.   John Doe and Attorney Baldacci Review of Part 1 Report, Comment, Request for Correction and Clarification

350.   After receiving the Part 1 Report, John Doe and Attorney Baldacci reviewed it.

351.   Upon reviewing the Part 1 Report, John Doe and Attorney Baldacci realized that, although it was  not clear when, at some point the Title IX Investigators had conducted a second interview with Jane Roe, had confronted her with John Doe's assertion as to the true nature of their pre-incident social history and their pre-incident sexual intimacy, and that she had recanted the statement she made to the Title IX Investigators on November 29, 2017, that she and John

Doe had only been "surface" friends.  Jane Roe further recanted her assertion she made in her written charge, as set forth in the Krentzman Memo to File that, before the incident, she and John Doe had only "made out twice sober" and admitted that their pre-incident relationship had progressed to the point where on "previous encounters" they had engaged in the very same level of sexual intimacy that she had charged in her then-pending complaint.

352.    John Doe and Attorney Baldacci also noted the way in which the Title IX Investigators had presented Jane Roe's recantation on these points both obscure it and tacitly justify it as a "clarification," rather than a recantation.   John Doe and attorney Baldacci not only believed this was unfair to John Doe, but also believed it could mislead the decision-maker, the AVPSA/Dean of Students, in weighing John Doe and Jane Roe's credibility.

353.    As a result, by e-mail dated January 30, 2018 at 1:57 p.m., Attorney Baldacci forwarded the following request to the Title IX Investigators: "We would like it noted that the Reporting Party's clarification of consensual sexual contact occurred only after she was interviewed a second time.   And it substantiates my client's statement regarding prior sexual contact."

354.    By email dated January 30, 2018, at 4:34p.m., Investigator Shayla Jordan responded to Attorney Baldacci stating, "[i]nvestigator Bamford and I have reviewed your request.   We have decided to include this information in our final report that we share with the Dean of Students."

355.    When John Doe and Attorney Baldacci received Jordan's assurance, which she made on behalf of Bamford, too, that the final Part 1 report would clearly explain Jane Roe's recantation, they relied on the Title IX Investigators' promise on this point and did not believe that they needed to follow up further.

**13.    Title IX Investigators' Submission of Report with Findings of Fact and Recommendation to Kevin Piskadlo, Ph.D., Associate Vice President for Student Affairs/Dean of Students.**

356.    As required by the Sexual Misconduct Policy, on or about February 7, 2018, the Title IX

Investigators forwarded their Final Report ("Final Report") to the AVPSA/Dean of Students,

Kevin S. Piskadlo, Ph.D.    Exhibit A at <u>The Investigation and Disciplinary Process for</u>

<u>Sexual/Gender-Based Misconduct and Interpersonal Violence</u>.

357.    The Sexual Misconduct Policy required that the Final Report "contain factual findings

and a recommendation of responsibility as to the original claim and/or any lesser offense." *Id.*

358.    At that time, Piskadlo was the Associate Vice President for Student Affairs/Dean of

Students.    Under the Sexual Misconduct Policy, Piskadlo was charged with reviewing the Final

Report and deciding "if the facts gleaned in the investigation do indeed align with the findings

offered by the Investigator." *Ibid.*

359.    In the event that Piskadlo found that the "facts gleaned" did in fact "align with the

findings offered," he was required to "issue a formal decision in the matter, including sanctions."

*Ibid.*

360.    The decision that Piskadlo was required to make was described in the Sexual Misconduct

Policy as the "initial outcome" and the Sexual Misconduct Policy required that Piskadlo's

decision include "the reason for the outcome and the sanction associated with the outcome."

*Ibid.*

   **14.    Title IX Investigators' Submission of Final Report to Piskadlo—Failure to
          Change Description of Jane Roe's Recantation.**

361.    The Final Report was composed of Parts 1 and 2.    Part 1 was identical to the draft

version of Part 1 as submitted to and reviewed by John Doe and Attorney Baldacci

362.    The Title IX Investigators *did not make the correction* that John Doe and Attorney

Baldacci had requested and which the Title IX Investigators promised they would make on Jane

Roe's recantation.    As submitted to Piskadlo that portion of Part 1 continued to read, "[Jane Doe] clarified that previous encounters in her room involved consensual sexual contact, including digital penetration."

363.    When the Title IX Investigators submitted the Final Report to Piskadlo, they did not submit a copy to John Doe.   Therefore, the Title IX Investigators knew that John Doe and Attorney Baldacci would not realize that they had failed to make it clear when and how Jane Roe had recanted until sometime after Piskadlo had reviewed the Final Report in full and decided whether John Doe was "responsible," and what sanction would be imposed.

364.    On information and belief, at all times the Title IX Investigators knew that if Piskadlo found John Doe "responsible" for the offense of "nonconsensual sexual intercourse," Piskadlo would dismiss him from Stonehill and the dismissal and reasons for it would become part of John Doe's permanent education record at Stonehill.

### 15.    Part 2—Final Report

365.    Part 2 of the Final Report was divided into two broad headings:   Credibility Assessment and Investigative Findings.   The Credibility Assessment Section was further divided into a discussion of "undisputed facts" and "areas of dispute."

366.    The Title IX Investigators included the following findings as "undisputed facts:"

A. That John Doe and Jane Roe met in the spring of 2017 through social media before arriving at Stonehill for the Fall Semester 2017;

B. That before coming to Stonehill, they communicated "primarily through social media;"

C. That on at least two occasions in the Fall 2017 Semester they were in Jane Roe's dormitory room;

85

D.  That earlier in the semester, on at least two occasions they had engaged in consensual sexual activity, including "fingering."

E.  That the parties had engaged in sexual activity consisting of digital stimulation before the incident "was clarified by [Jane Roe] in the review of facts;"

F.  That on the early morning of November 19, 2017, Jane Roe sent a message to John Doe.  John Doe responded by offering to walk Jane Roe back to her dormitory room;

G.  That John Doe and Jane Roe did not walk to O'Hara Hall together;

H.  That John Doe knocked on Jane Roe's door and John Doe entered Jane Roe's room;

I.  The encounter ended when [Jane Roe] began breathing heavily.   [Jane Roe] described this as she was crying and hyperventilating while [John Doe] described this as 'she curled in a ball' and was breathing heavily.  [John Doe] then left the room."

J.  That "later in the day [Jane Roe] sent a SnapChat message to [John Doe] stating something to the effect of 'that wasn't ok'"

K.  That [John Doe] replied with two SnapChat messages.

L.  That "there was no communication or contact between the parties after these messages."

M.  That "[e]arlier Snapchat messages were deleted when [John Doe] blocked [Jane Roe] on SnapChat after receiving the 'no-contact order.'"

86

367.    The "areas of dispute" section of Part 2 identified the following areas in which the parties disagreed:

  A.  That, "[John Doe] said that he had not consumed any alcohol on the evening of November 18, 2017 and the early morning of November 19, 2017.  [Jane Roe] said that [John Doe] implied that he had been drinking, although she did not notice significant impairment."

