## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOHN DOE,

      Plaintiff,

v.

STONEHILL COLLEGE, INC.,

      Defendant.

No. 1:20-cv-10468

**MOTION FOR LEAVE TO FILE EXCESS PAGES GRANTED ON JULY 20, 2020 (DKT. NO. 16)
*ORAL ARGUMENT REQUESTED**

## JOHN DOE'S MEMORANDUM OF LAW IN SUPPORT OF HIS OPPOSITION TO STONEHILL COLLEGE, INC.'S MOTION TO DISMISS

JOHN DOE,

Seth W. Brewster (BBO No. 551248)
Janna D. Gau (Maine Bar No. 6043)
Timothy C. Woodcock (Maine Bar No. 1663)
EATON PEABODY
80 Exchange Street, P.O. Box 1210
Bangor, Maine 04402-1210
(207) 947-0111
*sbrewster@eatonpeabody.com*
*jgau@eatonpeabody.com*
*twoodcock@eatonpeabody.com*

Dated: September 1, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

I.   PROCEDURAL BACKGROUND ................................................... 1

II.  RELEVANT FACTUAL BACKGROUND ...................................... 1

III. STANDARD OF REVIEW ON RULE 12(b)(6) MOTION TO DISMISS ........ 3

IV.  ARGUMENT AND  AUTHORITIES ............................................. 2

    1.   Contract Between Doe and Stonehill ........................................ 3

        A.  Stonehill's Sexual Misconduct Policy was Separate and
           Distinct from its Community Standards Policy ...................... 3

        B.  The Policy set Exacting Standards for Its
           Title IX Investigations ........................................................... 4

        C.  Sexual Misconduct Policy Guaranteed Substantive and
           Procedural Rights to Doe ....................................................... 6

        D.  The Policy Promised all Stonehill Personnel Would
           Be Specially Trained ............................................................. 6

        E.  The Policy Guaranteed that the Final Decision Would
           Include the Reasoning for the Outcome ................................ 8

    2.  Breach of Contract in Notice, Investigation, Adjudication
       and Resolution of Roe's Complaint. ......................................... 8

    3.  Doe has Sufficiently Pleaded Claims for Relief
       Under Title IX. ......................................................................... 15

        A.  Stonehill's Separate Disciplinary Process for Sexual
           Misconduct is Evidence of Discriminatory Purpose .......... 16

B.  Scrutiny by OCR and the Public are Evidence of Motivating Factors in Stonehill's Discriminatory Purpose.................................... 17

C.  Stonehill's Investigation, Adjudication and Resolution of Roe's Complaint Suggests Discriminatory Intent ........................................ 18

4.  Doe has Sufficiently Pleaded a Claim for Breach of the Duty of Basic Fairness. ................................................................................ 26

5.  Doe has Sufficiently Pleaded a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing. ................................. 27

6.  Doe has Sufficiently Pleaded a Claim for Defamation – Count VI. .......... 28

7.  Doe has Sufficiently Pleaded a Claim for Negligence Negligent Infliction of Emotional Distress and Fraud.............................. 29

8.  Doe is Entitled to Both Declaratory and Injunctive Relief. ....................... 30

CERTIFICATE OF SERVICE ............................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Anthony's Pier Four, Inc. v. HBC, Assoc.,*
411 Mass. 451, 583 N.E. 2d 806 (1991) ................................................................ 27

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................... 1, 2, 3

*Barrett Assoc. v. Aronson,*
346 Mass. 150, 190 N.E.2d 867 (1963) ................................................................ 30

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ..................................................................................2

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ............................................................................... 17

*Cloud v. Trustees of Boston Univ.,*
720 F.2d 721 (1st Cir. 1983) ....................................................................... 3, 27

*Coveney v. President & Trs. of College of Holy Cross,*
388 Mass. 16, 445 N.E. 2d 136 (1983) ...................................................................3

*Doe v. Amherst College*
238 F.Supp.3d 195 (2017)........................................................................... 28, 29

*Doe v. Baum,*
903 F.3d 575 (6th Cir. 2018) .........................................................................2

*Doe v. Boston College,*
892 F.3d 67 (1st Cir. 2018) ........................................................................ 16

*Doe v. Brandeis University,*
177 F.Supp.3d 561 (D. Mass. 2016) ........................................................... 7, 27, 30

*Doe v. Columbia University,*
831 F.3d 46 (2nd Cir. 2016) ...................................................................... 16, 18

*Ernst & Young v. Depositors Economic Protectors Corp.*,
45 F.3d 530 (1st. Cir. 1995) ...................................................................... 30

*Foster v. The Loft, Inc.*,
26 Mass. App. Ct. 289, 526 N.E.2d 1309 (1988) .................................................. 29

*Goss v. Lopez*,
419 U.S. 565 (1975) ............................................................................... 27

*Haidak v. Univ. of Mass. at Amherst*,
933 F.3d 56 (1st Cir. 2019) ...................................................... 4, 12, 15, 16

*HipSaver v. Kiel*,
464 Mass. 517, 984 N.E.2d 755 (2013) .................................................. 28

*Mangla v. Brown Univ.*,
135 F.3d 80 (1st Cir. 1998) .........................................................................3

*Masingill v. EMC Corp.*,
449 Mass. 532, 870 N.E.2d 81 (2007) ..................................................... 30

*Merrimack Valley Nat'l Bk. v. Baird*,
372 Mass. 721, 363 N.E.2d 688 (1977) ....................................................3

*Noonan v. Staples, Inc.*,
556 F.3d 20 (1st Cir. 2009) ................................................................ 28

*Payton v. Abbott Labs*,
386 Mass. 540, 437 N.E.2d 171 (1982) .................................................. 30

*Schaer v. Brandeis Univ.*,
432 Mass. 474, 735 N.E. 2d 373 (2000) ............................................ 2, 28

*Squeri v. Mount Ida College*,
954 F.3d 56 (1st Cir. 2020) .........................................................................3

*Starr v. Fordham*,
420 Mass. 178, 648 N.E.2d 1261 (1995) ............................................ 3, 6

*UNO Restaurants, Inc. v. Boston Kenmore Realty, Corp.*,
441 Mass. 376, 805 N.E.2d 957 (2004) ................................................................ 27

*Yusuf* v. Vassar College
35 F.3d 709 (2nd Cir. 1994) ................................................................................... 15

**Statutes and Codes**

20 U.S.C. § 1681 ....................................................................................................1

28 U.S.C. § 2201 .................................................................................................. 31

## I.      PROCEDURAL BACKGROUND

At issue is Plaintiff's First Amended Complaint ("FAC") setting forth claims by former Stonehill student, John Doe, against Stonehill College, Inc., ("Stonehill") for wrongfully expelling him for having allegedly engaged in Nonconsensual Sexual Intercourse with Stonehill student and classmate, Jane Roe. Doe has alleged, *inter alia*, that in investigating, evaluating, adjudicating, and resolving Roe's complaint, Stonehill breached its contractual commitments to him and such breach was motivated by discriminatory intent in violation of Title IX of the Education Amendments Act of 1972, 20 USC §1681, *et seq*. Stonehill has moved to dismiss all Plaintiff's claims pursuant to Rule 12(b)(6).

## II.     RELEVANT FACTUAL BACKGROUND

This case arises from a complaint filed by Jane Roe, a Student at Stonehill, alleging that John Doe violated Stonehill's Sexual Misconduct Policy by engaging in nonconsensual sexual intercourse with Roe on or about November 18-19, 2017. (Def.Mem. Ex. 1). Prior to the allegation against Doe, Roe and Doe had a pre-existing relationship which included the same level of sexual intimacy alleged on the evening or early morning hours of November 18-19. *See* FAC ¶¶ 21-73. Based upon Stonehill's breach of its contractual obligations to Doe as set forth below, and the discriminatory intent which was a motivating factor in Stonehill's investigation, adjudication and resolution, Doe sought relief against Stonehill for his claim by filing the above captioned action. *See* FAC ¶¶ 459-569 (Counts I – XIII).

