**Investigative Report**

Re:            Case #2017028701

Date:          February 7, 2018

Prepared by:   Shayla Jordan, Human Resources Generalist and Title IX Investigator
               David Bamford, Institutional Investigator, Prevention and Compliance Specialist

**Part I**

**Executive Summary:**

This case was referred for investigation on November 21, 2017 as the result of a report of alleged sexual misconduct on November 19, 2017. This investigation was conducted pursuant to the Stonehill College Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence Policy (Policy), Policy S1.14. The relevant policy definitions follow:

**Sexual Misconduct**

Stonehill College strictly prohibits sexual misconduct in all forms. Sexual misconduct includes the following:

Non-Consensual Sexual Intercourse, which is the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

**Consent**

A person who wishes to engage in sexual activity must ensure that they have the consent of their partner. Consent means informed, freely, and voluntarily given agreement, communicated by clearly understandable words or actions, to participate in each form of sexual activity. Consent is mutually understandable when a reasonable person would consider the words or actions of the parties to have demonstrated agreement between them to participate in the sexual activity. In the absence of mutually understandable words or actions, neither party should assume that it is permissible to engage in sexual activity.

Consent to some form(s) of sexual activity does not necessarily mean consent to other forms of sexual activity. Consent to sexual activity may be withdrawn at any time at which point all sexual activity for which consent has been withdrawn must cease. Acquiescence to sexual activity based on the use of fraud or force (actual or implied), whether that force be physical force, threats, coercion, is never consent.

Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual contact.

Coercion is verbal and/or physical conduct, including manipulation, intimidation, unwanted contact, and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to compel someone to engage in sexual contact.



Consent will not be assumed by silence, incapacitation due to alcohol or drugs, unconsciousness, sleep, physical impairment, or lack of active resistance. Consent may never be given by minors (for example, in Massachusetts, those not yet 16 years of age), mentally disabled persons, those who are unconscious, unaware or otherwise physically helpless, or those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary).

**Incapacitation**

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or drugs. Incapacitation is a state in which an individual is unable to give consent because they lack the ability for self-care, i.e., the person lacks the capacity to understand the "who, what, when, where, why, or how" of the sexual interaction. The impact of alcohol and other drugs varies from person to person.

**Involved Parties:**

| | |
|---|---|
| Reporting Party: | ▆▆▆▆▆ Class of 2021 |
| Responding Party: | ▆▆▆▆▆ Class of 2021 |
| Witness #1: | ▆▆▆▆▆ Witness prior to alleged incident |
| Witness #2: | ▆▆▆▆▆ Witness prior to alleged incident |

**Procedural History:**

| | |
|---|---|
| November 20, 2017 | Director of Human Resources and Title IX Coordinator Lily Krentzman received report of alleged sexual misconduct, specifically non-consensual digital penetration of the vagina, from the Reporting Party. |
| November 20, 2017 | Ms. Krentzman advised Michael Labella, Director of Community Standards and Deputy Title IX Coordinator, of the report. |
| November 22, 2017 | Mr. Labella appointed Shayla Jordan and David Bamford as case investigators. |
| November 29, 2017 | Investigators interviewed the Reporting Party. |
| December 8, 2017 | Investigators interviewed the Responding Party. |
| December 13, 2017 | Investigator Bamford interviewed Witness #1. |
| December 14, 2017 | Investigator Bamford interviewed Witness #2. |
| December 28, 2017 | Investigators met with Reporting Party for review of facts. |
| January 12, 2018 | Investigators conducted phone call with the Responding Party for review of facts. |

January 23, 2018	Written report sent to both parties. Both parties advised that they may submit a response to the report in writing by January 30, 2018

**Findings of Facts:**

**Summary of Interviews with the Reporting Party:**

Investigator Jordan explained that we had received a memo from Title IX Coordinator Lily Krentzman detailing a written statement she received from the Reporting Party alleging a violation of the college policy on Sexual and Gender-Based Misconduct and Interpersonal Violence. The Investigators provided a copy of this memo (Appendix A) to the Reporting Party and advised her that the Responding Party would be able to see the statement and other evidence during the investigative process.