  B.  That [Jane Roe] described herself as drunk and a six out of ten, with ten being the most drunk.  She said that she does not think she was capable of consent due to her intoxication.    [John Doe] said that he did not think she had been "drinking at all."

  C.  That "[John Doe] said that on three occasions he asked [Jane Roe] if she wanted him to stop (fingering her) and she said nothing and did nothing."

   That "[John Doe] said that at no time did [Jane Doe] tell him to stop or say 'no.'"

  D.  That, [Jane Roe] said that she specifically told [John Doe] to stop and pushed him away from her."

368.    Following its review of the "undisputed facts" and "areas of dispute," Part 2 addressed the following points:

  A.  Part 2 discussed Jane Roe's claim that she was incapacitated within the meaning of the Sexual Misconduct Policy and concluded that 'based on Jane Roe and John Doe's statements, Jane Roe was not incapacitated within the meaning of the Sexual Misconduct Policy;

B. Part 2 described John Doe's earlier sexual interactions with Jane Roe and reported that John Doe had said that on those prior occasions, John Doe had asked Jane Roe if she was "ok" with the sexual activity and she had said "yes," but on this occasion, John Doe had asked Jane Roe if she was "ok" and she did not respond but, instead, "moaned" and "cried;"

C. That Jane Roe "had an interaction with Witness 2 later in the morning of the incident.  When Witness 2 made a comment about seeing [John Doe] at [Jane Roe's] door earlier in the day, [Jane Roe] responded by saying something to the effect of 'it wasn't ok'."

  1. That "The comment made by [Jane Roe] to her hall mate soon after the incident supports her statement and belief that the sexual contact was unwanted."

369.    That [John Doe] sent two Snapchat messages to Jane Roe "because he hoped they would make [Jane Roe] feel better.  He stated that he was not drunk and denied that he did anything wrong.  He reiterated that he sent the messages to make [Jane Roe] feel better."

  1. Part 2 quoted the two messages and included them at Appendix B.

  2. Part 2 stated that, "The messages sent by [Jane Roe] to [John Doe] after the incident lead the investigators to conclude that [John Doe] knew and understood that the sexual contact was unwanted as well.'

370.    Part 2 quoted portions of the following definitions and standards in the Sexual Misconduct Policy:

  1. Nonconsensual Sexual Intercourse;

  2. "consent," including the standard by which "consent" is determined;

       3.  A further "clarification" of "Sexual Misconduct," expressing a preference for "verbal communication" over "non-verbal actions."

371.    Part 2 stated that, "[Jane Roe] states that she clearly said that she did not want to engage in sexual activity."

372.    Part 2 stated that, "[John Doe] indicated that [Jane Roe] did not give verbal consent but, rather, 'moaned' when asked if the sexual activity was ok."  This finding is misleading and mischaracterized John Doe's statement because in their past sexual encounters, Jane Roe would moan when she was experiencing pleasure.  It was therefore, reasonable for John Doe to believe he had Jane Roe's consent when she rolled over and made her vagina more accessible for digital stimulation and began moaning.

373.    Part 2 quoted the Sexual Misconduct Policy for the following point:  "The Policy also states that:  "[p]revious sexual activity or a current or past intimate relationship between two people is not the equivalent of consent to future sexual activity."

374.    Part 2 quoted the Sexual Misconduct Policy for the following point:  "[t]he policy states that an example of behavior that demonstrates a lack of consent and may constitute sexual assault includes, 'engaging in sexual activity with someone who had said 'no' or has indicated lack of consent through non-verbal communication."

375.    Part 2 concluded with a section entitled "Investigative Findings" which, *in toto*, read as follows:   The Investigators determined that based on a preponderance of the evidence it is more likely than not that [John Doe] violated Policy S1.14, specifically, non-consensual digital penetration of the vagina."

376.    The Final Report by the Title IX Investigators failed to follow the procedures set forth in the Sexual Misconduct Policy.

### N.   DECISION OF AVPSA/DEAN OF STUDENTS ON TITLE IX INVESTIGATORS FINDINGS OF FACT AND RECOMMENDATION/DISMISSAL OF JOHN DOE.

#### 1.   Stonehill Notice to John Doe of meeting with AVPSA/Dean of Students, Kevin S. Piskadlo, Ph. D.

377.   On February 8, 2018, John Doe received an e-mail from the office of the AVPSA/Dean of Students Piskadlo advising him that he must appear in Piskadlo's office on February 12, 2018.

378.   At no point before the meeting between John Doe and Piskadlo on February 12, 2018, did Stonehill provide John Doe with a complete copy of the Final Report.

379.   Under the Sexual Misconduct Policy, the Title IX Investigators' Final Report was submitted to Piskadlo in his capacity as the AVPSA/Dean of Students.

380.   Piskadlo was charged with "determin[ing] if the facts gleaned in the investigation do indeed align with the findings offered by the Investigator."     ExhibitA. The Investigation and Disciplinary Process for Sexual/Gender-Based Misconduct and Interpersonal Violence.

381.   If the AVSPA/Dean of Students determined that the "facts gleaned" did in fact "align" with the Investigator's findings, the AVPSA/Dean of Students was "required to issue a formal decision in the matter, including sanctions." *Ibid.*

382.   On February 12, John Doe met with Piskadlo in Piskadlo's office.   John Doe and Attorney Baldacci had arranged for attorney Baldacci to participate in the meeting by telephone.

383.   Piskadlo informed John Doe that he had some "tough news" for him—that the Title IX Investigators had recommended that John Doe be found "responsible" for violating the prohibition on "nonconsensual sexual intercourse."

384.   John Doe was incredulous at the finding and questioned Piskadlo about Jane Roe's false assertions to the Title IX Investigators, including her claim that she was intoxicated.   Piskadlo

responded by saying that, although Jane Roe had claimed that she was incapacitated, it was because she did not understand the meaning of "incapacitation" as used in the Sexual Misconduct Policy.

385.    Piskadlo's assertion that Jane Roe had asserted that she was "incapacitated" as opposed to merely "very drunk" was the first time John Doe had been made aware of this claim.

386.    It was unclear whether the Title IX Investigators had determined that Jane Roe did not understand the meaning of "incapacitation" or whether he, himself, had made that determination.

387.    When, later, John Doe received the Final Report, including Parts 1 and 2, he found a discussion of Jane Roe's claim of incapacitation in Part 2, but there was not a finding anywhere in the Final Report that, in claiming incapacitation, Jane Roe did not understand the meaning of the term.

388.    Although Piskadlo made it clear to John Doe that the Title IX Investigators had found him 'responsible,' Piskadlo did not explain why he, himself, had found that John Doe was responsible.