## III.    STANDARD OF REVIEW ON RULE 12(B)(6) MOTION TO DISMISS

Defendant has moved to dismiss all counts in Plaintiff's Complaint pursuant to Rule 12(b)(6)[1]. The Supreme Court addressed Rule 8's pleading requirements in *Ashcroft v. Iqbal*,

---

[1] In doing so, Defendant has complained that Plaintiff's counts are not clearly pleaded. To the extent Defendant was unclear on those bases, a Motion for a More Definite Statement pursuant to Rule 12(e) would have been

556 U.S. 662 (2009) and *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007). In *Twombly*, the Court held that a complaint must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence [of the conduct complained of]. *Id.* at 556. The Court explained that this standard was not high; it required only sufficient factual allegations to constitute "plausible grounds to infer" that the defendant had engaged in the acts or omissions at issue. *Id.* Under this standard, "a well-pleaded complaint may proceed even if it strikes the savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Id.*

The Court returned to Rule 8 in *Iqbal* clarified *Twombly* by explaining that, first, although the court must accept as true all factual pleadings, that rule did not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 at 678. Second, the pleaded facts, themselves, had set forth a "plausible claim for relief" which raised "more than the mere possibility of [the alleged] misconduct..." *Id.* at 679. In considering this question, a court may draw on its "experience and common sense." *Id.*

The First Circuit has held that, on a motion to dismiss, the court may consider "documents incorporated by reference [in the complaint], matters of public record, and other matters susceptible to judicial notice." *Squeri v. Mount Ida College*, 954 F.3d 56, 61 (2020).[2] As the Sixth Circuit observed in considering Title IX claims, "Doe's allegations do not have to give rise to the most plausible explanation—they just have to give rise to one of them." *Doe v. Baum*, 903 F.3d 575, 587 (2019), citing, *Iqbal* 556 U.S. at 678.

## IV.   ARGUMENT AND AUTHORITIES

---

warranted. To the extent the Court agrees that in some respects Plaintiff's claims are not clearly pleaded, Plaintiff would respectfully request the Court to consider Defendant's motion under Rule 12(e).

[2] Plaintiff has included with this Opposition Memorandum documents and correspondence generated by or submitted to Stonehill College in the course of its investigation and adjudication of Roe's complaint. Doe does not object to the documents Stonehill appended to its Motion to Dismiss.

1. **Contract Between Doe and Stonehill.**

The student-college relationship is contractual. *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478, 735 N.E. 2d 373 (2000) (citing, *Cloud v. Trustees of Boston Univ.* 720 F.2d 721, 724 (1st Cir. 1983) (quoting, *Coveney v. President & Trs. of the Coll. of Holy Cross*, 388 Mass. 16, 20, 445 N.E. 2d 136 (1983); *See, also, Mangla v. Brown, Univ.,* 135 F.3d 80, 83 (1st Cir. 1998). In general, "[c]ontract interpretation is an individualized process with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention." *Starr v. Fordham* 420 Mass. 178, 190, 648 N.E.2d 1261 (1995). College-student contracts are governed by "'the standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Schaer v. Brandeis*, 432 Mass. at 478, quoting, *Cloud,* 720 F.2d at 724. "The author of the ambiguous term is held to **any** reasonable interpretation attributed to that term which is relied on by the other party." *Merrimack Valley Nat'l Bk. v. Baird*, 372 Mass. 721, 724, 363 N.Ed.2d 688 (1977) (emphasis supplied).

### A. Stonehill's Sexual Misconduct Policy was Separate and Distinct from its Community Standards Policy.

Roe's complaint of sexual misconduct prompted an investigation under Stonehill's Title IX Policy ("Sexual Misconduct Policy" or "Policy"). *See* FAC, Ex. C; *see also* FAC ¶¶ 74-114; 185-206. Doe alleged that Stonehill developed the Policy in response to the Department of Education's ("DOE") Dear Colleague Letter of April 4, 2011. FAC at ¶¶ 125-131; 136-156. The Policy incorporates some terms from DOE's 2011 Guidance. FAC at ¶¶ 136-156. According to Stonehill's Motion to Dismiss, Stonehill revised the Policy in response to the DOE's September 22, 2017 Q&A. (Def. Mem.at p.4).

Stonehill's Sexual Misconduct Policy was separate and distinct from its policy S1.3, Community Standards and Student Conduct Process. *See* FAC, Ex. B. Significantly, the Sexual Misconduct Policy dispensed with a panel hearing in favor of an investigator model wherein "trained" Title IX investigators would interview the parties and witnesses and, gather evidence. FAC, Ex. C, pp. 4 and 19. From start to finish, the investigation, evaluation, adjudication, and resolution (including sanction) was conducted by Stonehill employees and administrators. Stonehill's Title IX investigators were to conduct the investigation and to recommend, but not to decide, "responsibility." FAC, Ex. C, p. 19. Without meeting with the parties or any witnesses, the AVPSA/Dean was to decide "responsibility" and to fashion any sanction. *Id*. The Vice President of Student Affairs was to decide any appeals. *Id*. at p. 20. Of a similar process, the First Circuit has observed "[s]uch a system of adjudication can fairly be called inquisitorial." *Haidak v. Univ. Mass. at Amherst*, 933 F.3d 56, 68. (2019).

The Sexual Misconduct Policy gave Stonehill much greater control over all aspects of Title IX investigations and adjudications. *See e.g.* FAC at Ex. C. The greater control Stonehill exercised, however, the greater became its responsibilities and obligations to those students who would become subject to its processes. *See, e.g., Haidak,* at 70 (discussing examination in lieu of cross-examination). As is discussed further below, Stonehill understood the obligations it had assumed that were inherent in its administrator-only process and gave assurances to that effect to its students.

### B. The Policy set Exacting Standards for its Investigations Title IX Investigation.

First, the Policy set broad standards of excellence and diligence, which it regularly repeated and restated, and which it promised every investigation and adjudication would meet. *See.e.g.* FAC at Ex. C. These standards included promises that the process would be "prompt"

and "equitable" and "impartial, prompt, fair, and equitable" FAC, Ex. C, at pp. 3, 4, 18,19, and 20; FAC ¶¶ 154, 268-273.  The Policy also promised that "the Title IX investigators [would] conduct thorough and impartial investigations into the facts of a case." *Id.* The Policy further stated that "[i]nvestigations will be prompt, thorough, and dedicated to impartial fact finding." *Id.* at p. 18; (Def. Mem. Ex. 1).

The Policy made specific guarantees as to steps Title IX investigators would take in fulfilling their responsibilities, promising that they would "interview[] the complainant, the respondent, witnesses, or others having relevant information, and [would] collect[] any other evidence deemed relevant to a case." *Id.*  The policy promised that the investigators would "glean"[3] evidence before making any recommendations to the AVPSA/Dean.  It then provided that, in reviewing the investigators' recommendation and acting on the investigators' recommendation, the AVPSA/Dean would be held to the same standard. FAC, Ex. C, p.19.  Of all the general and specific standards which Stonehill imposed on itself, the Policy clearly stated that two held primacy: "While the College endeavors to follow [the foregoing] timeframes, the **fairness** and **thoroughness** for the process are paramount." *Id.* at p. 18. (Emphasis supplied).