Investigator Jordan asked the Reporting Party to tell the investigators about the incident that led to the complaint against the Responding Party. The Reporting Party stated that her written statement contained her account of the incident and that she preferred to not re-tell the details of the incident. She did agree to answer questions about the statement and incident.

The Investigators asked questions to clarify or expand on the details of the statement.

The Reporting Party confirmed that the male student she accuses of assaulting her is the Responding Party. She said she has known him since the Spring of 2017 prior to coming to Stonehill for her freshman year. She described their relationship as "surface level friends." She said that they would say "hello" if they saw each other on campus. She said that the two occasions when she "made out" with him in her residence hall room were in late September or early October. She clarified that previous encounters in her room involved consensual sexual contact, including digital penetration of her vagina.

The Reporting Party said that she was in New Hall on Saturday night (November 18, 2017) and that this incident occurred in her residence hall room in the O'Hara Residence Hall at approximately 1:15 am on Sunday, November 19, 2017. She confirmed from her written statement that the person who knocked on her residence hall room door was the Responding Party.

The Reporting Party said that she had been drinking prior to the incident and that she was drunk, but "not slipping over myself" drunk. She said on a scale of one to ten, with ten being very drunk she was probably a six. She said that she assumed the Responding Party had been drinking based on his messages and comments and thought that, using the same scale, he was probably a one or two. She said that she did not observe behavior in the Responding Party to indicate that he had been drinking.

The Reporting Party said that after she began to cry, hyperventilate, and pretend to "fall asleep" the Responding Party left "relatively quickly."

She said that she communicated with the Responding Party later that morning via SnapChat. She was able to save two of the messages, but the remainder of the conversation disappeared after the Responding Party blocked her on SnapChat. She believed this happened after the campus "no-contact order" was issued.

See attached two screenshots (Appendix B) to her written statement that the Reporting Party states are SnapChat messages with the Responding Party sent to her following the incident.

The Reporting Party said that the other SnapChat messages included a back and forth with the Responding Party where he said something to the effect of "I'm sorry, what can I do?" She said that she

replied something to the effect of "you hurt me, sorry can't change that." She said he knew it was not consensual and that the encounter was "not ok." The Reporting Party provided a SnapChat log indicating her account activity, but not specific messages or images.

**Summary of Interviews with Responding Party:**

Investigator Jordan asked Responding Party to respond to the accusations made by the Reporting Party in her written statement. He stated that before he talked about the incident in question he wanted to point out that he had "a lot" of contact with the Reporting Party prior to this incident. He stated that earlier in the Fall 2017 semester he and the Reporting Party had engaged in "kissing and fingering" on two or three occasions in her residence hall room. He said that they knew one another through social media prior to coming to Stonehill this semester. He said that they communicated often and frequently by SnapChat. He said that she would often talk to him about "being scared" or "overwhelmed."

In the early morning hours of Sunday, November 19, 2017, the Responding Party said that he was walking back to his residence hall (Corr Hall) with his friend, Witness #1. He said he received a SnapChat message from the Reporting Party who told him she was "scared." He offered to walk her back to her residence hall (O'Hara). They did not meet up and she did not answer his messages so he decided to go to O'Hara to make sure she was ok. He said that if she had told him she was ok he would not have even gone to O'Hara. He said that he entered O'Hara and went to the hallway where her room is located. He saw several people in front of her door, but they did not appear to be at her room specifically. When the door to her room became clear he approached and knocked on the door. She opened the door and then he entered the room. He asked her if she was ok and she sad "yes." He said that they sat on her bed and talked. He said that at first she was wearing a t-shirt and pajama shorts, but then switched to a tank top and fleece bottom.