389.    Piskadlo informed John Doe that Stonehill had only one sanction for the offense of "nonconsensual sexual intercourse"—immediate dismissal from Stonehill.   Piskadlo made it clear that dismissal was always imposed irrespective of the severity of the accused student's conduct.

390.    Piskadlo made it clear that he had no discretion to impose a lighter sanction.

391.    Piskadlo made it clear that the impact of his dismissal from Stonehill on John Doe's goal of furthering his education and obtaining an undergraduate degree was not a factor in Piskadlo's imposition of the sanction of dismissal.

392.    When Piskadlo advised John Doe that the finding of "responsibility" for "nonconsensual sexual contact" required his immediate dismissal, it was the first time John Doe had ever heard from any person, including any Stonehill official, that dismissal was imposed on all such cases.

393.    In the course of their meeting, Piskadlo gave John Doe a letter from Piskadlo addressed to John Doe and dated February 12, 2018, the date of their meeting.

394.    John Doe was unable to read and fully understand the letter during the meeting, as the trauma of the recommendation and imposition of sanctions, overwhelmed him.

**2.   Dismissal Letter—AVPS/Dean of Students to John Doe/February 12, 2018.**

395.    Piskadlo's February 12, 2018 Letter to John Doe ("the Dismissal Letter") advised John Doe of the following:

    A.   That a Title IX investigation had been conducted of the charge that John Doe had violated Stonehill's Sexual Misconduct Policy;

    B.   That Piskadlo had reviewed the Final Report;

    C.   That the Final Report included the Title IX Investigators' had "found that it is more likely than not that [Jane Roe] had not consented to sexual penetration and that the messages [John Doe] sent indicated that [John Doe] understood that the sexual interaction was unwanted as well."

396.    The Dismissal Letter did not contain any discussion of Piskadlo's review and determination of the evidence.  In fact, it did not even clearly state that Piskadlo, himself, held an opinion on the Title IX Investigators' findings and recommendation of responsibility.   Instead, Piskadlo merely repeated the Title IX Investigators' findings.

397.    The Dismissal Letter then informed John Doe that Piskadlo had imposed the following sanctions:

> A.  That Piskadlo was dismissing John Doe from Stonehill.  On this sanction the Dismissal Letter stated that, "[a]s a result of this decision, and in keeping with the College's steadfast commitment to not to (sic) tolerate any form of gender-based misconduct, you are dismissed from the college; and
>
> B.  That John Doe was "not permitted on College property at any time and must fully separate yourself from the Stonehill (sic) and all College activities."

398.    The Dismissal Letter then advised John Doe of his right to appeal, the standards for appeal, the deadline for the appeal, and the Stonehill official—the Vice President for Student Affairs—responsible for adjudicating the appeal.

399.    The Dismissal Letter advised that Jane Roe also could appeal the decision.

400.    The Dismissal Letter reminded John Doe that the No Contact Order remained in effect and was binding on both parties.

### 3.  Stonehill Production of Final Report to John Doe

401.    At no time before or during Piskadlo's meeting with John Doe on February 12, 2018, did Piskadlo or any Stonehill official provide John Doe with a copy of the Final Report.

402.    On information and belief, Piskadlo's decision not to produce the Final Report to John Doe before meeting with him was based on Piskadlo's determination to deprive John Doe with the basis for the Title IX Investigators' recommendation.  On information and belief, Piskadlo's decision to withhold the Final Report until after his meeting with John Doe was over was consistent and compliant with Stonehill policy to this effect.

403.    On information and belief, Piskadlo also understood that, because he had failed to include any information in the Dismissal Letter revealing how he, himself, had analyzed the Final Report and how he, himself, or Stonehill had reached the decision that John Doe must be dismissed, Piskadlo knew that the Dismissal Letter also would provide John Doe with no basis to question Piskadlo's finding of "responsibility" or the sanction Piskadlo imposed.

404.    Later on the morning of February 12, 2018, and after meeting with Piskadlo, Donna Vrana, Community Standards Administrative Assistant, forwarded the Final Report to John Doe by E-mail.

### O.    STONEHILL'S CONSIDERATION AND DENIAL OF JOHN DOE'S APPEAL.

#### 1.    Appellate Powers and Responsibilities of the Vice President for Student Affairs.

405.    The Vice President for Student Affairs, Pauline Dobrowski, granted John Doe and Attorney Baldacci additional time within which to file John Doe's appeal, extending the deadline to February 26, 2018.

406.    When Attorney Baldacci sought a short additional extension, Dobrowski denied that request and required that the appeal be filed by close of business on February 26.

407.    On February 26, Attorney Baldacci filed John Doe's appeal with Dobrowski by e-mail.

408.    On February 27, Attorney Baldacci filed an "Amended Appeal" because he and John Doe had discovered a factual error in the appeal as filed.   Dobrowski accepted the Amended Appeal and it thereby became the appeal that Dobrowski considered.

409.    In considering John Doe's appeal, Dobrowski was exercising powers and responsibilities accorded to her by the "Appeals" section of the Sexual Misconduct Policy.

410.    Among the powers and responsibilities assigned to Dobrowski was determining whether investigative, evaluative, adjudicatory, and resolution stages of the Title IX investigation of Jane Roe's claim against John Doe had complied with the "process and procedures" set forth in the Sexual Misconduct Policy.

411.    On information and belief, at all times Dobrowski understood that the burden of proving the allegations against John Doe did not lie with the parties, but lay with Stonehill, itself.

412.    Among the powers and responsibilities assigned to Dobrowski was assessing new information that was not known to the parties at the time of the investigation.

**2.   Points Raised in John Doe's Appeal of the Letter of Dismissal and Final Report**

413.    In his appeal, John Doe raised the following points about the procedures employed in the Sexual Misconduct Policy:

   A.    Binding Character of College's Conduct Code and Adjudicative Procedures

   B.    Appellate Standards

   C.    Sexual and Gender-Based Misconduct Procedures

      1.  Discriminatory Purpose

      2.  Diminished Protections in Sexual Misconduct Proceedings

      3.  The Sexual Misconduct Procedures are Legally Insufficient

   D.    The Investigators' Investigation and Report

      1.  College Duties and Case-Specific Representations

      2.  Mandatory Requirement to Fully Investigate "Consent"

      3.  Were the Investigators Impartial

4.   The Investigation Did Not Meet the College's Standards or the Promises of Michael LaBella and the Investigators

5.   The Investigators Failed to Properly Assess the Credibility of the Accuser

6.   The Investigators Failed to Properly Assess the Accused's Credibility

7.   The Final Report did not Clearly Find Whether the Acts in Question Began Without Consent or Were Initially Consented to but Consent was Withdrawn

8.   Impact of Report Deficiencies on Vice President's Review

9.   The Vice President Did Not Conduct the Review Required by the Rules

E. The Sexual Misconduct Procedures did not Provide Fair Warning That a Finding of "Responsible" on a Charge of Nonconsensual Sexual Intercourse Must Lead to Expulsion

F.  New Evidence of Facebook Communications Between John Doe and Jane Roe Materially Bears on the Nature of Their Pre-incident Relationship and Supports John Doe's Explanations for his Snapchat Messages.