From the foregoing, it is apparent that in adopting the Policy, Stonehill accepted full responsibility for having assumed such great control over the processes and, it expressly warranted to its students, including Doe, that they would rely on those standards and processes and Stonehill's committment to them. Therefore, to the extent Stonehill is asserting that it is up to Doe to take the initiative on any point in contention, the Policy states otherwise.  At all time,

---

[3] The Policy's use of the word "gleaned" is striking.  It closely corresponded to and reinforced in the Policy's "paramount" commitment to a "thorough" investigations. "Glean" is defined as "1. To gather grain or other produce left over by the reapers. 2. To gather information or material bit by bit. *vt.* 1a: to pick up after a reaper 1b. to strip (as a field) of the leavings of reapers. 2a: to gather information bit by bit.  to pick over in search of relevant material <"gleaning" old files for information. 3. FIND OUT." Merriam Webster Collegiate Dictionary, 11th Ed. (2004).

these obligations remained with Stonehill.   These, then, were the purposes underlying and governing the Policy.  *Starr, at* 420 Mass. at 190.

### C. Sexual Misconduct Policy Guaranteed Substantive and Procedural Rights to Doe.

In addition to the governing principles set forth above, the Policy guaranteed Doe specific procedural rights. These included:  1) the case against Doe must be proved by a "preponderance of the evidence;"[4] 2) the right to receive the "notification" of the report of misconduct which notice must "include sufficient details and allow for sufficient time to allow the Respondent to prepare a response before any initial interview;" FAC, Ex. C, p.20 - Right No.2; 3) the right to submit names of potential witnesses to the Investigators. *Id.* at p. 21 - Right No. 7; 4) the right "to be informed of all witnesses being interviewed;" *Id.*; 5) the right to submit questions to the Investigators to be posed to any witnesses (the Investigators had the right to "assess the appropriateness and relevance" of proposed witnesses and questions); *Id.* at p.21 - Right No.  8; 6) the right to "review and respond to pertinent evidence"; *Id.* at Right No. 9; and, 7) the right to "review and respond to the investigation report before it is submitted to the [AVPSA/Dean]." *Id.* at Right No.  11.   Notably, this last right reinforced an earlier guarantee that before the investigators made a recommendation on responsibility, and before they submitted the Final Report to the AVPSA/Dean, Doe would have the opportunity to review "the facts gleaned"[5] and to suggest "relevant witnesses and evidence."  *Id.*

### D. The Policy Promised all Stonehill personnel would be Specially Trained.

The Policy guaranteed that the Title IX investigators were "annually trained" and would discharge their duties in accordance with contractually imposed standards.  FAC, Ex. C, p. 17 and 20 - "Right" No. 3; (Def. Mem. Ex. 1).  On this point, the Policy promised "[e]very staff

---

[4] The recommendation would be based on the "totality of the evidence."   FAC, Ex. C., pp. 17-18.

member and investigator in the intake or resolution of complaints will be annually trained on how to conduct an investigation and hearing process that protects the safety of individuals and promotes individual accountability." *Id.* at p. 17, n. 2; see also FAC at ¶ 175. As sexual acts are deeply personal, it is understood that in the vast majority of such complaints, there will only be two witnesses. Therefore, when Stonehill guaranteed that its Title IX investigators were "trained," this meant that they would both be skilled in questioning the parties about the details of their intimacy on the point at issue, as well as their past practices to the extent that they bore on the question of consent.[6] See, *Doe v. Brandeis*, 177 F.Supp.3d 561, 608 (D. Mass 2016) (on significance of prior sexual interaction).

Thus, the Policy guaranteed the investigators would be skilled in determining each party's credibility where the parties differed materially over the nature and extent of the conduct at issue, whether consent was given and withdrawn, or never given at all, or where they had a prior history of intimacy, and how they communicated consent to one another in previous interactions. Indeed, the investigation of prior sexual intimacy between the two parties and the nature of those interactions is relevant in a determination of whether there was consent in this instance, particularly where consent was given by actions in prior interactions. *See* FAC, Ex. C. p., 19 and 21 at Right No. 11; see also FAC ¶¶35-47. That the Policy designates this as a "right" implies that the investigators must thoroughly investigate the prior sexual history in order to determine its relevance[7].

---

[6] The Sexual Misconduct Policy states that, "Consent means informed, freely, and voluntarily given agreement, communicated by clearly understandable words **or actions** to participate in some form of sexual activity." FAC Ex. C, p. 7 (emphasis supplied). It further states that, "[w]hile a person's **non-verbal actions can constitute consent,** verbal communication between two people is the best way to ensure that each person knows the intentions of the other person." *Id.* at p. 8 (emphasis supplied).

[7] This is contrary to Stonehill's assertion in its motion that prior sexual history is not relevant and the new Title IX regulations affirm that. In fact, the new regulations state that
...(b) (6)(i) Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that

Stonehill's contractual commitment to the specialized skill and competence of its Title IX investigators in these areas was particularly important because the decision-maker, the Associate Vice President for Student Affairs/ Dean of Students ("AVPSA/Dean") would not meet with either party before rendering his decision and, therefore, would be uniquely dependent on the Title IX investigators' assessments of credibility. FAC at ¶¶ 377-394.

### E. The Policy guaranteed that the Final Decision would Include the Reasoning for the Outcome.

The Policy provided that the AVPSA/Dean would decide the issue of responsibility and impose the sanction. FAC Ex. C, p. 19. The Policy required the AVPSA/Dean to issue a "formal decision" and that these "final results" would be disclosed to the parties. It provided that Stonehill would notify the parties "in writing" of the "initial outcome" and "the appeal outcome." *Id.* at pp.19-20. It provided that "[t]he notice of the outcome will include the outcome, the reason for the outcome, and the sanction associated with the outcome." *Id.*[8] The Policy provided both parties with the right to appeal the AVPSA/Dean's Final Decision. *Id.* at p. 21.

### 2. Breach of Contract in Notice, Investigation, Adjudication and Resolution of Roe's Complaint.

**Charging Letter:** On November 22, Labella sent Doe a letter in which he more formally put him on notice of Roe's charge. ("Charge Letter").[9]   The Charge Letter bears emphasis because it became, in effect, the only official charging instrument in the case—presenting

---

someone other than the respondent committed the conduct alleged by the complainant, **or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.**
85 Fed.Reg. at 300354, fn. 267 (May 19, 2020) (emphasis added).

[8] At this section of the Policy several different terms are used to describe the AVPSA/Dean decision on responsibility and sanctions. They are: "formal decision", "final results", "initial outcome", and, "notice of outcome"; see also, "formal decision. *Id.* at p. 21 - Right No. 12. These terms appear synonymous.
[9] The Policy provides that the Deputy Title IX Director would have "initial meetings with the parties' and that within five business days of those meetings, if appropriate, will issue a "charge letter." FAC Ex. C. Doe did not have an initial meeting because, when Roe filed her complaint, he was away on Thanksgiving break.   See Def. Mem. Ex.1.

formulaic description of the charge against Doe. It also described several of the essential procedural and substantive elements of the investigative adjudicatory process which, through the Policy, Stonehill had contractually guaranteed to Doe. (Def. Mem. Ex. 1); FAC at ¶¶ 103-114.[10]

First, the Charge Letter advised that Stonehill was "investigating a report from [Roe] that, on Saturday, November 18 (sic), 2017, in [Roe's] room in O'Hara Hall, between 1:00am, and 2:00am" Doe had violated the Sexual Misconduct Policy[11] by engaging in "nonconsensual sexual intercourse" with Roe. *Id.* Although the Policy[12] defines the phrase "nonconsensual sexual intercourse,"[13] the letter did not make that clear.

The Charge Letter also advised Doe that for allegations of sexual misconduct under the Policy, Stonehill employed an "investigator model" and that Stonehill had assigned two Title IX investigators—Shayla Jordan and David Bamford. FAC at ¶¶ 103-114; (Def. Mem. Ex. 1). The letter explained that Doe should "[b]e assured" that the investigators "are specifically trained to handle this kind of incident." *Id.* It then listed procedural rights the Policy guaranteed to Doe. *Id.* The Charge Letter was intended to ensure that Doe was not only aware of these commitments, but that he relied on Stonehill to fulfill them.