The Responding Party said that they laid on the bed "cuddling" and that he rubbed her arm. He said that she was on her stomach on the right side of the bed. He said that he had his back against the wall on the left side of the bed. He said that he was rubbing her back and then began to "finger" her, similar to what he had done on the past occasions he mentioned earlier. He said that she then flipped to her back. He said that he asked her if she wanted him to stop. He said that she just "moaned," but gave no answer. He said that he asked a second and third time with no answer and then stopped. He said that she "curled in a ball" and started to breath heavy. He said that she rolled toward him pinning him against the wall. He said he climbed over her, put on his shoes, and left the room. He estimates that he was in the room for 20 to 30 minutes.

The Responding Party said that he received a SnapChat message later in the morning to the effect of "that wasn't ok." He confirmed that he also sent the two messages that the investigators had provided to him prior to the interview. He said that there was no other contact after that. He said that he blocked her on SnapChat after receiving the "No Contact" order. He said that he did not realize that many of the previous messages would disappear when he blocked her.

The Responding Party said that he did not consume any alcoholic beverages that night and that he did not notice any indication that she had been drinking either. Investigator Bamford asked him why he had sent the SnapChat message indicating that he had been drunk and he said that he messaged her what he thought would "make her feel better." He stated that Witness #1 had been with him all night and could confirm that he had not been drinking. He stated that Witness #1 was his only witness.

Investigator Bamford then reviewed the memo of the written statement submitted by the Reporting Party to confirm his answers. Investigator Bamford explained that he knew that the Responding Party already answered many of the questions, but that he wanted to review them with him to be clear and the

Responding Party said that he understood. He stated that there was never any mention by the Reporting Party of her being drunk. He also adamantly denied that she ever told him to stop or leave. He said that she did not push him away at any time. He said that she did not answer him when he asked three times if what he was doing (penetrating her vagina with his finger or fingers) was ok. He reiterated that he sent the two SnapChat messages later Sunday because he thought "it would make her feel better."

### Summary of Witness #1 Interview

Witness #1 said that at approximately 9:00 pm he was at Corr Hall with the Responding Party. He said that they were playing Madden (video game) and stayed there until about 10:30 pm. At approximately 10:30 pm they both went to the Courts. Witness #1 said that the Responding Party received a text message and then said he needed to leave because he was "meeting a friend." Witness #1 estimated that this happened between 11:45 pm and midnight, but said that he was not confident about the exact time.

Investigator Bamford asked Witness #1 if either he or the Responding Party had consumed alcohol that evening. Witness #1 said that he does not drink and that the Responding Party did not drink alcohol while they were together that evening. Witness #1 described the Responding Party as "straight" all night.

Witness #1 said that he does not know what happened after the Responding Party left.

Investigator Bamford asked Witness #1 if he had any additional information and he said that he did not.

### Summary of Witness #2 Interview

Witness #2 stated that she remembers seeing the Responding Party at the Reporting Party's residence hall door, but does not recall the exact day or time. She stated that she also remembers seeing the Reporting Party later the same morning and making a comment to her about the Responding Party being at her door.

Witness #2 said that it was "late at night" when she was walking from her room (O'Hara) diagonally across the hallway to her friends' room. The Reporting Party's room is next to her friends' room. Witness #2 said that she saw the Responding Party knocking at the Reporting Party's door. She said his back was to her, but she still recognized him. She said that they did not interact and she was not in a position to notice if he appeared intoxicated. She said that he "was standing up fine." She said that a few minutes later she left her friends' room and he was no longer in the hallway. She does not know where he went while she was in her friends' room.

Witness #2 said that "about a week before" this incident she had spoken with the Reporting Party about her and the Responding Party, but had no further information.

**Part 2**

**Credibility Assessment:**

There are a significant number of undisputed facts regarding the incident in question.