### 3.  Procedural Defects Apparent to Dobrowski from the Structure and Wording of the Final Report

414.   Aside from the points raised in John Doe's appeal, the following procedural defects should have been apparent to Dobrowski:

a.   The February 12, 2018 letter does not state that Dr. Piskadlo reviewed and made independent determinations as to whether the facts gleaned in the investigation aligned with the findings of the Investigators as required by Stonehill's Investigation

and Disciplinary Procedures for Sexual/Gender-Based Misconduct and Interpersonal Violence,

b.   Investigators did not advise John Doe that he had any rights with respect to the Investigative Report dated January 23, 2018.

c.   Investigators did not conduct an interview of Jane Roe relating to the incident, but instead accepted the written version which Jane Roe had submitted to Lily Krentzman, the Title IX Director.

d.   Investigators characterized the second interview with Jane Roe as a review of facts when in fact it was an initial interview as the Investigators had relied on a reading of Jane Roe's statement in the first meeting.

e.   John Doe never received, nor was he allowed to review, the written statement of Jane Roe which was the basis of the Title IX investigation.

f.   There was new evidence which conflicted with Jane Roe's characterization of her pre-incident relationship with John Doe which went to her credibility.

**4.  Dobrowski's Denial of John Doe's Appeal.**

415.   On March 9, John Doe and Attorney Baldacci participated in a conference call with Dobrowski and Stonehill General Counsel, Thomas Flynn, Esq.

416.   In that telephone conference call, Dobrowski advised that she had reviewed John Doe's appeal and had denied it in its entirety.   She advised John Doe that his dismissal was now final and his separation from Stonehill was immediately in effect.

417.   When Attorney Baldacci asked Dobrowski to explain why she had denied John Doe's appeal, Dobrowski, on advice of Flynn, refused Attorney Baldacci's request.

418.   Dobrowski's refusal to explain why she had denied John Doe's appeal was consistent with the Title IX Investigators' failure to provide an explanation of how they had determined John Doe was responsible, including, what weight they had given Jane Roe's false statements about her pre-incident social relationship with John Doe, her pre-incident sexual experiences with John Doe, and her false claim that, at the time of the November 19 encounter, she was "incapacitated" within the meaning of the Sexual Misconduct Policy.

419.   Dobrowski's refusal to explain why she had denied John Doe's appeal was also consistent with Piskadlo's failure to set forth in the Letter of Dismissal "the reason for the outcome" and the "reason for" imposing the sanction of dismissal.

420.   Dobrowski's refusal to explain her decision, on advice of Stonehill's in-house attorney, was consistent with Stonehill's determination that the reasons for sanctioning a student on a charge of sexual misconduct should be obscured and concealed for the purpose of allowing Stonehill to engage in sex discrimination against male students without establishing a record sufficiently clear to demonstrate Stonehill's improper and unlawful motivation.

421.   After the telephone conference call, Dobrowski forwarded a letter dated March 9, 2018 to John Doe denying his appeal ("Denial Letter").   The Denial Letter was a form letter that had been revised to include information particular to the charge against John Doe.

422.   The Denial Letter identified the two appellate standards and advised that John Doe's appeal lacked "sufficient reasoning to meet either criteria (sic) for appeal."   The Denial Letter stated that Dobrowski "determined that the investigators' process was compliant with our policy."   Exhibit B.   The Denial Letter provided no explanation for Dobrowski's finding on this point.

423.    John Doe's appeal not only alleged that the Title IX Investigators had failed to comply with standards and processes in the Sexual Misconduct Policy and the Student Conduct Policy but that the AVPSA/Dean of Students had also failed to comply with those policies.    The Denial Letter did not acknowledge this basis for appeal nor rule on it.

424.    The Denial Letter stated that Dobrowski had also rejected John Doe's assertion that he had new evidence that should be considered on the question of "responsibility."    The new evidence provided was Facebook Messenger messages between John Doe and Jane Roe which showed the existence of a long standing relationship between the two and went to the credibility of Jane Roe. The Denial Letter did not address the new evidence at all and provided no explanation for Dobrowski's finding on this point.

425.    The Denial Letter advised that, with the denial of John Doe's appeal, the decision on Jane Roe's complaint against him was final and that John Doe had been "dismissed from the College" and that, '[a]s such, effective immediately, you are not permitted to be on College property at any time and must fully separate from Stonehill and all College activities."

426.    The Denial Letter did not provide any period after which John Doe could return to Stonehill as a student or even as a visitor.    The Denial Letter intended John Doe's separation from Stonehill to be a permanent, lifelong separation.

427.    The Denial Letter gave John Doe instructions on how to arrange to return to the campus and retrieve his belongings without violating the Denial Letter's terms.

428.    The Denial Letter advised that, although Stonehill had dismissed John Doe with no date for his possible return to Stonehill either as a student or a visitor, Stonehill retained jurisdiction over John Doe's relationship with Jane Roe advising that, "the previously established no contact with [Jane Roe] remains in effect.    This restriction includes, but is not limited to, in person, by

mail or e-mail, messaging, by phone, through a third party, and/or through any form of social media.   This is a reciprocal restriction."

429.   The Denial Letter did not explain how, after dismissing John Doe from Stonehill, Stonehill's No Contact Order could continue to bind him.    The Denial Letter also placed no time or place restrictions on the No Contact Order but, instead, was framed as a perpetual restriction to which John Doe was required to adhere.

430.   On March 11, 2018 John Doe was allowed onto the Stonehill campus for the purpose of removing his belongings.   He did so, and from that point forward to the present, has been separated from Stonehill.

**5.   Effect of Dobrowski's Denial of John Doe's Appeal.**

431.   On information and belief, Dobrowski has been trained in the standards and procedures of the Sexual Misconduct Policy and the Student Conduct Policy.

432.   On information and belief, Dobrowski understood that she was obligated to review all phases of the investigation, evaluation, adjudication, and resolution of the charge against John Doe against the standards and processes set forth in the Sexual Misconduct Policy as well as Title IX.

433.   Dobrowski's Denial Letter constituted Dobrowski's ratification and approval of all the investigation, evaluation, adjudication, and resolution of the charge against John Doe including, in particular, the actions of the Title IX Investigators and the AVPSA/Dean of Students, on behalf of Dobrowski, herself, as Vice President of Student Affairs, but on behalf of Stonehill College, as well.

434.   Dobrowski's failure to explain in any detail why she was denying any and all of the grounds raised in John Doe's appeal was required by, and consistent with, Stonehill's unstated,

unpublished policy of obscuring or refusing to state the rationale for its decisions finding male students responsible for violations of the Sexual Misconduct Policy.