**Investigation**: On November 27, Investigator Jordan wrote to Doe introducing herself and fellow Investigator, David Bamford, explaining that they would be proposing dates and

---

[10] Jane Roe initiated the complaint process by meeting with Title IX Coordinator, Lily Krentzman on November 20, 2017. Roe declined to be interviewed about the incident and gave Krentzman a prepared statement which Krentzman converted into a Memorandum to File ("Krentzman Memo")

[12] The Labella Letter was sent when Stonehill's 6/27/17 Sexual Misconduct Policy was in effect FAC, Exhibit A). On December 5, 2017, Stonehill issued a revised Sexual Misconduct Policy. FAC, Ex. C. Although Stonehill did not make it clear to Doe at the time, based on Stonehill's Motion to Dismiss, it appears that Stonehill considered the 12/05/17 version of the Policy to govern Roe's complaint.

[13] The Policy provides that "sexual misconduct" is prohibited and provides further that "sexual misconduct" includes, "Non-Consensual Sexual Intercourse, which is the penetration, no matter how slight, of the vagina or anus, with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." FAC, Ex. C. at p. 6.The breadth of this definition is discussed further below.

times for an interview.  FAC ¶ 233-255.  They did not tell Doe they would be meeting with Roe

the very next day and, therefore, provided him no opportunity to propose questions to her.  FAC

¶ 233-255.  Nor did they provide Doe with the Krentzman Memo.  *Id.*  On November 29, without

notice to Doe, the Title IX Investigators interviewed Roe.  *Id.*; see also Final Report, Ex. 1.

On December 8, Doe and his attorney met with the Investigators.  By this time, Doe was

aware that, per the Krentzman Memo, Roe had falsely minimized their pre-incident relationship

and prior sexual intimacy.  FAC at ¶ 259-267; *See* Final Report, Ex. 1.  The investigators showed

Doe the Snapchat messages Roe had saved.  *Id.*  Doe explained that neither was correct, and why

he had sent them.  *Id.*  Since Doe realized that his sobriety was an issue, he referred the

Investigators to Witness No. 1, who was with him when he received Roe's request and would

attest to his sobriety.  *Id.*

The investigators told Doe that Roe had directed them to Witness No. 2, who lived in

O'Hara, who would confirm that Doe was at Roe's room that night but, they explained, since

Doe had admitted that he went to Roe's room, they did not think it was necessary to interview

Witness No. 2.  *Id.* at ¶ 266.  When the Investigators concluded their interview with Doe, they

knew that both Roe and Doe agreed that they had been together in Roe's room on the early

morning of November 19; that they had been sexually intimate; and, that intimacy had been

limited to Doe's digital stimulation of Roe's clitoris.  They also knew there were no other

witnesses to this incident.  *See* Final Report, Ex. 1.

The investigators also knew Doe and the Krentzman Memo differed materially over the

incident, including whether, from the start, Roe had objected to the interaction or whether she

had indicated consent and then, withdrawn consent.  FAC at ¶¶48-64 and 91-102.  In addition,

they knew that according to the Krentzman Memo, Roe was claiming that she was "drunk"; too

drunk to be sexually intimate but that Doe was claiming that Roe did not even appear to have been drinking.[14] They also knew Doe and the Krentzman Memo differed materially over the nature of Doe and Roe's prior sexual relationship before the incident.

**Witness No. 1.**   The Title IX investigators interviewed Witness No. 1—the witness Doe had recommended—but did not provide Doe with prior notice of this interview as the Policy required.  Witness No. 1 confirmed that Doe had not been drinking that night.  FAC at ¶¶274-278.  **This is a breach of a guaranteed right enumerated in the Policy**.

**Witness No. 2.**   The investigators told Doe that Roe had suggested Witness No. 2 only if Doe denied he had gone to Roe's room that night.  Therefore, the investigators gave him so little notice of the interview, that he did not have time to propose questions, but, given what he understood was Witness No. 2's knowledge, he was not sure what she could add.  FAC at ¶¶ 279-284.  As it turned out, either Witness No. 2 or Roe, or both, provided the investigators with *post-incident* information which the investigators found material and which they concealed from Doe by omitting it from the factual findings they shared with him.[15] Emphasis added.  **This is a breach of a guaranteed right enumerated in the Policy**.

**Closure of Investigation.**   On December 20, Doe was advised by Investigator Jordan that the investigation was closed and to schedule a time to review the facts.  FAC at ¶ 285.  In writing to Doe, Jordan was acting in accordance with Policy's requirement that "[u]pon completion of the investigation," they would share the "facts gleaned in the matter" with the parties.  FAC Ex. C, p. 21.  When the Title IX investigators closed their investigation, they had

---

[14] At some point, Roe converted her claim that she was "drunk" in the Krentzman Memo into a claim of incapacity under the Policy.  *See* Ex.1.  Doe does not know whether Roe made this claim in her November 29 interview or her post-investigation, December 28 interview.

[15] The FAC alleges that Witness No. 2 gave the investigators the post-incident information. *Id.*; *see also* Final Report, Ex. 1.  It is also possible that Roe was the source of the information, though that could only have been in her December 28 interview.  Either way, in violation of the Policy, when they prepared their Final Report, the investigators concealed this information from Doe, leaving it out of Part 1, which they shared with Doe, and placing in Part 2, which Doe did not see until after he had been expelled.

not resolved the material discrepancies between Doe and Roe on the nature of their pre-incident social relationship and whether, and to what extent, they had been sexually intimate before the incident. FAC at ¶¶ 288-290.   Given Stonehill's promises, including its commitments to "fairness" and "thoroughness," Doe reasonably expected that its assessment of Doe and Roe's accounts of the incident and their relationship would, at a minimum, be "iterative." *Cf., Haidak*, 933 F.3d 70[16]. **This failure to resolve the material discrepancies is a breach of a guaranteed right enumerated in the Policy.**

On December 28, 2017, the investigators met with Roe. Because they were ostensibly meeting with Roe to review the "facts gleaned in the matter," they knew they must confront Roe with Doe's disagreement with the Krentzman Memo's characterization of their pre-incident social and sexual relationship. FAC at ¶¶ 321-329. The truth about both, was a fundamental element of the investigation that they had previously misrepresented to Doe that they had closed. **This is a breach of a guaranteed right enumerated in the Policy.**

Doe received no prior notice of the investigators' second interview with Roe and, therefore had no opportunity to propose questions to the investigators that they would pose to Roe. FAC ¶¶ 321-329. This meant that at no point in the investigation was Doe given the opportunity to submit questions for the investigators to pose to Roe—or, indeed, to any witness. **This is a breach of a guaranteed right enumerated in the Policy.**

From the Final Report, it appears that at the December 28 interview, the investigators questioned Roe about her pre-incident sexual relationship with Doe and she recanted her

---

[16] Does not understand the First Circuit to have ruled out altogether finding that cross-examination may not be required.  It is not required, however, in those instances where the school's process of interrogation (or lack thereof) is not "so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation."  *Haidak v. Univers. of Mass.-Amherst*, 933 F.3d at 70.  Stonehill's failure to question Roe about the details of the incident and her prior sexual relations with Doe created precisely that "categorically unacceptable risk."

assertion that they had only been "surface level friends" and she had only "made out" with him twice. *See* Final Report, Ex.1. Roe's admission to the same degree of pre-incident sexual intimacy greatly diminished the intensity of what, based on the Krentzman Memo, appeared to be Doe's unprecedented and unanticipated sexual aggressiveness. FAC at ¶¶ 92-97. Although the investigators' presumption on that point did not excuse their failure to ask Roe **any** questions about the incident, Roe's admission removed that excuse. Importantly, the admission also raised questions about how, in their prior intimate interactions, Roe and Doe had communicated consent with one another. Yet, the Final Report indicates that the investigators stuck with their original determination that they would ask Roe **nothing** about the incident and **nothing** about their pre-incident intimate interactions. Doe alone was to answer those questions. FAC at ¶¶ 311-319; 351-355. **This failure is a breach of a guaranteed right enumerated in the Policy.**

In the Final Report, the investigators disguised Roe's admission that she had misrepresented the truth on both points by characterizing her admission as a "clarification," implying that she had spontaneously corrected the record. FAC at ¶¶353-355. Although Roe had recanted her assertion that she and Doe had not been sexually intimate before the incident, nothing in the Final Report indicates that the investigators asked her any questions about the details of her interaction with Doe during the incident or how, in their previous intimate experiences, she had communicated consent to him—whether by words or actions or both. **This is a breach of a guaranteed right enumerated in the Policy and Jordan's promise to Doe on January 30, 2018.** *See* Jordan Email, Exhibit 2, attached hereto.