- The Responding Party and Reporting Party first met in the Spring of 2017 via social media prior to coming to Stonehill for the Fall 2017 semester.
- They communicated primarily via social media prior to coming to Stonehill.
- On at least two occasions earlier in the Fall 2017 semester they were in the Reporting Party's residence hall room.
- Earlier in the semester on at least two occasions in the Reporting Party's residence hall room they engaged in consensual sexual activity, including "fingering." This point was clarified by the Reporting Party in the review of facts.
- On November 19, 2017 in the early morning hours, the Reporting Party messaged the Responding Party. The Responding Party offered to walk her back to her residence hall.
- Both parties agree that they did not meet to walk to O'Hara Hall together.
- Both parties agree that the Responding Party knocked on the Reporting Party's residence hall room door and entered the room.
- While lying on the bed, the Responding Party "fingered" the Reporting Party.
- The encounter ended after the Reporting Party began to breath heavily. The Reporting Party described this as she was crying and hyperventilating and the Responding Party described this as she "curled in a ball" and was breathing heavily. The Responding Party then left the room.
- Later in the day the Reporting Party sent a SnapChat message to the Responding Party stating something to the effect of "that wasn't ok."
- The Responding Party replied with two SnapChat messages.
- There was no communications or contact between the parties after these messages.
- Earlier SnapChat messages were deleted when the Responding Party blocked the Reporting Party on SnapChat after receiving the "no-contact order."

There are, however, areas of dispute:

- The Responding Party said that he had not consumed any alcohol on the evening of November 18, 2017 and the early morning of November 19, 2017. The Reporting Party said that the Responding Party implied that he had been drinking, although she did not notice significant impairment.
- The Reporting Party described herself as drunk and a six out of ten, with ten being the most drunk. She said that she does not think that she was capable of consent due to her level of intoxication. The Responding Party said that he did not think she had been drinking at all.

- The Reporting Party said that she explicitly told the Responding Party that she was drunk and didn't want to "do anything" meaning sexual activity.
- The Responding Party said that on three occasions he asked the Reporting Party if she wanted him to stop (fingering her) and she said nothing and did nothing.
- The Responding Party said that at no time did the Reporting Party tell him to stop or say "no."
- The Reporting Party said that she explicitly told the Responding Party to stop and pushed him away from her.

During the course of the investigation the Reporting Party indicated that she believed that she was intoxicated to the point of incapacitation and was, therefore, unable to consent to sexual activity. Based on the statements of the Reporting Party and the Responding Party the investigators determined that the Reporting Party was not incapacitated due to alcohol consumption. According to the Policy, an incapacitated person lacks the capacity to understand the "who, what, when, where, why, or how" of the sexual interaction. The Reporting Party's detailed description of the incident, and the many facts corroborated by the Responding Party, indicated an understanding of the situation.

The Responding Party indicated that during the previous similar sexual activity with the Reporting Party, that he had verbally asked her if she was ok with the activity and she verbally said "yes." At the time of this alleged incident the Responding Party stated that he verbally asked the Reporting Party if she was ok with the sexual activity. He stated that unlike the previous times she did not verbally answer. He stated that she "moaned" and eventually cried. At that point he stopped and left the room. The Reporting Party stated that repeatedly she explicitly said that she did not want to engage in sexual activity.

The Reporting Party had an interaction with Witness #2 later in the morning of the incident. When Witness #2 made a comment about seeing the Responding Party at the Reporting Party's door earlier in the day, the Reporting Party responded by something to the effect of "it wasn't ok." The comment made by the Reporting Party to her hall mate soon after the incident supports her statements and belief that the sexual contact was unwanted. The messages sent by the Responding Party to the Reporting Party after the incident lead the investigators to conclude that the Responding Party understood that the sexual interaction with the Reporting Party was unwanted as well.

The Responding Party admitted to sending the following two messages (Appendix B):

"I'm so really sorry I know I fucked up, I totally misread the situation. What can I do to make it right?"

"Please forgive me for being a drunken idiot. I'd never want to hurt you"

The Responding Party stated that he sent the messages because he hoped that they would make the Reporting Party feel better. He stated that he was not drunk and denied that he did anything wrong. He reiterated that he sent the messages to make the Reporting Party feel better.