435.    Dobrowski's failure to explain in any detail why she was denying John Doe's appeal of the sanction of dismissal that had been imposed upon him was required by and consistent with Stonehill's decision to impose the sanction of permanent dismissal on any student found responsible for nonconsensual sexual intercourse, but not to provide notice to students either that this sanction must be imposed in all such cases, regardless of the facts and circumstances, or to provide any explanation for the uniform application of that sanction.

**6.      Stonehill's Retention of John Doe's Tuition for the Spring 2018 Semester.**

436.    On March 31, 2018. John Doe petitioned Stonehill for the return of the monies he had advanced for the Spring 2018 Semester.

437.    Although at all times Stonehill knew that the completion of the Title IX Investigation had been delayed by the intervention of the Thanksgiving and Christmas-New Year's holidays, the latter of which coincided with Stonehill's mid-year break, and, although at all times, Stonehill knew that John Doe had to borrow the monies that he advanced to Stonehill for the Spring 2018 Semester, Stonehill denied John Doe's request and retained and continues to retain the monies John Doe advanced for the Spring 2018 Semester.

438.    At all times, Stonehill knew that, if John Doe were held "responsible" it would immediately dismiss John Doe and that it would seek to retain John Doe's tuition for the Spring 2018 Semester.

439.    Stonehill's retention of John Doe's tuition was, therefore, a consequence of Stonehill's unstated and unpublished sanction for nonconsensual sexual intercourse which Stonehill viewed as a violation of Title IX.

440.    Under the 2017 Q&A, before retaining John Doe's Spring 2018 Semester monies, Stonehill was required to consider the impact on John Doe of separating him from his education, including the ability for John Doe to finance that education.

441.    On information and belief, Stonehill did not consider the impact of retaining John Doe's Spring 2018 Semester monies on his education and, Stonehill's failure to do so was motivated by, and it is evidence of, its discriminatory intent against John Doe on the grounds that he is a male.

**P.      STONEHILL'S FACILITATION OF JANE ROE'S DEFAMATION OF JOHN DOE**

442.    On May 23, 2018, John Doe received a Snapchat message from a female student at Stonehill whom he had met while a student at Stonehill there who asked if they could talk.  John Doe said that they could talk but he was not available for a telephone call.

443.    The female student then sent him a screenshot of an exchange with Jane Roe that Jane Roe had initiated which went as follows:

> Jane Roe:  "I saw you post a picture with [John Doe] a while ago saying miss you love and I wanted to confront you a while ago;
>
> Female Student:   about what?;
>
> Jane Roe:  why he left stonehill;
>
> Female Student:  He said it was money;
>
> Jane Roe:  He raped me and got kicked out."

444.    The female student forwarded her exchange with Jane Roe with the message, "please tell me this isn't true, [John]".  John Doe responded by admitting that Stonehill had dismissed him

but added that the Stonehill process was "totally unfair" and that he "could not say more about it right now."

445.    In response to Jane Roe's assertion, he told the female student, "I did not rape [Jane]."

446.    By asserting that John Doe had "raped" her when, by her own admission, their sexual activity had been limited to digital stimulation, Jane Roe was employing a word that is commonly understood to mean forcible sexual intercourse or sexual intercourse with a person incapable of giving consent.   No one alleged that John Doe had engaged in such conduct with Jane Roe.

447.    Stonehill had, however, made it possible for Jane Roe to accuse John Doe of having raped her by having included digital manipulation of the clitoris under the broad heading of "Nonconsensual Sexual Intercourse" which implies either forcible sexual intercourse or sexual intercourse with a person incapable of giving consent.

448.    That Stonehill dismissed John Doe, an extreme sanction, supported the foregoing inference and facilitated Jane Roe's misleading assertion to the female student.

449.    In addition, under the heading "Related Massachusetts Legal Definitions," Stonehill misstated and mischaracterized the Commonwealth of Massachusetts' definitions of "Sexual Assault" and "Rape" in the following manner:

    A.   Stonehill asserted that the laws of Massachusetts defined "sexual assault" as meaning rape when, under the laws of Massachusetts, rape is a form of sexual assault, but not all sexual assault is rape.

    B.   Stonehill also asserted that the laws of Massachusetts defined rape as "(1) the penetration of any orifice by any body part or object; (2) by force and (3) without consent.   Rape also includes instances in which the victim is incapacitated

("wholly insensible so as to be incapable of consenting") and the perpetrator is aware of the incapacitation."

## Q.  STATUS OF JOHN DOE'S EFFORTS TO OBTAIN AN UNDERGRADUATE DEGREE

450.  Because John Doe was dismissed early in the Spring 2018 Semester, he could not resume his education at another undergraduate institution for that semester.

451.  John Doe was devastated by his dismissal from Stonehill the impact of which was made worse by the unfairness and outcome-driven manner in which Stonehill had investigated, evaluated, adjudicated, and, resolved the charge against him.

452.  John Doe was uncertain whether, with his Stonehill Education Record containing a finding that he was "responsible" for nonconsensual sexual intercourse, he would be unable to gain admission to any undergraduate institution.

453.  John Doe trained to become a pharmacy technician, a state-licensed position, and became employed in that capacity.

454.  In November of 2018, John Doe applied for admission to an undergraduate institution for the Spring 2019 Semester.

455.  As part of the admissions process, John Doe was required to answer a question that revealed Stonehill's action taken against him.

456.  He was also required to appear at the undergraduate institution and answer questions about the charge against him, Stonehill's investigation, evaluation, adjudication, and resolution of that charge.

457.  In order to be eligible to attend any undergraduate classes at the University of Maine, John Doe is on a "deferred suspension" due to the Stonehill finding and is "under close scrutiny

and any violation of the UMS Student Conduct Code would likely result in [his] separation" from the university. John Doe was also required to complete an online sexual harassment and assault prevention training before being allowed on campus. This process was humiliating and stressful as it was like reliving the Stonehill experience again.

458.    Stonehill's unlawful dismissal of John Doe has delayed his completion of his undergraduate degree by more than a year, caused substantial financial hardship, and has severely impacted his reputation by making a permanent record of his expulsion from Stonehill.

## COUNT I – VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *et seq.*

459.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

460.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, *et seq.* ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

461.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender.

462.    Stonehill receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Stonehill by its students or given to Stonehill by the federal government directly.

463.    Stonehill, through the actions of its agents, has discriminated against John Doe, on the basis of sex, through discriminatory, gender-biased implementation of Stonehill's policies and procedures.

464.     Title IX "is designed to eliminate... discrimination on the basis of sex in any education program or activity receiving Federal financial assistance...." 34 C.F.R. §106.1.

465.     In the Student Handbook, Stonehill explicitly holds itself out as governed by Title IX.

466.     A school subject to Title IX is required to "adopt and publish grievance procedures providing for prompt and equitable resolution of student ... complaints alleging any [prohibited] action." 34 C.F.R. § 106.8.