**Interim Report/Part 1**: On January 23, the investigators forwarded Part 1 of the Final Report to Doe and his attorney for their review. FAC ¶¶ 351-355. Under the Policy, the investigators were required to provide the parties with all the "facts gleaned in the matter,"

meaning that whatever facts they intended to rely on had to appear in that part of the report they shared with the parties.[17]  The Policy provided that, in addition to "factual findings," the report would include "a recommendation of responsibility as to the original claim and/or any lesser offense."   FAC at Ex. C, p.19. The recommendation, of course, was not a "fact gleaned" but, rather, was based on those facts.  The investigators did not, therefore, share the recommendation with the parties. Instead, they divided the report into Parts 1 and 2.   They shared Part 1 with the parties, but not Part 2. *See* Part 1 Report, attached as Exhibit 3 and Ex. 1. **This is a breach of a guaranteed right enumerated in the Policy.**

**Doe Comment on Part 1:**   In reviewing Part 1, Doe and his attorney noted that it appeared that Roe had recanted her assertion about their pre-incident social relationship and their sexual experiences but that her admission was obscured because Part 1 characterized Roe as having "clarified" that before the incident she and Doe had engaged in "consensual sexual contact, including digital penetration of her vagina." FAC at ¶¶340-355.  As set forth above, Doe requested the investigators correct Roe's recantation, and Jordan affirmed that they would. FAC at ¶¶353-355; 361-364. **This is a breach of a guaranteed right enumerated in the Policy and Jordan's promise to Doe on January 30, 2018.** *See* Exhibit 2.

**AVPSA/Dean Decision and Dismissal:**   On February 7, the investigators submitted the Final Report, Parts 1 and 2, to the AVPSA/Dean, Kevin Piskadlo, with a recommendation that he find Doe "responsible" for "nonconsensual intercourse" under the Policy. FAC at ¶¶377-394; Ex. 1.  On February 12, Piskadlo advised Doe of the investigators' recommendation and that, under Stonehill policy, Piskadlo had no choice but to expel him from Stonehill.  Piskadlo did not explain his own reasoning to Doe either orally, or in his letter to Doe of February 12, 2018.

---

[17] This requirement appeared at FAC , Ex. C, p. 21 at Rights Nos. 9 and 10.  (Stonehill added Right No. 10 in 12/05/17 revision of the Policy).

(Def. Mem. Ex. 3). **This failure to explain the reasoning for the outcome is a breach of a guaranteed right stated in the Policy.**

Upon reviewing Parts 1 and 2 of the Final Report, Doe and his attorney realized that the investigators had violated numerous Policy standards and procedures and that Piskadlo had compounded their violations by failing to ensure that the investigation complied with the Policy and by failing to advise Doe not only of the "outcome" and the "sanctions", but also for the "reason for the outcome." *Id.* **This failure to explain the reasoning for the outcome is a breach of a guaranteed right stated in the Policy.**

**Denial of Doe Appeal:**   Dobrowski, by failing to recognize the clear violations of both substantive and procedural rights guaranteed to Doe in the investigation, adjudication and resolution of Roe's complaint ratified the breaches of contract described herein, and ratified the discriminatory intent which was a motivating factor of Stonehill's numerous contractual breaches.   FAC at ¶¶ 405-435.

### 3.  Doe Has Sufficiently Pleaded Claims for Relief under Title IX.

In considering Title IX claims by students aggrieved by colleges' disciplinary proceedings, the First Circuit has generally applied the "erroneous outcome" and "selective enforcement" claims for relief first identified in *Yusuf v. Vassar College*, 35 F.3d 709, 725 (1994). *See*, *Haidak v. Univ. of Mass/Amherst*, 933 F.3d 56, 73-74 (2019).   To maintain an "erroneous outcome" claim, a plaintiff "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf,* 35 F.3d at 715.   In other words, the plaintiff must allege facts showing "the plaintiff was innocent and wrongly found to have committed an offense." *Id.* Plaintiff must then "allege particular

circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*; that is, gender bias need not be the only motivating factor.

By contrast, a "selective enforcement" claim lies where "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* The First Circuit has yet not recognized a private right of action for disparate treatment, but it has observed that "evidence of a statistical disparity may generate an inference of intentional discrimination," *Haidak*, 933 F.3d at 75. The First Circuit has ruled on such claims without accepting their validity. *See, Doe v. Boston College (Boston College I)*, 892 F.3d 67, 93 (2018) (a deliberate indifference claim must "cause [students] to undergo harassment" or "make them liable or vulnerable to it."). In addition, drawing on Title VII law, to test the sufficiency of a Title IX complaint, the Second Circuit held that where a plaintiff has alleged "specific facts that support a minimal plausible inference of [sex-based] discrimination," the complaint will be sustained. *Doe. v. Columbia University*, 831 F.3d 46, 56 (2016). Although the First Circuit has acknowledged the Second Circuit's holding on this point, it has not adopted it. Therefore, Plaintiff will urge the sufficiency of his complaint under both, with, and without the "minimal plausible inference" standard.

### A. Stonehill's separate disciplinary process for sexual misconduct is evidence of discriminatory purpose.

Doe alleged that Stonehill has two separate and entirely distinct disciplinary policies. The Community Standards Policy is an accusatory process requiring a complaint, particular procedural protections, culminating in a panel hearing, with the right of appeal. FAC at ¶¶134-135, *see also*, FAC, Exs. B and C. By contrast, the Sexual Misconduct Policy uses an inquisitorial process as more fully set forth above. *See* FAC at ¶¶169-173; 185-205, FAC, Ex. C. Although the Title IX investigators meet with the parties and any witnesses and gather all

evidence, they do not actually adjudicate the charge; that is done by the AVPSA, who never meets with the parties or any witnesses. *Id.*

Doe further alleged that on September 22, 2017, the DOE vacated the 2011 Dear Colleague Letter and the 2014 Q&A and issued new guidance for Title IX recipients' handling of sexual misconduct claims.   FAC at ¶¶ 216-231.   In doing so, it warned, "[w]hen a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided." FAC at ¶ 218. In Doe's appeal, he directed Stonehill to the DOE's 2017 Q & A and cited the disparate procedures as a basis for his appeal. *Id.*   Moreover, in Stonehill's Motion to Dismiss, it has asserted that the DOE's 2017 Q&A prompted its December 5 revision of the Policy.

Notwithstanding Stonehill's awareness that its separate procedures (which gave primacy to the Sexual Misconduct Policy) are evidence of discriminatory purpose, Stonehill maintained those separate procedures when it revised its Policy issued on December 5, 2017, in response to the DOE 2017 Q & A.   It should be emphasized that, in advising that separate investigative and adjudicate procedures suggest discriminatory purpose, the DOE, the department with authority over Title IX, was interpreting that Act.   Under these circumstances, its interpretation is entitled to deference. *Chevron (USA), Inc. v. Nat. Res. Def. Cncl, Inc.*, 467 U.S. 837 (1984). Therefore, for this reason alone, Plaintiff's complaint sufficiently alleges an inference that Stonehill acted with a discriminatory, gender-based purpose.