The Policy defines Non-Consensual Sexual Intercourse as penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim. The Policy further states that consent means informed, freely, and voluntarily given agreement, communicated by clearly understandable words or actions, to participate in each form of sexual activity. Consent is mutually understandable when a reasonable person would consider the words or actions of the parties to have demonstrated agreement between them to participate in the sexual activity. In the absence of mutually understandable words or actions, neither party should assume that it

is permissible to engage in sexual activity. The Policy further states that Consent will not be assumed by silence.

The Policy offers clarification regarding Sexual Misconduct. It states that "While a person's non-verbal actions can constitute consent, verbal communication between two people is the best way to ensure that each person knows the intentions of the other person." The Reporting Party states that she clearly said that she did not want to engage in sexual activity. The Responding Party indicated that she did not give verbal consent, but rather "moaned" when asked if sexual activity was ok. The Policy also states that "Previous sexual relations or a current or past intimate/romantic relationship between two people is not the equivalent of consent to future sexual activity." The policy states that an example of behavior that demonstrates a lack of consent and may constitute sexual assault includes "engaging in sexual activity with someone who has said "no" or has indicated lack of consent through non-verbal communication."

### Investigative Findings:

The investigators determined that based on a preponderance of the evidence it is more likely than not that the Responding Party violated Policy S1.14, specifically, non-consensual digital penetration of the vagina.

**Appendix A**

Lily Krentzman, Title IX Coordinator

Memo to File

Re:    Report of Alleged Violation of Sexual and Gender-Based Misconduct and Interpersonal Violence Policy

Date:   November 21, 2017

---

At 3:00pm, Ms. ▉ arrived at my office and I explained the process of a Title IX investigation and asked her if she wanted to go through the process and file a formal complaint. She said yes and then shared the following information with me. She was too nervous to speak so she had written down the following for me:

"A boy on the football team & I had previously made out sober twice in my room.

I was in New Hall on Saturday night, November 18th. He offered to walk me back. (----) At one point he stopped replying & I was impatient so I assumed he wasn't coming. So I called ▉ and he stayed on the phone with me while I walked over the red bridge to O'Hara. I was in my room, changed into pajamas. I was very drunk, grabbed a water bottle, & was headed to bed. Then there was a knock on my door. I went over & saw it was him. I think he asked me how's it going or am I okay or something. I said yeah I'm fine I'm just still drunk. He let himself further into my room. I said look, I don't want to do anything I'm drunk and I'm tired. He didn't take the hint so I was like alright I'm going to bed. Then I laid down & closed my eyes hoping he would take THAT hint, & leave. He came and laid down w/ me & tried to kiss me and I literally didn't let him. I said stop, I'm drunk. I don't want to do anything with you. And he said, "you don't seem 'that' drunk". And I was like "well I am, and I don't want to do anything." He started rubbing my back and my thigh and I started falling asleep, which is scary for me because I was tired, but sleeping is such a vulnerable state. His hand moved down my thigh quickly and brushed against my vagina which left me completely shocked, awake, startled, and taken aback. I pushed him away. He put his hand in my pajama shorts and started rubbing and I said "I don't want to…" and then he started fingering me. I was too drunk to fight him off. I think he thought that since I was wet I wanted it which made it ok? That I wanted it? Even though my words <u>directly</u> contradicted it?

I said stop, I don't want this, like three or four times, he kept adding more fingers. I don't know how many but it hurt. I jumped to some sort of last ditch effort to save myself & started crying & hyperventilating, until I "fell asleep" (I didn't fall asleep, I was so panicked) He finally left.

▉ (There was a star drawn beside his name)

Ms. ▉ had to leave to go to class for a test and told me she was going to be leaving for home right from the class. I told her I would be in touch with any questions.

She is aware that a mutual no contact order is in place.

Appendix B





I'm so really sorry I know I fucked up, I totally misread the situation. What can I do to make it right?