467.     Under Department of Education 2011 guidance, equitable resolution of a student complaint of sexual misconduct involves a school:

- conducting an "adequate, reliable, and impartial investigation of complaints,"

- providing "the opportunity for both parties to present witnesses and other evidence,"

- maintaining "documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings,"

- determining the outcome on a preponderance of the evidence standard, and

- providing for an appeal.

(*See* April 4, 2011 Letter from Department of Education Assistant Secretary for Civil Rights (the "Dear Colleague Letter")).

468.     In addition, "a school's investigation and hearing processes cannot be equitable unless they are impartial [,] [t]herefore, any real or perceived conflict of interest between the factfinder or decision-maker and the parties should be disclosed."

469.     Finally, every person involved in implementing the procedures and deciding a complaint in a sexual violence case "should have adequate training or knowledge regarding sexual violence."

470.    Stonehill's Sexual Misconduct Policy, its practices related thereto, and its handling of the complaint of sexual misconduct against John Doe, violate Title IX's requirements and recommendations for equitable resolution of student complaints of sexual misconduct.

471.    Rather than undertake a thoughtful implementation of federal guidance for the protection and support of young women on campus, Stonehill chose to dismantle the rights of young men to a fair adjudication of the claims against them.

472.    These steps were undertaken with the purpose of protecting Stonehill against the possibility of complaints of inadequate investigation by young women who had made sexual misconduct claims to the school.

473.    These steps were intended to and do have the effect of scapegoating those accused of sexual misconduct, i.e., Stonehill's male students, and as such, are discriminatory on the basis of sex.

474.    Stonehill's Sexual Misconduct Policy and its practices related thereto reflect the false, antiquated notion that, especially in cases where complainant and respondent are students with a prior history of consensual sexual contact, it is not possible to determine whether sexual misconduct has actually occurred on the complained-of occasion.

475.    Stonehill's Sexual Misconduct Policy reflects the College's choice, in the face of its antiquated belief that the "truth" is impossible to determine, to protect itself from accusations of "inadequate" investigation by ensuring a finding of responsibility on the part of the accused.

476.    An equitable process, including investigation by a party without a vested interest in protecting the school's interests, a hearing before an impartial adjudicative body, at which both parties may present witnesses, and the conduct of which is preserved in a record for purposes of appeal, can and does result in the just adjudication of complaints of sexual misconduct.

477.    Stonehill's Sexual Misconduct Policy and practices related thereto are designed to avoid adjudications of non-responsibility related to complaints of sexual misconduct, whether adjudications of responsibility for sexual misconduct are merited or not.

478.    Students accused of sexual misconduct at Stonehill, who on information and belief have invariably been male, have been scapegoated in Stonehill's process for adjudicating sexual misconduct as part of the Stonehill's self-interested strategy to avoid unwelcome federal scrutiny.

479.    Stonehill's Sexual Misconduct Policy and practices related to the investigation and adjudication of complaints of sexual misconduct have a disparate negative impact upon Stonehill's male students.

480.    Even assuming *arguendo* that Stonehill had complied with its policies and procedures, such rules afford varying rights to women and men because in virtually all cases of alleged sexual misconduct at Stonehill, the accused student is a male and the accusing student is a female.

481.    On information and belief, a female student at Stonehill has never been disciplined, much less expelled, for alleged sexual misconduct.

482.    Stonehill's policies and procedures have deprived John Doe, on the basis of his sex, of basic due process and equal protection rights as they deny a student accused of sexual misconduct the right to confront and/or cross-examine his accuser, or have a hearing in front of a panel of his peers.

483.    Due to his gender, Stonehill, through its agents, imposed sanctions on John Doe that were excessively severe.

484.    John Doe, based on his gender, was discriminated against by Stonehill in violation of Title IX and, as a result, John Doe has been seriously and irreparably damaged.

485.    As a direct and proximate consequence of Stonehill's Title IX violations, John Doe has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a permanent notation in his Education Record indicating that he was found to have committed sexual misconduct, harassment, and/or other related offenses.

486.    This mark on John Doe's record stigmatizes John Doe as he now has a record that notes findings of guilt equivalent to a rape conviction for conduct he did not commit.

487.    John Doe was wrongly found to have committed the acts for which he was accused.

488.    The proceeding by which he was found to be responsible for the alleged sexual misconduct was flawed and fundamentally biased and unfair.

489.    The flawed proceeding led to an adverse and erroneous outcome.

490.    The particular circumstances suggest that gender was a motivating factor behind the erroneous finding.

491.    In addition, the severity of the discipline imposed upon John Doe was motivated by and affected by his gender.

492.    As set forth above, the Student Sexual Misconduct Policy is discriminatory on its face. In addition, the very recent #METOO movement, and the DOE's pending investigations against Stonehill, and the publicity related to those investigations, all contributed to the discriminatory conduct of Stonehill in its, investigation, determination of wrongdoing, and sanctioning of John Doe.

493.    As a direct and proximate result of Stonehill's discriminatory conduct, John Doe has suffered significant damages, including, but not limited to, having academic and/or disciplinary records that improperly include a notation indicating that he committed sexual misconduct which

is the equivalent of a rape conviction, attorneys' fees, costs, and additional damages which are to be established at trial.

## COUNT II – BREACH OF CONTRACT

494.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

495.    John Doe and Stonehill are parties to an enforceable contract whereby Stonehill has agreed to provide John Doe with educational services and, conditioned upon John Doe's satisfactory completion of his coursework and compliance with Stonehill's standards for student conduct, Stonehill has agreed to provide John Doe with the degree he seeks.

496.    Valuable consideration in an amount in excess of $59,000.00 has been paid on behalf of John Doe to Stonehill, which Stonehill has accepted.

497.    Under the contract, Stonehill has a legal obligation to provide John Doe with a disciplinary process that meets with John Doe's reasonable expectations and provides fundamental fairness.

498.    Furthermore, Stonehill has adopted policies and procedures related to the investigation of student misconduct, which it is bound by contract, and in fairness, to substantially observe.

499.    Up to this time, John Doe has complied with all academic and non-academic requirements necessary to achieve a degree from Stonehill.

500.    Stonehill has breached the terms of its contract with John Doe by subjecting John Doe to the fundamentally unfair and inherently discriminatory policies and procedures of the Sexual Misconduct Policy, to an incomplete investigation conducted by Investigators who may have had a conflict of interest due to a prior investigation involving the same accuser, Jane Roe, and to an unjustified and unwarranted sanction of expulsion from Stonehill without the right of reinstatement.

501.    Stonehill's breach of its duty to abide by its own policies and procedures and/or meet common standards of due process and provide fundamental fairness, include, but are not limited to, the following:

- The failure to refer the matter to an external investigator who did not have a conflict of interest or bias from a prior investigation with the same accuser.

- The failure of the investigators to follow the procedures set forth in the S1.14 Policy.

- The failure to conduct a complete investigation.