### B.  Scrutiny by OCR and the public are evidence of motivating factors in Stonehill's discriminatory purpose.

Plaintiff has alleged that, before Roe brought her complaint against Doe, Stonehill was the subject of an investigation by DOE's Office of Civil Rights ("OCR").   FAC at ¶¶ 143, 207-209.   In March of 2016, it was reported that Stonehill was the subject of an investigation by

DOE'S Office of Civil Rights for its alleged failure to properly investigate and decide complaints of sexual misconduct by female students. *Id.*; FAC at ¶¶ 207-209; *see also*, News Report, attached hereto as Exhibits 4 and 5.

In *Doe v. Columbia Univ.*, the Second Circuit found that public criticism of a Title IX recipient for failing to address the sexual misconduct complaints of female students would give rise to a "minimal plausible inference" that, in sanctioning a male student, the college acted with discriminatory, sex-based intent. 831 F.3d at 58. In reaching this conclusion, the court acknowledged Columbia's arguments that there were other, non-discriminatory explanations for its actions, but responded, "[i]t is not the court's function in ruling on a motion to dismiss for insufficiency of the complaint to decide which was the defendant's true motivation. *Id.* at 56, n. 10.    The Court also rejected the District Court's finding that Columbia's avoidance of adverse publicity was a lawful motive.   As the Court explained, "[a] defendant is not excused from liability because the discriminatory motive does not result from a discriminatory heart, but a desire to avoid practical disadvantages that might result from unbiased action." *Id.* at 58, n. 11.

### C. Stonehill's investigation, adjudication and resolution of Roe's complaint suggests discriminatory intent.

Doe claims the outcome of Stonehill's adjudication was erroneous and based upon selective enforcement. The following are instances in which Stonehill violated the Policy and each such violation raises an inference of discriminatory intent against Doe based on his sex:[18]

**The Title IX Investigators did not give Doe notice of any interview with Roe.**  Although the Title IX investigators were required to provide Doe with sufficient notice of witness interviews that he could suggest questions for them to pose to witnesses, they did not give him notice of

---

[18] Doe understands that he does not have an action against Stonehill for violating Title IX guidelines and standards, per se, but submits that Stonehill's violation of those standards and guidelines, like Stonehill's violation of its Policy standards, raise a reasonable inference of discriminatory intent.

their November 29, 2017 interview of Roe. FAC at ¶ 233-255.  This was not a mistake. Beginning with the Krentzman Memo, the Title IX investigators knew that Doe and Roe were the only witnesses to their sexual intimacy.  They also knew that the Policy's "investigator model" process meant that Doe would not be able to confront Roe with questions about her allegations.  Under these circumstances, they knew that they must not confront both Doe and Roe with any conflicts in their accounts.  By failing to give Doe notice of their interview of Roe, the Title IX investigators ensured that **they** would not have to consider posing any questions that might discomfit Roe or suggest that they doubted her claims.

Also, by failing to provide notice to Doe, the investigators were able to limit their questions to Roe and, as is discussed herein, avoid asking her any questions about the details of her sexual encounter with Doe.  They carried this forward into their second interview with Roe where, apparently, they told her that Doe had disputed her assertion that they were only "surface level friends" and that, before November 19, they had only "made out" two times.  As with the November 29 interview, the investigators did not provide Doe with notice that they intended to question Roe on these points. FAC at ¶¶ 321-329.

**The Title IX investigators failed to question Roe about the details of the incident.**  When Krentzman met with Roe on November 20, Roe stated she did not wish to answer questions. Krentzman honored her request and asked her no questions.  Krentzman, herself, sent Roe the clear signal that Stonehilll would not press her on the veracity and plausibility of her allegations. By contrast, in the Charging Letter, Labella comforted Doe to "[b]e assured that Title IX Investigator(s) are specifically trained to handle **this type** of incident and that their work would be prompt**, thorough,** and **impartial.** (Def. Mem., Ex.1)  (Emphasis supplied).

Although they knew that Roe and Doe were the **only** witnesses to the incident, notwithstanding their obligation to conduct a "thorough" and "impartial" investigation, they asked Roe **no** questions about the incident. That the investigators' excused one of the only two witnesses to the incident—the female—from answering **any** questions about it, while requiring the only other witness—the male—to explain it in detail, gives rise to the inference that they were motivated by discriminatory intent. Their deference to the accuser is evidence that they gave credence not only to Roe's complaint, but also to her claim that the experienced had traumatized her; they should respect her preference not to "re-tell the details…" When held against their obligation to conduct a "thorough" and "impartial" investigation, the Investigators; failure to question Roe gives rise to a reasonable inference that they were motivated by sex-based discriminatory intent against Doe.

**The investigators' failure to question Roe was inconsistent with the preponderance of the evidence standard.** The Policy required Stonehill prove the complaint against Doe by a preponderance of the evidence.[19] By giving pre-interview credence to Roe's claims of sexual assault and her difficulty in coping with it, the investigators acted contrary to the preponderance of the evidence standard which prohibited them from assuming that any part of Roe's statement, as set forth in the Krenztman Memo, was true. The investigators disregard for Stonehill's burden to prove the charge by excusing Roe, but not Doe, from answering questions about the incident raises a reasonable inference of discriminatory intent against Doe based on his gender.

**Roe asserted that Doe might have believed she had consented to sexual intimacy.** In the Krentzman Memo, Roe asserted that she had told Doe that she was "drunk" and, therefore, she did not want to participate in sexual activity. FAC at ¶ 96. Even so, she alleged, Doe persisted.

---

[19] In the 2017 Q&A, DOE made it clear that, in prosecuting a sexual misconduct claim, the school, not the private parties, bore the burden of proof. 2017 Q&A at 4.

Roe then added. '**I think he thought** that since I was wet I wanted it which made it ok." FAC at ¶ 96 (emphasis supplied). Roe's assertion on this point begged clarification.   Coming from Roe, it suggested at least three points:  1) that, notwithstanding her protests, Doe's manipulation gave her physical pleasure 2) that **Roe** believed that her reaction to his stimulation may have given **Doe** the impression that "she wanted it"—that is, had, through "actions", consented to it; and, 3) that, notwithstanding her assertion that, before that evening she and Doe had only "made out" twice, in fact, she  knew enough about him and his own sexual experience to know that he would recognize her physical reaction as manifesting her pleasure from his digital stimulation.[20]

The Policy **mandated** that the Title IX investigators question Roe closely on her assertion.   The definition of "consent" provided that consent could be given by "actions' as well as words and provided further that consent would be judged by a "reasonable person" standard. FAC at Ex. C, p. 7.

**The investigators failed to seek evidence on Roe's claim of intoxication/incapacity.**  As noted above, the Policy guaranteed expertise in all its Title IX employees in investigating and adjudicating claims of sexual misconduct. FAC, Ex. C; FAC at ¶175.  Because Roe repeatedly cited her intoxication as the reason she could not rebuff Doe's advances, the investigators had an obligation to ask Roe questions about assertions.   Moreover, the investigators knew that because Doe had denied that Roe had appeared intoxicated, this was another point at which their accounts of that evening—and thus their credibility—clashed.

As to Roe's assertions of intoxication and alcohol-induced incapacity, the investigators knew that she was underage and was not allowed to consume alcoholic beverages. The Policy provided that, because her complaint concerned sexual misconduct, if the investigators concluded that she

---

[20] On its face, Roe's statement is inconsistent with her claim that, from the outset, she objected to Doe's stimulation and forcibly resisted him.  This inconsistency demanded clarification, but the investigators asked Roe nothing about it.

had brought the charge in "good faith," she would be eligible for "amnesty" on her violation of the alcohol policy.[21]

They knew that if Roe had gone to a party at New Hall and even consumed alcohol, much less become intoxicated or incapacitated by it, someone at the party would likely know that. They also knew that Roe had claimed that, as she was walking back to O'Hara from New Hall, she had a telephone conversation with her former boyfriend.   Yet, despite the Policy's requirement and the investigators' pledge to be "thorough" and "impartial" and to "glean" all the evidence, the Final Report contains no indication that they sought **any** information from neutral third party witnesses on this point.  Ex.1.