- The failure to consider text messages and additional information.

- The failure to allow John Doe and his attorneys time to submit additional materials.

- The failure to have any hearing on the matter.

- The failure to allow John Doe the opportunity to question and/or cross-examine witnesses against him.

- Failure of the Associate Vice President for Student Affairs to analyze and make a determination as to the credibility of the allegations against him.

502.    As a direct and proximate result of Stonehill's breaches, John Doe has suffered significant damages, including, but not limited to, having academic and/or disciplinary records that improperly include a notation indicating that he committed sexual misconduct and/or sexual harassment which is the equivalent of a rape conviction, attorneys' fees, costs, and additional damages which are to be established at trial.

## **COUNT III – UNJUST ENRICHMENT**

503.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

504.    In the alternative, should this Court find no remedy at law available to John Doe under Count II, John Doe pleads unjust enrichment.

505.    Stonehill received a substantial monetary benefit in tuition and fees paid on John Doe's behalf and in anticipation that, if John Doe met all academic and non-academic requirements of Stonehill, John Doe would be awarded a degree.

506.    The conduct of Stonehill resulted in John Doe's unwarranted expulsion from Stonehill College.

507.    Under the circumstances, it would be unjust for Stonehill to retain the benefits, in the form of tuition and fees, which were paid on John Doe's behalf in anticipation of Stonehill's fair and equitable treatment of John Doe as a student of Stonehill.

## COUNT IV – PROMISSORY ESTOPPEL

508.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

509.    John Doe asserts that Stonehill's Student Handbook and other representations are binding contracts and that Stonehill has materially breached multiple provisions therein relating to the sexual misconduct proceedings in this case.

510.    However, in the event the Court were to find that no such contracts exist, Stonehill, through, but not limited to, its statements, regulations, standards, procedures and policies, made representations to John Doe, independent of any express contractual promises, that Stonehill expected or should have expected would induce John Doe to apply to and enroll in Stonehill.

511.    Stonehill expected or should have expected John Doe to accept its offer of admission and incur the tuition, fees and costs necessary for enrollment based on Stonehill's statements, regulations, standards, procedures and policies.

512.     John Doe relied on Stonehill's express and implied promises that he would not be discriminated against by Stonehill and would be afforded the rights set forth in the Student Handbook and other representations set forth above.

513.     John Doe justifiably relied on Stonehill's express and implied promises to his detriment, as Stonehill failed to adhere to its statements, regulations, standards, procedures and policies and did, in fact, discriminate against him by failing to provide him with the rights set forth in the Student Handbook and other representations.

514.     As a direct, proximate and foreseeable consequence of this conduct, John Doe has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses, and expelled from Stonehill.  Such notation in John Doe's academic record is the equivalent of a rape conviction.

515.     This mark on John Doe's record inhibits or destroys his ability to enroll in a similarly ranked college or university.  In addition, this finding stigmatizes John Doe with a record that notes findings of guilt from conduct he did not commit. John Doe has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

## COUNT V – NEGLIGENCE

516.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

517.     John Doe asserts Stonehill owed duties of care to John Doe independent of any contractual duties, including, but not limited to:

(a)        To ensure that its policies and procedures concerning sexual misconduct are

113

fundamentally fair and reasonable;

(b)      To ensure that its policies and procedures concerning sexual misconduct are compliant with applicable federal/state law, namely, but not limited to, Title IX;

(c)      To adequately train its administration, staff, employees, representatives, agents, investigators, and attorneys of such policies and procedures concerning sexual misconduct; and

(d)      To ensure that its administration, staff, employees, representatives, agents, investigators, and attorneys adhere to such policies and procedures.

518.    Based on the above-described facts and conduct, Stonehill breached its duties of care owed to John Doe.

519.    As a direct, proximate and readily foreseeable consequence of Stonehill's conduct, John Doe has sustained significant damages, including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offense.

520.    This mark on John Doe's record inhibits or destroys his ability to enroll in a similarly ranked college or university and stigmatizes John Does regarding future higher education and employment activities as he maintains a college record which notes findings of guilt for conduct he did not commit. John Doe has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

<u>**COUNT VI – DEFAMATION**</u>

521.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

522.    By and through its agents, including, but not limited to, Krentzmann, Bamford, Jordan, Labula, Piskadlo and Dubrowski, Stonehill made false and defamatory statements regarding John Doe in the Final Report dated February 9, 2018.

523.    Stonehill published these false and defamatory statements by making them to numerous

third parties, including, but not limited to, members of the staff and faculty of Stonehill and Jane Roe.

524.    At the time Stonehill made these false and defamatory statements, it knew, or should have known that its' defamatory statements were false.

525.    In particular, in a telephone conference with Stonehill's General Counsel, John Doe's attorney informed Stonehill that if the Investigator issued a report holding John Doe responsible for sexual misconduct, then Stonehill would have issued a false report.

526.    Also, in this telephone conversation, John Doe's attorney informed Stonehill's General Counsel that Stonehill must carefully review the history between Jane Roe and John Doe, including the text and Snapchat messages, before concluding its investigation and issuing its report.

527.    Furthermore, on or about January 30, 2018, John Doe's attorneys sent a letter to Stonehill's General Counsel and its Investigator, which expressly set forth numerous inadequacies of the investigation and issues that needed additional information and investigation.

528.    In reckless disregard of these warnings, on February 12, 2018, Stonehill published the Report, which contained numerous false and defamatory statements, including, but not limited to, that John Doe had engaged in sexual harassment and non-consensual sexual contact.

529.    On February 26, 2018, John Doe's attorneys provided almost 300 pages of materials which established that the Report's statements about John Doe were false.

530.    In reckless disregard of this additional information, Stonehill, through its agents, published the March 9, 2018, denial of appeal letter that contained numerous false and defamatory statements about John Doe, including, but not limited, to that John Doe had engaged

in sexual harassment and nonconsensual sexual contact.

531.   Stonehill, through its agents, made the false and defamatory statements with reckless disregard for the truth and with an improper purpose and such statements were unprivileged.

532.   Stonehill, through its agents, acted with express malice or they were reckless with their disregard for the truth such that malice is implied.

533.   John Doe has further been compelled to self-publish this false and defamatory adjudication as part of his application to complete his studies at another college.

534.   As a result of the publication of these false and defamatory statements, including the College's initial publications and John Doe's subsequent compelled self-publication, John Doe has suffered damages, including, but not limited to, harm to his reputation, mental suffering, humiliation, embarrassment and loss of social standing in the community, and attorney's fees to correct the false and defamatory statements.

## COUNT VII - FALSE LIGHT

535.   Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

536.   Stonehill's unnecessary and punitive sanctions are communicative conduct that falsely publicized to the campus at large that John Doe was responsible for severe misconduct when he was not.

537.    As a result, of Stonehill's conduct, John Doe suffered damages, including, but not limited to, harm to his reputation, mental suffering, humiliation, isolation, embarrassment and loss of social standing in the community, and attorney's fees to correct the false and defamatory statements.