**Roe lied to Krentzman and the investigators.**   Roe lied to Krentzman and the investigators about her pre-incident social relationship and her pre-incident sexual relationship with Doe. Direct lies to investigators from a complainant or respondent (or witness for that matter) should, at minimum, be recognized and assessed for their impact on that party's credibility.   Yet, the investigators, in violation of their contractual duties, did not even acknowledge that Roe—the female complainant—had lied to them and Krentzman, on these critical points.

**The investigators disguised Roe's recantation.**   The   investigators   not   only   did   not acknowledge Roe's lies,--the lies of the female complainant—they covered them up.   Then they misled the male respondent and his attorney by promising they would clarify Roe's recantation. FAC at ¶¶353-355; 361-364.

**The investigators withheld "factual" findings favoring Roe from Part 1, but included them in Part 2 of the Final Report.**   As discussed above, the Policy required the investigators to share the "facts gleaned" from the investigation with the parties.  The investigators were required

---

[21] There is no comparable "amnesty" provision in the Community Standards Policy.

to share all **factual** information on which the investigators intended to rely with the parties before submitting their report and recommendations to the AVPSA/Dean.

Part 2 represents that "[**Roe**] said that she does not think that she was capable of consent due to her level of intoxication." Ex. 1 (emphasis supplied). Roe did not make this claim in the Krentzman Memo nor does it appear in Part 1 (although Part 1 quotes "Incapacitation" as well as other Policy provisions verbatim.). Ex. 3. It is not clear when Roe made this claim. It is clear that the investigators did not reveal it to Doe. Stonehill has asserted that it was not required to reveal **Roe's claim** of incapacity because "the Policy does not require that the parties be advised of one another's legal positions." (Def. Mem. at 13).

First, the Motion fails to cite any Policy provision containing this exception. Second, **Roe**'s claim of incapacity was based on **her** representation of a **fact**—that is, the degree of her intoxication—which she contended met the Policy's Incapacitation standard. Doe was entitled to know that Roe had claimed such an extreme state of intoxication. Roe's credibility was always an issue and, for that reason, her claim of intoxication required the investigators' assessment in fulfillment of the Policy's "thoroughness" requirement—independent of any request Doe might make. As to Doe, however, the Policy required that the investigators reveal Roe's factual claim to him. Third, Part 2 contains Roe's statement about how, in prior instances of sexual intimacy, she had communicated her consent—in words. The investigators did not share Roe's assertion on this critical point with Doe, hiding it in Part 2. Fourth, Part 2 states that Doe said that at the time of the incident, Roe "cried." This is yet another critical "fact" that the investigators withheld from Part 1 so that Doe could not comment on it. Fifth, the investigators included an exchange between Roe and Witness No. 2 the morning after the incident in which "Witness #2 made a comment about seeing [Doe] at [Roe's] door earlier in the day, [Roe] responded

23

something to the effect of "it wasn't ok." In finding Roe's complaint credible, the investigators placed great weight on this exchange observing that it was made "soon after the incident [and] supports her statements and belief that the sexual contact was unwanted." Yet, despite the investigators' view of the evidentiary value of this exchange, they withheld it from Doe and, in fact, misled him on it.

The investigators told Doe that Roe had proposed Witness No. 2 solely as a pre-incident witness. FAC at ¶¶265-267. They reinforced this impression when, in Part 1 of the Report, they described Witness No. 2 as "Witness **prior to** alleged incident." *See* Ex.1. (Emphasis supplied). Without question—whether true or not—the purported Roe—Witness No. 2 exchange was a "fact gleaned". As such, the Policy required investigators to share with Doe. Their failure to abide by the Policy in a way that favored Roe—the female complainant—over Doe—the male respondent gives rise to the reasonable inference that they were motivated by discriminatory intent against Doe because of his sex.

**The investigators' characterization of Doe's Snapchat messages as superficial and misleading**. The investigators relied heavily on two Snapchat Doe's two Snapchat messages, both sent the morning after the incident in response to Roe's accusatory Snapchat messages. Ex.1. In one message, Doe told Roe that he had been a "drunken idiot". In the second message, Doe said he "fucked up" because he "totally misread the situation". The investigators—and now Stonehill, itself—placed great weight on Doe's first and second messages, saying that they were evidence that ["Doe] understood the sexual interaction with [Roe] was unwanted as well."

These messages certainly show that, once Roe accused Doe of lacking consent, he understood what she was saying and tried to placate her. They do **not** show that at the time Doe and Roe were sexually intimate, Doe knew that he lacked her consent—yet **that** was the legal

24

standard the investigators were required to address; that is, whether, **at the time** the sexual contact occurs, through "words or actions", the parties have communicated consent.   The investigators concluded that Doe's assertion that he had been drunk was not true and, based on the Krentzman Memo, Roe would have known it was untrue.   In his second message, Doe is clearly not admitting that, at the time of the sexual interaction he knew he lacked Roe's consent; to the contrary, he is stating that be believed that he had her consent but that, faced with her accusation, he must have "totally **misread** the situation"—that is, misread Roe's words or actions and concluded that she had given consent.   As has been noted above, highly pertinent as to whether Doe's belief that Roe had consented, was **Roe's** assertion in the Krentzman Memo that she believed that, because of her physical reaction to Doe's stimulation, Doe may have believed that she had consented. But, of course, the investigators had resolved that they would not ask Roe any questions about the details of the incident, so they could not explore Roe's comment.

**The AVPSA/Dean's failure to review "facts gleaned" and is evidence of discriminatory intent.**   AVPSA/Dean Piskadlo, like the investigators, was required to review the report and determine whether the "fact gleaned" did "indeed, align with" the investigators findings. Stonehill represented to Doe that, like the investigators, Piskadlo was "trained" in Title IX cases. Piskadlo must know, therefore, that the investigators were required to share all factual findings with the parties **before** submitting the Final Report to him.

As noted above, the most basic review of Part 1 and Part 2 of the Final Report reveals material factual findings in Part 2 that were not included in Part 1. In discharging his duties, Piskadlo was required to note this and inquire of the investigators whether they had fulfilled this duty to the parties.   In failing to do so, Piskadlo knew that the investigators had submitted a

report favoring the female complainant over the male respondent and he knew that Stonehill's only sanction for the male respondent was dismissal.

**The AVPSA/Dean's failure to explain his reasoning for the outcome is further evidence of discriminatory intent.**   The Policy required Piskadlo to explain his reasoning in affirming or rejecting the investigators' recommendation. FAC at Ex. C, p. 19. Piskadlo's February 12 letter, however, reveals nothing of his reasoning. Piskadlo's failure to fulfil his duty to reveal his reasoning favoring the female complainant over the male respondent, raises a reasonable inference of discriminatory intent against Doe because of his male gender.

**Denial of Doe's Amended Appeal ratified the discriminatory intent behind the finding of responsibility.**   Doe appealed the AVPSA/Dean's decision and sanction and also challenged the Title IX Investigators' violations of policy and procedure. *See* Amended Appeal, Ex. 6.  As Plaintiff in the instant case, Doe alleged that he raised the following issue on appeal. Dobrowski, the Vice President for Student Affairs, with the advice of Stonehill General Counsel, Thomas Flynn, denied Doe's appeal in its entirety.  In doing so, she ratified and approved all violations in the Policy's processes and standards. *Id.* Given Stonehill's demonstrable Policy violations and Stonehill's experience with public criticism of its Title IX practices and the OCR investigation, Dobrowski's denial of Doe's appeal gives rise to the reasonable inference that she and General Counsel Flynn were motivated by discriminatory intent against Doe based on his gender. Further, Dobrowski's refusal to explain her denial of Doe's appeal violated the Policy.   FAC at Ex. C, p. 21.