## **COUNT VIII – VIOLATION OF UNFAIR TRADE PRACTICES ACT**

538.   John Doe repeats and realleges the foregoing allegations as if more fully set forth herein.

539.   At all relevant times, Stonehill offers for sale and sells education services to students in Massachusetts and around the nation.

540.   In connection with the sale of educational services, Stonehill made numerous representations to John Doe and other students, including, but not limited to the following:

- That Stonehill would adopt a fair and impartial disciplinary proceeding that would meet the common standard of fair play and be fundamentally fair.

- The Stonehill would refer its sexual misconduct proceedings to trained Title IX investigator(s).

- That Stonehill's Investigator would not have a conflict of interest in the investigation.

- That Stonehill would communicate with parents when their student faced disciplinary proceedings.

- That Stonehill would not engage in discriminatory practices based on gender against male students.

541.   The representations of Stonehill were false, and Stonehill knowingly maintained these false representations with the intent to increase its sales to families of college-aged students.

542.   The Stonehill's false representations and its conduct in the disciplinary process with respect to John Doe constitute unfair trade practices under the Massachusetts Unfair Trade Practices Act, M.G. Law 93A§ 1, *et seq*.

543.   Pursuant to M.G. Law 93A§ 9, John Doe purchased educational services from Stonehill primarily for personal, family, and/or household purposes.

117

544.    As a result of Stonehill's conduct, John Doe has suffered the loss of money as a result of such unfair and deceptive practices, including, but not limited to, the loss of tuition and other payments, attorneys' fees and expenses.

545.    As a direct and proximate result of Stonehill's conduct in violation of the Massachusetts Unfair Trade Practices Act, 93A§ 1, *et seq*., John Doe has suffered damages in the amount to be established at trial.

## COUNT IX – FRAUD

546.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

547.    Stonehill's representations to John Doe and his family set forth above were false and were made to induce John Doe to attend Stonehill and to make over $56,000 in tuition and other payments to Stonehill.

548.    John Doe justifiably relied on Stonehill's representations to his detriment and has attended Stonehill College since September 2017 and paid over $56,000 to Stonehill.

549.    Stonehill's false representations were made either knowingly or with reckless disregard for their truth or falsity.

550.    Stonehill's conduct was motivated by actual ill will or was so outrageous that malice is implied.

551.    As a result, John Doe has been damaged in amount to be established at trial.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

552.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

553.    Stonehill owed duties of care to John Doe.  Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair, impartial and equitable manner.

554.    Stonehill breached its duties owed to John Doe.

555.    Such breach by Stonehill created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

556.    As a direct and foreseeable consequence of Stonehill's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

557.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe, namely, John Doe has suffered from insomnia, depression and anxiety since the commencement of the subject investigation.

558.    Stonehill's extreme and outrageous conduct was the cause of John Doe's distress. As a result of the foregoing, John Doe is entitled to recover damages in an amount to be determined at trial, plus interest, attorneys' fees, expenses and costs.

## COUNT XI – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

559.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

560.    Based upon the aforementioned facts and circumstances, Stonehill College breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate sanction of expulsion, notwithstanding the lack of evidence in support of Jane Roe's allegations of non-consensual sexual activity.

561. As a result and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

562. John Doe is entitled to recover damages for Stonehill's breach of the express and implied contractual obligations described herein.

563. As a result of the foregoing, John Doe is entitled to recover damages in an amount to be determined at trial, plus interest, attorneys' fees, expenses and costs.

## COUNT XII – BREACH OF COMMON LAW DUTY OF FAIRNESS

564. Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

565. In addition to the breaches of Stonehill's explicit policies and procedures, Stonehill had a duty to provide fairness in disciplinary proceeding both by its own policies, and those imposed by Massachusetts law.

566. John Doe relied on, and had an expectation, that the disciplinary process would be conducted in a fair manner.

567. Stonehill violated its duty of fairness.

568. As a result of Stonehill's breach of its duty of fairness in the disciplinary proceeding, John Doe has suffered damages to be determined at trial.

## COUNT XIII – DECLARATORY JUDGMENT

569. Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

570.    Stonehill has committed numerous violations of the Parties' contracts and of state and federal law.

571.    John Doe's education and future career have been severely and irreparably harmed. Without appropriate redress, the unfair outcome of the finding and the expulsion sanction will continue to cause irreparable and irreversible damages to John Doe's educational career and future employment opportunities for the rest of his life.

572.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Stonehill.

573.    By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. §2201, a declaration that (i) Stonehill College's sexual misconduct investigation of John Doe violated his contractual rights and his due process and equal protection rights; (ii) Stonehill College's finding of responsibility was illegal, null and void; and (iii) Stonehill College's current rules, regulations and procedures are illegal in violation of Title IX, 20 U.S.C. § 1681, *et seq.*

## COUNT XIV – PERMANENT INJUNCTION

574.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

575.    By virtue of Stonehill's violation of his contractual, due process and equal protection rights, John Doe has suffered irreparable harm for which money damages are wholly inadequate.

576.    The balance of any hardships weighs in favor of John Doe and against Stonehill.

577.    The public would not be disserved by the granting of a permanent injunction.

578.    To address that harm, John Doe is entitled to injunctive relief from this Court compelling Stonehill College to (i) vacate the finding of responsibility by the Vice President and Dean of

121

Students, Dr. Piskadlo, on February 12, 2018, as well as the denial of appeal issued on March 9, 2018; (ii) expunge all negative references contained in John Doe's scholastic and disciplinary record; (iii) remove all references of John Doe's expulsion from his scholastic and disciplinary record and replace it with the term "voluntary withdrawal;" and (iv) destroy any and all record of the investigation that gave rise to the illegal finding of responsibility.

## COUNT XV - ATTORNEY FEES

579.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth herein.

580.    In accordance with 42 U.S.C. 1988(b), John Doe is entitled to recover attorney fees and costs upon prevailing in his Title IX claims as set forth above.

581.    In addition, John Doe is entitled to attorney fees and costs under the Massachusetts Unfair Trade Practices Act, 93A§ 1, *et seq*.

Wherefore, John Doe prays this Court enter judgment in his favor and against Defendant Stonehill College on each of his claims for relief as set forth herein, along with attorney fees' interest, costs, and any other relief this Court deems just and proper.

Dated this 9th day of March, 2020.

Respectfully submitted,

*Seth W. Brewster*

_____
Seth W. Brewster, MA Bar No. 551248
*Janna D. Gau, Maine Bar No. 6043
*Timothy C. Woodcock, Maine Bar No.1663
EATON PEABODY
80 Exchange Street, P.O. Box 1210
Bangor, Maine  04402-1210
(207)947-0111

*Pending Order on Motion Pro Hac Vice

ATTORNEYS FOR JOHN DOE

**JURY TRIAL DEMANDED**