### 4.  Doe Has Sufficiently Pleaded a Claim for Breach of the Duty of Basic Fairness.

Where a student has been the subject of a college disciplinary hearing, a court will review the record to ensure it accorded the student "basic fairness." *Cloud*, 720 F.2d at 725; *Schaer*, 432

Mass. at 481. Here, the Stonehill Policy, itself, promised Doe that "fairness" would be "paramount." Therefore, Stonehill guaranteed Doe basic fairness. In *Doe v. Brandeis,* the Court observed that determining whether a "basic fairness claim lies "may vary depending upon the competing interests at stake [and] include such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature." 177 F.Supp.3d at 601, citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Here, consequences for Doe were extreme and Stonehill, though its adoption of the Sexual Misconduct Policy, embraced a high degree of accountability for itself.

Should this Court find that the discrete instances of contract breach discussed above and alleged in Plaintiff's Complaint did not constitute breaches of particular contract terms, Plaintiff contends that they nonetheless violate Stonehill's basic fairness obligations.

### 5. Doe Has Sufficiently Pleaded a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Massachusetts law implies a covenant of good faith and fair dealing into every contract. *UNO Rest., Inc. v. Boston Kenmore Realty, Corp.*, 441 Mass. 376, 385, 805 N.E. 2d 957 (2004). This implied term requires the parties to do nothing that "will have the effect of destroying or inuring the rights of the other party to receive **the fruits of the contract.**" *Anthony's Pier Four, Inc. v. HBC, Assoc.*, 411 Mass. 451, 471, 583 N.E. 2d 806 (1991). "Plaintiff must show a lack of good faith and is **not** required to show that defendant acted in bad faith." *Uno Rest.,* 441 Mass at 385, n. 5 (emphasis supplied). As set forth above, Doe has sufficiently set forth numerous instances of Stonehill's breach of the implied covenant of good faith and fair dealing.

Plaintiff has set forth above discrete instances in which Stonehill breached the Policy. Should the Court conclude that any or all of these instances do not allege discrete breaches, Plaintiff contends that they nonetheless breach Stonehill's implied covenant of good faith and

fair dealing.   That is because, as noted at the outset, Stonehill promised Doe that in the investigation, evaluation, adjudication, and, resolution of the charge against him "fairness" and "thoroughness:" would be "paramount."   Meeting those standards was a "fruit" of the contract which Stonehill guaranteed Doe would enjoy.

### 6. Doe Has Sufficiently Pleaded a Claim for Defamation – Count VI.

Under Massachusetts law, the tort of defamation seeks to impose liability on a defendant for harm sustained by a plaintiff as a result of the publication of a false statement about the plaintiff to others. *Doe v. Amherst College*, 238 F.Supp.3d 195, 226 (2017); *citing HipSaver v. Kiel*, 464 Mass. 517, 984 N.E.2d 755, 762 (2013).   Under Massachusetts law, the plaintiff must establish the following five elements to recover for the tort of defamation: (1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss. *Doe v. Amherst College*, at 226-227; *citing Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).   As set forth above, Defendant published a written statement about Doe that was defamatory and false.   As a result of the false and defamatory statement, Doe suffered economic loss.

Stonehill's use of the term "non-consensual" to describe the sexual contact between Doe and Roe is a false, and defamatory, statement.   FAC at ¶ 375, 530.   Stonehill, by and through its "trained" Title IX investigators, knew that the issue of consent was never resolved and therefore, any conclusion or statement relating to the fact of whether or not the sexual contact or sexual intercourse between Doe and Roe was consensual, would be a false statement.   Contrary to Stonehill's assertion, this knowingly false statement is not protected by a conditional privilege. As distinguished from the defamatory statements alleged in *Doe v. Amherst College*, *supra.*, in

the present case, Stonehill's publication of the defamatory and false statement to Roe and each person or entity reviewing Doe's education record, was not necessary for the protection or furtherance of a legitimate business interest. Here, there was no legitimate business interest in knowingly publishing a false statement to Roe, who Defendant would reasonably expect to publish the false and defamatory statement to others. As she did. FAC ¶ 442-446.

### 7. Doe Has Sufficiently Pleaded Claims for Negligence, Negligent Infliction of Emotional Distress and Fraud.

**Negligence – Count V.**      Defendant had a duty to exercise reasonable care in the selection and retention of its employees. *See e.g. Foster v. The Loft, Inc.,* 26 Mass. App. Ct. 289, 290, 526 N.E.2d 1309, 1310 (1988).  Negligent retention of an employee occurs when an employer becomes aware or should have become aware of problems with an employee that indicates his or her unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment. *Id.* at 291, 526 N.E.2d at 1311 (internal citations omitted). First, Stonehill, was negligent in its supervision and retention of Krentzman because she either did not adequately train Bamford and Jordan, or allowed their woeful incompetence in the investigation and determination of responsibility.  Most strikingly obvious is the fact that the Title IX investigators had a duty to allow Doe an opportunity to review the entire factual findings and recommendations of the investigators.  So, either the Title IX investigators were unsupervised, not properly trained, and incompetent, or, they were acting deceptively to hide their findings and recommendations from Doe so he would not be given an opportunity to lodge a response.  Either scenario points to negligent supervision and retention by Krentzman, or negligent supervision and retention by Krentzman's superiors.

**Negligent Infliction of Emotional Distress – Count VIII.**      Under Massachusetts law, for a plaintiff to succeed on a claim for negligent infliction of emotional distress, he must prove the

following: 1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective symptomatology; and 5) that a reasonable person would have suffered distress under the circumstances of the case. *Payton v. Abbott Labs.*, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982). In *Brandeis*, the Court allowed plaintiff's claim for negligent infliction of emotional distress where it found that the plaintiff had made out a plausible claim for negligent supervision. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 614 (D. Mass. 2016). Here, as in Brandeis, Defendant was negligent in its supervision and retention of its employees involved in the investigation and resolution of Title IX complaints.

**Fraud - Count VII**.          To establish a claim for fraud or deliberate misrepresentation, a plaintiff must show that (1) the defendant made a false representation of material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing the plaintiff to act thereon; and (4) that the plaintiff reasonably relied upon the misrepresentations as true; and (5) acted upon the misrepresentation to his detriment. *See e.g. Barrett Assoc. v. Aronson*, 346 Mass. 150,, 190 N.E.2d 867 (1963); see also *Masingill v. EMC Corp.*, 449 Mass.532, 540, 870 N.E.2d 81 (2007).

### 8. Doe is Entitled to Both Declaratory and Injunctive Relief.

Under the Declaratory Judgment Act, the district court "may declare the rights and other legal relations of any interested party seeking such declaration" in cases of "actual controversy"..., and "upon filing of an appropriate pleading." 28 U.S.C. §2201(a). Federal courts "retain substantial discretion in deciding whether to grant declaratory relief." *Ernst & Young v. Depositors Economic Protectors Corp.*, 45 F.3d 530, 534 (1st. Cir. 1995). Doe has sufficiently pleaded his claims for breach of contract, actionable violations of Title IX, and tort claims against Defendant, as such Doe's claim for declaratory relief should overcome Defendant's Motion to Dismiss.

Respectfully submitted,

JOHN DOE,

By his attorneys

*/s/Janna D. Gau*
Seth W. Brewster (BBO No. 551248)
Janna D. Gau (Maine Bar No. 6043)
Timothy C. Woodcock (Maine Bar No. 1663)
EATON PEABODY
80 Exchange Street, P.O. Box 1210
Bangor, Maine 04402-1210
(207) 947-0111
*sbrewster@eatonpeabody.com*
*jgau@eatonpeabody.com*
*twoodcock@eatonpeabody.com*

## CERTIFICATE OF SERVICE

I, Janna D. Gau, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 1st day of September, 2020.

*/s/Janna D. Gau*

31