UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 20-10468-LTS |
| ) | |
| STONEHILL COLLEGE, INC., ) | |
| ) | |
| Defendant. ) | |

ORDER ON DEFENDANT STONEHILL COLLEGE, INC.'S
MOTION TO DISMISS (DOC. NO. 22)

February 23, 2021

SOROKIN, J.

Plaintiff John Doe is suing Defendant Stonehill College, Inc. ("Stonehill") for harm

arising out of Stonehill's investigation of alleged sexual misconduct. Doe was admitted to

Stonehill College's freshman class in 2017. Shortly thereafter, Doe, who is male, met Jane Roe, a

female admitted student, through a Facebook group. Once on campus, Doe and Roe developed a

friendship and eventually engaged in consensual sexual activity at least three times during the

fall of 2017. On November 18, 2017, Doe penetrated Roe with his fingers. Roe filed a sexual

misconduct complaint against Doe based on this interaction. Stonehill conducted a two-month

investigation and concluded under a preponderance of the evidence standard that Doe was

responsible for committing sexual assault. Doe was expelled. Doe now asserts a variety of claims

against Stonehill under Massachusetts law as well Title IX, 20 U.S.C. § 1681, et seq. Doc. No.

19.[1] Stonehill moved to dismiss all of Doe's claims, Doc. No. 22; Doe opposed, Doc. No. 29;

Stonehill replied, Doc. No. 34; and the Court held a hearing on February 9, 2021. For the

following reasons, Stonehill's Motion to Dismiss is ALLOWED as to all counts of Doe's

Amended Complaint.

## I.   FACTS

The facts set forth below are drawn from the allegations in the Amended Complaint, Doc.

No. 19, and such other documents as explained here. Further facts are set forth in the discussion

as relevant to the resolution of the issues raised by the pending motion. In addition to the

Amended Complaint, the Court considers the documents attached as exhibits to the Amended

Complaint, Stonehill's Motion to Dismiss, and Doe's Opposition.[2] The Court accepts as true

Doe's factual allegations for purposes of the Motion as well as all reasonable inferences drawn

therefrom.

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

[2] The Court considers these documents for three reasons. First, neither party challenges the authenticity of any of these documents. Second, Doe expressly consents to consideration of the documents attached to Stonehill's moving papers, Doc. No. 29 at 8 n.2, and argues the merits of the Motion to Dismiss in light of the further documents he attached to his opposition. Doe makes no suggestion that consideration of those additional documents converted the motion to one for summary judgment. Third, the law makes the aforementioned documents available to the Court on the Motion to Dismiss in any event. "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33–34 (1st Cir. 2001). However, there is "a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993)). When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998). That is precisely the case here, as the documents the parties submit merge into the Amended Complaint based upon the allegations of the Amended Complaint. See, e.g., Doc. No. 19 ¶¶ 237-239, 274, 284, 413.

### A.  The Relationship Between John Doe and Jane Roe

Stonehill College is a private, Catholic, liberal arts college in Easton, Massachusetts. Doc. No. 19 ¶¶ 4, 8. John Doe was admitted into Stonehill's class of 2021. Id. ¶¶ 14, 17. In spring 2017, before arriving on campus, Doe met Jane Roe in a Facebook group for incoming students and they began to message each other over Snapchat and through other forms of social media. Id. ¶ 21. They met in person on campus once classes began in September 2017 and developed a friendship. Id. ¶¶ 24, 33.

Starting in October 2017, their relationship began to include consensual sexual intimacy. Id. ¶ 35. These sexual encounters occurred at least three times. Id. ¶ 43. Doe alleges that their interactions "established a pattern of verbal communication and physical cues by which Jane Roe indicated her consent to digital stimulation and John Doe understood that she had consented." Id. ¶ 46. Moreover, Doe alleges the only sexual act in which he engaged with Roe was his digital stimulation of Roe. Id. ¶ 43.

### B.  The Alleged Sexual Assault

On November 18, 2017, around midnight, Doe was on campus with a male friend (later designated "Witness #1") when he received a Snapchat message from Roe. Id. ¶¶ 48–49. Roe told Doe that she was at a party but was too scared to walk back to her dormitory alone. Id. ¶ 49. Doe offered to walk Roe back to her dormitory; Roe said yes but then stopped responding to Doe's messages. Id. ¶¶ 49–51. When she did not respond, Doe began walking in the direction of Roe's dormitory. Id. ¶ 51. Roe then messaged Doe that she had been on a phone call and was back in her room. Id. Doe told Roe that he was on his way already. Id. When Doe reached Roe's dormitory, there were a number of students around the door to her room, including a female

student later designated "Witness #2." Id. ¶ 52. In view of Witness #2, Doe knocked on Roe's door, and she opened it and let him in. Id. ¶¶ 52–53.

The Amended Complaint lays out both Doe's and Roe's versions of what transpired next. Doe alleges that after he entered the room, he and Roe engaged in consensual sexual contact that involved his digital stimulation of Roe, similar in nature to their prior interactions. Id. ¶¶ 54–60. Doe did not believe Roe had consumed any alcohol prior to their meeting. Id. ¶ 56. By contrast, Roe alleges that she was heavily intoxicated by the time she came back to the room and did not want to engage in any sexual activity. Id. ¶ 96. Roe states that she told Doe multiple times to stop and that she was drunk. Id.

The next morning, November 19, 2017, Doe alleges that he received Snapchat messages from Roe saying things like "what just happened[?]," "that wasn't consensual," and "that wasn't ok." Id. ¶ 65. Doe states that he was "alarmed" by these messages. Id. ¶ 66. He alleges that he grew "concerned that she would accuse him" of sexual misconduct. Id. Doe "finally" responded to Roe with messages stating the following: "Please forgive me for being a drunken idiot. I'd never want to hurt you," and "I'm so really sorry I know I fucked up, I totally misread the situation. What can I do to make it right?" Id. ¶ 70. In the Amended Complaint, Doe states "[n]either Snapchat message that John Doe sent to Jane Roe was true" and that he knew so at the time—while he believed their interaction had been consensual, he thought Roe "did not want to accept responsibility for having engaged in sexual activity with him" and his messages would help her "feel better about herself." Id. ¶¶ 71–72. Nothing in the Amended Complaint alleges Roe felt this way, nor does the Amended Complaint allege any factual allegations for this feeling other than Doe's interpretation based on his view of the night's events.

On November 20, 2017, Roe filed a sexual misconduct complaint against Doe with Lily Krentzman, Stonehill's Title IX Coordinator. Id. ¶ 74. Doe received an email later that day from Stonehill's Director of Community Standards, Michael Labella, which alerted him that an incident report had been filed and that the school was implementing a no-contact order between Doe and Roe. Id. ¶¶ 76–77.

### C. Stonehill's Title IX Investigation

On November 22, 2017, Labella formally notified Doe that Stonehill was investigating Roe's allegation that Doe had violated Stonehill's Sexual Misconduct Policy ("the Policy"). Id. ¶ 103. Stonehill's Title IX Investigators, Shayla Jordan and David Bamford, interviewed Roe and Doe separately. Id. ¶¶ 233, 256, 259. Doe retained an attorney, who was present for his interview. Id. ¶¶ 258–59. The Investigators also interviewed Witness #1 and Witness #2. Id. ¶¶ 274, 279. On December 20, 2017, Doe was advised that the interview phase was complete. Id. ¶ 285. Nonetheless, on December 28, 2017, the investigators conducted a follow-up interview with Roe, in which Roe confirmed that she and Doe had engaged in consensual sexual activity in the past. Id. ¶¶ 324–25, 328. On January 12, 2018, the investigators reviewed "Part 1" of the report over the phone with Doe and his attorney, and Doe was sent a copy of Part 1 of the report on January 23, 2018, which contained statements of disputed and undisputed facts. Id. ¶¶ 330, 333–34. By reviewing the dates of his and Roe's interviews, Doe and his attorney surmised that Roe had been interviewed twice, and in her second interview she had corroborated his statement that they had engaged in sexual conduct in the past. Id. ¶¶ 344, 349. Doe's attorney emailed the investigators the following: "We would like it noted that the Reporting Party's clarification of consensual sexual contact occurred only after she was interviewed a second time. And it substantiates my client's statement regarding prior sexual contact." Id. ¶ 353. Investigator Jordan

responded, "Investigator Bamford and I have reviewed your request. We have decided to include this information in our final report that we share with the Dean of Students." Id. ¶ 354. Doe does not allege asking for the investigators to include further information, ask further questions of Roe, or interview further witnesses. In fact, Doe does not allege asking for any other changes to Part 1 of the Final Report.

On February 12, 2018, Doe met with Stonehill Dean of Students Kevin Piskadlo. Id. ¶ 382. At this meeting, with Doe's attorney on speakerphone, Piskadlo informed Doe that he had been found responsible for violating Stonehill's prohibition on nonconsensual sexual intercourse. Id. ¶¶ 382–83. Piskadlo additionally informed Doe that the only possible sanction was dismissal from Stonehill. Id. ¶ 389. Doe was given a letter explaining his expulsion and a copy of the Final Report after his meeting, which contained Part 1, the facts (which he had reviewed), as well as Part 2, the credibility assessment and finding (which he had not previously seen). Id. ¶¶ 393, 395, 404; Doc. No. 29-1. Doe filed an appeal with the school, which was denied on March 9, 2018. Doc. No. 19 ¶¶ 407, 415–16. Doe then filed this case in federal court.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the

complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003)).

This Court has subject matter jurisdiction over the claim in Count I, which alleges violations of federal law pursuant to 28 U.S.C. § 1331. The remainder of Doe's claims arise under state law. Federal courts may exercise supplemental jurisdiction over state law claims brought together with claims arising under federal law. 28 U.S.C. § 1367. In addition, federal courts have jurisdiction over suits brought pursuant to state law where there is complete diversity of citizenship between the adversaries and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332; Arbaugh v. Y&H Corp., 546 U.S. 500, 513 (2006). Plaintiff is a resident of Maine and Stonehill is located in Massachusetts and organized under Massachusetts law. Plaintiff asserts he is entitled to damages in excess of the statutory threshold amount. In the absence of any challenge from Defendant and based upon the Court's review of the Amended Complaint, the court finds it has jurisdiction over the state law claims in this case pursuant to both 28 U.S.C. § 1367 and 28 U.S.C. § 1332.

## III.  DISCUSSION

### A.  Title IX (Count I)

The Court first turns to Doe's Title IX claims. Pursuant to Title IX of the Education Amendments of 1972, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Several distinct Title IX theories emerge in Doe's sprawling, 120-page complaint, and the Court addresses each of them in turn.

### 1. Stonehill's Separate Process for Sexual Misconduct

First, Doe alleges that the mere fact that Stonehill has a separate process for handling cases of sexual misconduct distinct from other kinds of misconduct evidences gender-based discrimination sufficient to state a claim for violation of Title IX. Doc. No. 29 at 22–23. The school does have two sets of disciplinary procedures, one for sexual misconduct allegations and another encompassing the range of other kinds of misconduct. See Doc. Nos. 20-1; 20-2; 20-3. Both policies are before the Court. Under both policies, a violation finding requires satisfying the preponderance of evidence standard. See Doc. Nos. 20-1 at 17; 20-2 at 12; 20-3 at 17. The procedures set forth in the two policies do differ.[3]

Doe cites no textual provision of Title IX nor any caselaw supporting his claim that the existence of two sets of procedures violates the statute. Rather, he relies upon the 2017 Title IX guidance from the Department of Education, which states that "[t]he standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases"—it is in the context of these evidentiary standards that "special procedures" for sexual misconduct cases can suggest discriminatory purpose, according to that guidance. See Doc. No. 29 at 23; United States Department of Education, Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct (Sept. 2017) ("2017 OCR Q&A"), at 5 n.19. Of course, here, the same evidentiary standard applies under both policies. Stonehill procedures establish a preponderance of the evidence standard for allegations of sexual misconduct as well as for allegations of other misconduct. See Doc. Nos. 20-1 at 17; 20-2 at 12;

---

[3] Specifically, allegations of non-sexual misconduct may be addressed through an informal conference or at a hearing with witness testimony in front of a board made up of students, faculty, and staff. See Doc. No. 20-2 at 10–13. Determinations of violations of the sexual misconduct policies are made by the Dean by way of an inquisitorial process without a hearing. See Doc. No. 20-3 at 18–20.

20-3 at 17. Thus, even assuming without deciding that the Department of Education's guidance set forth in a Q&A document enjoys some measure of legal force or deference, the policies do not suggest discriminatory purpose here under the reasoning of that document. Doe does not state a claim for a Title IX violation simply based on the existence of a separate Sexual Misconduct Policy that applies the same evidentiary standard as the other misconduct policy though it sets out other different procedures. Cf. Fed. R. Evid. 412 (establishing special rules of admissibility applicable only in proceedings "involving alleged sexual misconduct").

### 2. Stonehill's Lack of Cross-Examination and Live Hearing

Next, Doe alleges that Stonehill's process violated Title IX because it lacked an "equitable process"—namely, a live hearing with an opportunity to cross-examine witnesses. Doc. No. 19 ¶¶ 476–77, 482. The text of Title IX does not require a live hearing with cross-examination or any other particular procedure and Doe points to no language so requiring. Neither party has provided the Court with legal authority stating that Title IX by its terms requires a private university to provide a live hearing with some form of cross-examination. From its own review of the applicable caselaw, the Court notes that the First Circuit has so far declined to establish any framework for assessing the sufficiency of disciplinary procedures under Title IX. See Doe v. Trs. of Boston Coll., 892 F.3d 67, 90 (1st Cir. 2018) ("Boston Coll. I") ("Neither the Supreme Court nor this Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX. We need not establish one at this moment.").

The First Circuit has examined the need for a live hearing and cross-examination in the context of federal procedural due process claims. The Court notes that while Doe states he was deprived of "basic due process," Doc. No. 19 ¶ 482, Doe cannot bring claims based on a

violation of due process. Stonehill is "not a public university or a government actor and is not subject to due process requirements." Doe v. Trs. of Boston Coll., 942 F.3d 527, 533 (1st Cir. 2019) ("Boston Coll. II"). However, for public universities, procedural due process "[i]n the school disciplinary context . . . requires 'some kind of hearing.'" Haidak v. Univ. of Massachusetts-Amherst, 933 F.3d 56, 66 (1st Cir. 2019) (citing Goss v. Lopez, 419 U.S. 565, 579 (1975)). In Haidak, the First Circuit considered a disciplinary policy that included a hearing but did not provide parties with the opportunity to cross-examine each other face to face. The First Circuit concluded that the absence of direct cross-examination was not in itself a procedural due process violation. Haidak, 933 F.3d at 69. The Court cautioned:

> This is not to say that a university can fairly adjudicate a serious disciplinary charge without any mechanism for confronting the complaining witness and probing his or her account. Rather, we are simply not convinced that the person doing the confronting must be the accused student or that student's representative.

Id.

Later in 2019, the First Circuit emphasized that Haidak and its requirement of "some mechanism for confronting the complaining witness" was limited to federal due process claims brought against public universities. In Boston College II, the First Circuit rejected a district court's reading of Haidak that would have required private universities to provide some kind of real-time cross-examination in disciplinary proceedings under the Massachusetts contract law concept of basic fairness. Boston Coll. II, 942 F.3d at 533–36. The First Circuit noted that "the highest court of Massachusetts, the Supreme Judicial Court (SJC), has been explicit that a private university need not comply with federal due process to meet the basic fairness requirement in disciplining students." Id. at 533–34. Moreover, "Massachusetts case law has also clearly approved school disciplinary procedures which did not involve any opportunity for the accused student to pose questions to be addressed to the accuser, through surrogates or directly, much

less to do so in 'real time.'" Id. at 534; see, e.g., Driscoll v. Bd. of Trs., 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007). For a sexual misconduct disciplinary process to satisfy the basic fairness required under by Massachusetts law, it need not involve a live hearing or cross-examination. In sum, the relevant caselaw leaves open the question about what procedures exactly are required under Title IX.

Under the statute, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of [20 U.S.C. § 1681]. 20 U.S.C. § 1682. Pursuant to this grant of authority, the Department of Education's 2017 Title IX Guidance, which was effective during Doe's disciplinary proceeding, informed schools that Title IX proceedings could occur "with or without a hearing." 2017 OCR Q&A, at 5. Thus, Stonehill's procedures complied with then-existing guidance from the Department of Education. Recently, the Department of Education changed its position. Effective August 14, 2020, the Department of Education adopted a regulation requiring postsecondary institutions (such as Stonehill) to provide parties with a live hearing and cross examination. 34 CFR 106.45 (2020); see also Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30028 n.4 (promulgating regulation pursuant to authority under 20 U.S.C. § 1682). The new regulation only applies prospectively, not retroactively. 85 Fed. Reg. 30026, 30061. As the Department of Education's position interpreting its own regulation is entitled to deference, see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), the Court applies the revised regulation prospectively only. Notably, Doe advances no argument to apply it retroactively. Accordingly, Stonehill was not in violation of any Title IX guidance or regulations at the time of Doe's proceedings, even though if the allegation arose today, current Department of Education

regulations would plainly require a different process including a live hearing with cross-examination.

That leaves the question of whether Title IX (as distinct from implementing regulations) requires a live hearing with cross-examination. The text of the statute imposes no such requirement. The shifting positions of the Department of Education, including its position that the current regulation applies only prospectively, have been pursuant to regulatory authority under 20 U.S.C. § 1682, rather than interpreting the meaning of the statute itself. The First Circuit has left the question open and distinguished carefully the different procedures required by procedural due process, Title IX and the basic fairness required by Massachusetts contract law. For these reasons, the Court declines to interpret Title IX to require categorically a live hearing with cross-examination in all disciplinary proceedings involving claims of sexual misconduct.

The statute does guarantee that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Doe alleges Stonehill used a non-adversarial factfinding and adjudication method that, facially, offered parties the same meaningful access to information, process, and resources—including the opportunity to retain counsel, to review the factual record and to respond to it. Doe availed himself of each of these opportunities. Stonehill's use of an inquisitorial model is not in itself legal error. In upholding a non-adversarial discipline policy, the First Circuit noted that "we consider the inquisitorial model fair enough for critical administrative decisions like whether to award or terminate disability benefits." Haidak, 933 F.3d at 68; see also Doe v. Brown Univ., 210 F. Supp. 3d 310, 332 (D.R.I. 2016) ("Brown Univ. I") (finding similarly structured "investigator model" did not violate Title IX on its face). Doe

12

has not plausibly alleged that this model discriminates against him "on the basis of sex."

Accordingly, the Court concludes that Doe has failed to plausibly allege a violation of Title IX

arising out Stonehill's policy, as the Court rejects the claim that Title IX requires a live hearing

with cross examination in every case of alleged sexual misconduct.[4] Of course, this is not to say

that the actual process followed by Stonehill is immaterial—it is relevant to Doe's erroneous

outcome and selective enforcement claims under Title IX.

### 3. Selective Enforcement

Doe next alleges a "selective enforcement" Title IX claim. Doc. No. 29 at 21. To prevail

on a claim for selective enforcement, Doe must show that "the severity of the penalty and/or the

decision to initiate the proceeding was affected by [his] gender." Haidak, 933 F.3d at 74 (citation

omitted). This claim fails. Doe has not plausibly alleged any facts that his proceeding was

initiated because of his gender, or that male and female students accused of sexual misconduct

are treated differently or subject to different sanctions. He provides no "similarly situated

comparator of another gender." Doe v. Brown Univ., 327 F. Supp. 3d 397, 412 (D.R.I. 2018)

("Brown Univ. II"). While Stonehill's policy is gender neutral, Doe alleges that only male

students are accused of sexual assault and by default, that means Stonehill's policy was

selectively enforced against men. Doc. No. 19 ¶¶ 471–473 (alleging that Stonehill's policies

"have the effect of scapegoating those accused of sexual misconduct, i.e., Stonehill's male

students, and as such, are discriminatory"). Doe is incorrect. Doe has no factual allegations

suggesting anything other than that Stonehill responds to the complaints it receives, regardless of

the genders of the parties involved. The First Circuit has already rejected this kind of argument.

---

[4] To the extent Doe is claiming that even if the requirements of Title IX vary depending upon the circumstances, his particular case required a live hearing with cross-examination, this is just another way of expressing the erroneous outcome claim the Court addresses below.

See Boston Coll. I, 892 F.3d 67, 91–92 (noting the Court was "unmoved by the Does' contention that B.C.'s procedures are infected with a systemic gender bias . . . [because] only male students have been accused of sexual assault" and that "[i]t is unreasonable to draw such an inference from this information rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases at" the school). Doe's allegations do not support a claim for selective enforcement under Title IX.

### 4. Erroneous Outcome: Elements and Gender Bias

Doe next alleges an "erroneous outcome" Title IX claim. Doc. No. 19 ¶ 489; Doc. No. 29 at 21. To state an erroneous outcome claim, Doe must "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and indicate that "gender bias was a motivating factor." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994); see also Boston Coll. I., 892 F.3d at 90 (using Yusuf framework by agreement of the parties); Brown Univ II., 327 F. Supp. 3d at 412 (using Yusuf framework). "[T]he claim is that the plaintiff was innocent and wrongly found to have committed an offense." Yusuf, 35 F.3d at 715. However, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." Id.

This claim fails for a simple and straight forward reason. Even if the procedural or fact-based errors Doe alleges were sufficient, he has no plausible allegations that indicate that gender bias was a motivating factor behind any deficiency. That alone requires dismissal of the claim. Cf. Doe v. Univ. of Massachusetts-Amherst, No. CV 14-30143-MGM, 2015 WL 4306521, at *8–9 (D. Mass. July 14, 2015) (dismissing erroneous outcome claim where plaintiff failed to state any "specific factual allegations from which a factfinder could plausibly infer the influence

of gender bias"). Doe states that respondents in sexual assault proceedings at Stonehill have

"invariably been male" and "have been scapegoated in Stonehill's process," Doc. No. 19 ¶ 478,

but "these statements are unsupported by even minimal data or credible anecdotal references;

they are the type of conclusory statements that Iqbal and Twombly do not allow the court to

consider," Univ. of Massachusetts-Amherst, 2015 WL 4306521, at *8–9. Doe also alleges that

the Department of Education's investigation of Stonehill, which began over a year before his

disciplinary proceeding, and the emergence of the national #MeToo movement somehow tainted

his process—specifically, he claims that "Stonehill felt pressure to expedite the investigation and

find a male student responsible for sexual misconduct due to the pressure and scrutiny of the

other pending OCR investigations, and the #METOO movement." Doc. No. 19. ¶ 209. Again,

Doe alleges no facts, data, or anecdotes showing that either a past investigation or the growing

#MeToo movement led to a process tainted by gender bias.[5]

### 5. Erroneous Outcome: Articulable Doubt

The failure to plausibly allege gender bias forecloses the Title IX claim. In an abundance

of caution, the Court also separately considers whether Doe has plausibly alleged articulable

---

[5] For his allegation that a March 2016 Department of Education investigation motivated Stonehill to act in a discriminatory matter towards him, Doe relies on Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016). See Doc. No. 29 at 23–24. This Second Circuit case is inapposite for a variety of reasons. In Columbia University, the Second Circuit found that plaintiff established a "minimal inference" of discriminatory intent under Title IX—a standard not adopted by the First Circuit—because the school was in the midst of responding to widely publicized student concerns about campus sexual assault when it ruled on the plaintiff's case. See 831 F.3d at 57–59. Doe does not allege that Stonehill was being investigated for gender bias nor he allege that there was any public outcry on campus from the old investigation during his proceeding. Cf. Doe v. Univ. of Dayton, 766 F. App'x 275, 282 (6th Cir. 2019) (distinguishing Columbia University from case where plaintiff "fail[ed] to draw any connection between" a Department of Education agreement and his hearing two years later, and where there was no "substantial public pressure or outcry in the weeks leading up to his hearing"). The mere existence of a prior Department of Education investigation is not on its own indicative of gender bias tainting a later proceeding, and Doe alleges nothing that connects the two here.

doubt. He has not. Doe's allegations of articulable doubt fall into three categories: error based on omitted facts, error based on procedural deficiencies, and error based on the school's decision to find him responsible for committing sexual assault. The Title IX investigation compiled a complete factual record, previewed by Doe, and omitted no material evidence or topic of inquiry. The decision itself was not a pure credibility choice between two diametrically opposed stories, but rather grounded in objective contemporaneous written evidence from the parties as well as many facts about the interaction undisputed by Doe and Roe. The remaining theories of doubt advanced by Doe are belied by his allegations, while the numerous allegations of procedural error are without force.

### a. Omitted Facts

Doe unsuccessfully argues for articulable doubt based on facts allegedly omitted by Stonehill from Part 1 of the Final Report. The Sexual Misconduct Policy requires Stonehill to afford parties the right to "review and respond to pertinent evidence received," Doc. No. 20-3 at 21, and Doe identifies facts not revealed to him when Stonehill shared Part 1 of the Final Report with him prior to its transmission to the Dean. First, Doe states that he was not informed that Roe told Witness #2 the morning after the incident that "it wasn't ok." Doc. No. 29 at 29–30. Doe is correct that this factual assertion is not included in the segment of the report that he reviewed, Part 1, and is only included in the credibility assessment of Part 2, Doc. No. 29-1 at 7, which he did not have an opportunity to review prior to the Dean's decision. This failure to disclose violated the Policy. But this omission does not plausibly set forth a claim of articulable doubt in the outcome of the proceeding. The statement from Witness #2 was cumulative to (and weaker than) the written text message Roe sent to Doe the morning after the event. In fact, the language of Roe's alleged statement to Witness #2 mirrors Roe's language to Doe in the text message

("[T]hat wasn't ok," Doc. No. 19 ¶ 65). And Doe has neither alleged nor argued how the absence

of knowledge of this cumulative and less significant evidence undermines confidence in the

outcome of the proceeding or contributes to the creation of articulable doubt.

Second, Doe states that Part 2 of the Final Report contains a statement from Roe that

prior instances of sexual intimacy had involved verbal consent, which was not included in Part 1.

Doc. No. 29 at 29. Assuming without deciding that Doe should have received this statement, its

omission is neither material nor does not it plausibly set forth a claim of articulable doubt in the

accuracy of the outcome of the proceedings. Doe's own Amended Complaint alleges that his

prior sexual interactions with Roe included "verbal communication." Doc. No. 19 ¶ 46. And his

Amended Complaint does not allege any verbal consent on the night of the incident in question.

Doc. No. 19 ¶¶ 57–58. Roe, of course, asserted she never provided verbal (or any other) consent

that night. In addition, Doe does not allege (1) that he told the Investigators that his prior sexual

interactions with Roe lacked verbal consent or (2) that after he received Part 2 of the Final

Report, he challenged this statement in his appeal.[6]

---

[6] Doe repeatedly states that physical cues indicated consent throughout his relationship with Roe
and these cues were present on the night of November 18th. See Doc. No. 19 ¶¶ 68, 71.
However, Doe does not actually allege that the physical cues that indicated consent in the past
were present on the night of November 18th. Indeed, his non-conclusory allegations describe his
first three sexual encounters with Roe as factually distinct from the sexual activity on November
18th. Compare id. ¶ 38 (alleging that on prior occasions, Roe "physically communicated her
consent by removing her clothing, allowing him to fondle her and to rub her bare skin, and by
making her vagina more accessible to him") with id. ¶¶ 57–58 (alleging that on November 18th,
Roe "put on a tank top and fleece pullover" and "lay down next to John Doe," at which point "he
began to rub her back" before proceeding, without Doe alleging further action by Roe, to
digitally penetrate her). Plaintiff's counsel suggested at oral argument that Roe stated in her
initial report to Stonehill that she (Roe) understood why Doe would have thought their encounter
was consensual based on physical cues. The Court notes that Roe's statement contains no such
words. Rather, Roe stated: "[H]e started fingering me. I was too drunk to fight him off. I think he
thought that since I was wet I wanted it which made it ok? That I wanted it? Even though my
words directly contradicted it?" Doc. No. 29-1 at 10 (emphasis original). If anything, Roe's

Third, Doe states he did not learn that Roe was claiming incapacitation until after he received the Final Report, i.e., after the Dean had determined Doe was responsible. Doc. No. 19 ¶ 385; Doc. No. 29 at 29. While the draft report he reviewed (Part 1) did not have this claim, it included both Roe's statement that she was intoxicated as well as the Policy's definition of "incapacitated." Doc. No. 19 ¶¶ 334, 346. The Policy does not require parties to be informed of other parties' legal arguments. Given that the Part 1 draft he received contained both her statement and the policy, it is not plausible Doe lacked either the ability to respond to the factual allegation that Roe was intoxicated or sufficient notice to do so. In any event, Stonehill rejected Roe's claim of incapacitation. Id. ¶ 368(A). That outcome was inevitable. Roe's self-described state of intoxication plainly failed to qualify as incapacitation under the Policy. This issue fails to plausibly allege a claim of articulable doubt.

Fourth, Doe states he did know that the Final Report would include that at the time of the incident, Roe cried. Doc. No. 29 at 29. However, the draft report provided to Doe stated in the factual allegation section that Roe "began to cry." Doc. No. 19 ¶ 347; Doc. No. 29-1 at 3. Doe had sufficient ability to challenge this factual allegation. Moreover, Doe's allegation here does not plausibly allege a claim of articulable doubt.

### b. Procedural Errors

Next, Doe identifies a series of alleged procedural errors, none of which cast articulable doubt on the accuracy of the outcome.

- Doe alleges he did not receive advance notice of the investigator's first interview of Roe. Doc. No. 19 ¶¶ 233–34. However, he points to no provision of the Policy requiring

---

statement indicates that Doe would have already been in violation of the Policy at the time he was purporting to determine consent from her physical reactions.

investigators to inform a party prior to conducting an interview.[7] He alleges that he
"reviewed" the investigators' factual findings after the interviews were concluded, id. ¶
330, and does not allege any questions he would have asked with advance notice or any
follow-up questions he or his attorney sought beyond what is addressed below in this
decision. Nor did he flag any in his appeal.

- Doe alleges that Stonehill should have referred the investigation to an external, third-
  party investigator. Id. ¶ 476. Doe does not allege that Stonehill's Policy required external
  referral. More importantly, he does not allege any facts showing that the Title IX
  investigators were biased or had a conflict of interest that would cast articulable doubt on
  his process. He concedes in his appeal that he had the chance to object to either of the
  investigators for bias at the outset, which he did not do. Doc. No. 29-6 at 10. Doe's only
  allegation is that the investigators may have been involved in a prior sexual misconduct
  investigation where Roe was a complainant, Doc. No. 19 ¶ 501; Doc. No. 29-6 at 10, but
  this statement is insufficient to allege that they were biased against Doe.

- Doe alleges that Stonehill issued a blanket no-contact order without considering the
  particular circumstances of the case, Doc. No. 19 ¶¶ 82–83, and did not advise him that
  his Snapchat messages with Roe would be deleted if he blocked her on the application,
  id. ¶¶ 84–90. Doe does not allege that the no-contact order prevented him from
  interacting with investigators or from fully participating in the process in any way that
  would cast doubt on the outcome of the investigation. The no-contact order applied

---

[7] As Stonehill notes, a requirement of advance notice would hinder the school's ability to
conduct a fair and impartial proceeding because it could allow witnesses to be pressured or lead.
Doc. No. 23 at 17. The Policy does allow individuals to submit names and questions to
investigators and to review and respond to the draft report. Doc. No. 20-3 at 21.

equally to Roe, prohibiting her from contacting him. Importantly, as Title IX guarantees an education free from bias based on "sex," Doe does not allege plausibly (or at all) that the no-contact order limited his education in any way. Moreover, preventing contact between an accused and an accuser while the decisionmaker resolves the accusation is a prudent investigatory practice. As to informing Doe that his Snapchat messages would disappear, Doe does not cite to any portion of the Policy or Title IX regulations in alleging that Stonehill had this kind of obligation.[8] Nor does Doe allege that Stonehill took steps to inform Roe of this consequence of blocking him on Snapchat. Ultimately, these allegations are immaterial to a determination of erroneous outcome, and Doe so concedes because he did not respond to Defendant's arguments against them in the Motion to Dismiss.[9]

- Doe alleges that Stonehill did not question Roe about the details of the alleged sexual assault. Doc. No. 19 ¶¶ 238, 243–44; Doc. No. 29 at 25–27. Doe's own allegations do not support this claim because he alleges that Stonehill investigators interviewed Roe after she made a written report, and while she "preferred to not re-tell the details of the incident," she "did agree to answer questions about the statement and incident. The Investigators asked questions to clarify or expand on the details of [her written] statement." Doc. No. 29-1 at 3 (emphasis added). Again, nowhere does Doe allege

---

[8] As Stonehill states, this requirement "would put educational institutions in the untenable position of knowing at the inception of the case . . . what evidence supports each parties' positions, and the intricacies and personal settings of myriad social media tools through which individuals may communicate." Doc. No. 23 at 26–27.

[9] The Court also notes that Doe has not alleged disappeared text messages that bore on the outcome of the consent question.

questions that the investigators should have asked or details they failed to obtain except as noted elsewhere in this decision.

- Doe alleges that Dean Piskadlo failed to review the "facts gleaned" in the investigation or provide his independent explanation for the finding that Doe was responsible for sexual assault. Doc. No. 19 ¶¶ 388, 396; Doc. No. 29 at 31–32. Doe's own allegations state that he met with Piskadlo, he was informed that he had been found responsible for violating the Policy, and he was given a letter stating "[t]hat Piskadlo had reviewed the Final Report." Doc. No. 19 ¶¶ 393, 395. The Final Report contained the "facts gleaned." Doe does not cast any doubt upon the letter or its contents, and the Policy does not require the Dean to provide independent reasoning. Even under a lenient motion to dismiss standard, the Court can discern no assertions beyond Doe's "mere conclusory statements" that Piskadlo failed to review the facts gleaned, violated the Policy, or that the letter plausibly gives rise to a claim of articulable doubt in the outcome of the proceeding.

None of these alleged procedural errors, taken individually or together, cast articulable doubt on the outcome of Doe's proceeding.

### c. Stonehill's Decision

Finally, Doe alleges articulable doubt based on the decision reached by the school. However, according to the allegations of the complaint, Stonehill made its decision based upon a full factual record and Doe identifies no omitted material evidence. The Final Report presented his version of the events based upon Doe's discussions with the investigators and Roe's version based upon two interviews with her in addition to her initial report. Simply put, Doe fails to allege documents, witnesses, forensic evaluations, or other material evidence omitted from the Final Report. He does complain that Stonehill failed to interview witnesses to corroborate or

refute Roe's assertion she was drunk that evening. Doc. No. 19 ¶ 303–312. Of course, her level

of intoxication is immaterial to the erroneous outcome claim; Stonehill rejected the assertion that

she was so drunk she was incapable of consent. Doc. No. 29-1 at 7. Indeed, Roe's own

description of her state of intoxication in the facts section of the Final Report precluded such a

finding. <u>Compare</u> Final Report, Doc. No. 29-1 at 3 (stating Roe described herself as "drunk, but

'not slipping over myself drunk'" and "on a scale of one to ten, with ten being very drunk she

was probably a six") <u>with</u> Sexual Misconduct Policy, Doc. No. 20-3 at 8 (defining incapacitation

as a "state beyond drunkenness or intoxication" where an individual "lacks the capacity to

understand the 'who, what, when, where, why, or how' of the sexual interaction").[10]

Based upon this record, Stonehill decided that Doe engaged in nonconsensual sexual

activity based on objective facts. The Sexual Misconduct Policy establishes that a person who

wishes to engage in sexual activity must have the consent of their partner. Consent means:

> informed, freely, and voluntarily given agreement, communicated by clearly
> understandable words or actions, to participate in each form of sexual activity.
> Consent is mutually understandable when a reasonable person would consider the
> words or actions of the parties to have demonstrated agreement between them to
> participate in the sexual activity.

Doc. No. 20-3 at 7. Certain objective facts are established by Doe's allegations. Doe and Roe

both state that Roe was "tired" when Doe arrived. Doc. No. 19 ¶¶ 54, 96(D). Doe engaged in

sexual activity within the meaning of the Policy when he penetrated Roe with his fingers. <u>See</u>

Doc. No. 20-3 at 6. Doe says he did so without any verbal consent from Roe. Doc. No. 19 ¶¶

---

[10] Doe complains that Stonehill undertook no investigation into whether Roe was untruthful in
asserting she was intoxicated and no or too limited of an inquiry into Roe's initial statement she
and Doe had "made out" previously, later "clarified" at his request to acknowledge the prior
history of sexual activity described by Doe. Doe posits that both of these matters bore on Roe's
truthfulness. However, these matters did not bear on her capacity to recall—both Doe and Roe
describe her as well aware of what was occurring—nor on the particulars of what happened
between them in her room on November 18th.

263(C)–(E). In Doe's telling, Roe lay down next to him on her bed fully clothed, he rubbed her back, and then penetrated her. Id.; Doc. No. 29-1 at 4. Roe also says she did not provide verbal consent in advance of Doe's penetration. Doc. No. 19 ¶¶ 96(F)–(I); Doc. No. 29-1 at 3. Doe and Roe both describe Roe's behavior following this sexual activity the same way: Doe says Roe was "breathing heavily" and Roe says she was "hyperventilating," Doc. No. 19 ¶¶ 61, 96(L); Doe says Roe "seemed" to have gone to sleep, and Roe says she pretended to fall asleep, id. ¶¶ 63, 96(L). Promptly the next morning, Roe messaged Doe "that wasn't consensual" and "that wasn't ok." Id. ¶ 65. Doe appreciated the gravity of these messages before he responded: he was "alarmed" and "concerned" that she would accuse him of sexual misconduct. Id. ¶ 66. Doe then admitted misconduct in writing, saying he had been "a drunken idiot," that "I know I fucked up," and that he "totally misread the situation." Id. ¶ 70. Doe now says, as he maintained to the Title IX investigators, that he lied when he wrote these contemporaneous messages describing the very event under investigation—he contends that "[n]either . . . message that [he] sent to Jane Roe was true." Id. ¶ 71. These statements and pieces of evidence are the type of objective facts that form the basis of misconduct determinations. See 34 C.F.R. § 106.45(b)(1)(ii) (2020) (requiring "an objective evaluation" of evidence); see also 85 Fed. Reg. 30026, 30097 (May 19, 2020) (noting that "[w]here misconduct is at issue . . . conclusions about whether the misconduct took place involve objective factual determinations rather than subjective academic judgments").

To cast articulable doubt on the accuracy of the outcome of the proceeding, Doe alleges a variety of statements about Roe: that Roe was sober, Doc. No. 19 ¶ 56; that she "lied" when she initially described their prior interactions as "surface level friends" who "made out," id. ¶¶ 95, 335(B); that she was emotionally fragile, id. ¶ 69; that for unspecified reasons she regretted this sexual encounter with Doe (but none of their prior ones), id. ¶ 72; and that after he penetrated her

with his fingers she was experiencing "intense pleasure," id. ¶ 58. Neither separately nor together do these assertions give rise to a plausible claim of articulable doubt. They are not facts concerning what happened between Roe and Doe that give rise to articulable doubt. Rather, they are either extraneous points or assertions that Stonehill could not rely upon Roe's word. But, of course, Stonehill did not simply rely upon Roe's word. Before the investigators were Doe's contemporaneous admissions of misconduct as well as their strikingly similar descriptions of the event. While the Policy's definition of consent might admit the possibility that a reasonable person could conclude consent had been given even if the other party did not so intend, that is not plausible here in the face of Roe's contemporaneous assertions (that "wasn't consensual") and Doe's contemporaneous admissions (e.g., that "I know I fucked up" and that "I totally misread the situation"), both of which are alleged by Doe. Nothing Doe alleges supports his theory of articulable doubt, which is premised on the foundation that (1) he lied in writing about the events in question after Roe leveled her accusation, and (2) that Roe must be lying about these events because of disputes he raises with her statements about things other than the events in question. Doe has the further problem that his Amended Complaint arguably alleges he violated the policy. Compare Doc. No. 19 ¶ 58 (alleging Doe penetrated Roe without any verbal consent or any physical cue other than the lack of objection to a back rub) with Sexual Misconduct Policy, Doc. No. 20-3 at 7 (requiring parties to "ensure that they have the consent of their partner" which is "communicated by clearly understandable words or actions").

### d. Totality of the Circumstances

For the reasons just explained, none of Doe's individual attacks on the process, the factual investigation, or the decision plausibly allege articulable doubt. The Court also considers the sum of the totality of all of the circumstances. Even taken together, Doe fails to plausibly

plead "articulable doubt." Prior to the decision, he twice had the opportunity to review all of the facts gathered by Stonehill and respond to them, once orally and later in writing. The investigators went back to Roe for further detail in light of information provided by Doe. In short, the process complied with the Policy, comported with governing Title IX rules, and provided him with a fair opportunity both to respond to the factual recitation set forth by the investigators and either submit more evidence or request the investigators obtain more evidence. By this process, it also tested Doe's and Roe's statements.

Doe contends Roe lied both about the nature of their relationship and that she was drunk. But of course, that information was before Stonehill and in any event bears at most on Roe's general character for truthfulness. Cf. Fed. R. Evid. 608(b) (authorizing in trials inquiry into specific instances of misconduct bearing on a witness's character for truthfulness at the discretion of the judge). Doe's recitation of events corroborated virtually all of Roe's rendition except her verbal rejection of sexual activity. Moreover, here, unlike in many cases, Stonehill possessed contemporaneous objective written evidence of non-consent in the form of Roe's allegation and Doe's admission both uttered the morning after in their undisputed text messages. The allegations of the Amended Complaint do not give rise to articulable doubt. In sum, in this particular case, Doe's allegations simply do not rise to the level of a plausible claim of articulable doubt under the totality of the circumstances even drawing as the Court does all reasonable inferences in his favor and considering the absence of a live hearing.

Accordingly, Doe has failed to allege plausibly an erroneous outcome claim under Title IX. Because of the failure of each of Doe's various Title IX theories, the Court ALLOWS the Motion to Dismiss Count I, alleging a violation of Title IX.

B.  **Breach of Contract (Count II)**

Doe alleges that Stonehill breached its contract with him by not following the procedures outlined in the Sexual Misconduct Policy and engaging in a fundamentally unfair investigation. Doc. No. 19 ¶¶ 494–502. Specifically, he restates many of the same issues that he alleged as Title IX violations: that Stonehill failed to refer the matter to an external investigator; that investigators did not follow the Sexual Misconduct Policy; that investigators did not conduct a full investigation; that investigators failed to consider his text messages; that investigators failed to allow him additional time to submit materials; the failure to have a hearing with cross-examination; and the failure of the Dean to make a credibility determination. Id. ¶ 501.

In Massachusetts, student-college relationships are contractual in nature and the terms of that contractual relationship can be derived from student policy manuals. Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 593 (D. Mass. 2016) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)). "Under Massachusetts breach of contract law as to private academic institutions, two tests are relevant to Doe's breach of contract claim . . . The first test looks at the terms of the contract established between the college and the student and asks whether the reasonable expectations of the parties have been met." Boston Coll. II, 942 F.3d at 533 (citing Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000); Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983)). The reasonable expectation standard asks what meaning the party making the manifestation under the contract—the university—should reasonably expect the other party—the student—to give it. Schaer, 735 N.E.2d at 378.

The second test is whether the procedures followed were "conducted with basic fairness." Id. at 380 (quoting Cloud, 720 F.2d at 725). This inquiry is "uncertain and elastic," but requires the Court to assess whether the university provided "some minimum level of fair play" to the

student during the disciplinary process. <u>Doe v. Brandeis Univ.</u>, 177 F. Supp. 3d. at 572,

601; <u>see</u> <u>Sonoiki v. Harvard Univ.</u>, No. 19-CV-12172, 2020 WL 3416516, at *10 (D. Mass. June

22, 2020) ("a disciplinary decision must be arbitrary or capricious or made in bad faith to violate

basic fairness"); <u>Coveney v. President & Trs. of the Coll. of the Holy Cross</u>, 445 N.E.2d 136,

139 (Mass. 1983) (concluding that private university did not act arbitrarily or capriciously where

the school acted in good faith and on reasonable grounds in conducting disciplinary

proceedings). This inquiry does not require "adher[ence] to the standards of due process

guaranteed to criminal defendants" or abiding "by rules of evidence adopted by courts." <u>Schaer</u>,

735 N.E.2d at 381. Overall, Massachusetts courts are "chary about interfering with academic and

disciplinary decisions made by private colleges and universities" and colleges "must have broad

discretion in determining appropriate sanctions for violations of its policies." <u>Id.</u> The Court

examines each part of the test as applied to Doe's allegations below.

### 1. Reasonable Expectations

"At this stage in the litigation, the court must accept as true the factual allegations made

by Doe and must make any reasonable inferences favorable to his position both with respect to

determining what a student may have reasonably expected terms in [the Policy] to mean and

whether the [school] failed to meet those expectations." <u>Doe v. Amherst Coll.</u>, 238 F. Supp. 3d

195, 215 (D. Mass. 2017). Even under a lenient Motion to Dismiss standard, Doe does not

sufficiently allege that Stonehill failed to meet his reasonable expectations based on the Sexual

Misconduct Policy. In resolving the Title IX claim above, the Court has already discussed at

length why Doe's numerous allegations that Stonehill violated the Sexual Misconduct Policy are

insufficient—nearly every issue Doe raises is belied by the Policy itself. The Policy did not

require Stonehill to provide Doe with Roe's initial complaint or advance notice of her interview

and it did not require hiring an external investigator. A student reading the policy could not reasonably expect Stonehill to take those steps. Further, the Policy does not state that students will receive reasoning from the Dean of Students beyond an "outcome letter" and the Final Report (both of which Doe received). The Policy states that sanctions for being found responsible of sexual misconduct can include dismissal. Doc. No. 20-3 at 1.

There is one issue on which the Court concurs with Doe that he has plausibly alleged Stonehill violated the Policy or failed to meet his reasonable expectations: Stonehill failed to share with Doe the factual assertion that Roe told Witness #2 the morning after the incident that "it wasn't ok," see Doc. No. 29 at 29–30, and Doe was entitled to this information. However, this lone violation is insufficient to support a claim for breach of contract. The Policy takes into account the potential for minor, non-prejudicial errors. It states:

> Appeals will be considered based on the following criteria:
> 1. Failure to follow the process or procedures outlined within this Policy, which resulted in significant prejudice such that it impacted the outcome. Minor deviations from designated procedures will not be the basis for sustaining an appeal unless significant prejudice results.
> 2. New information that was not known at the time of the hearing

Doc. No. 20-3 at 22. Doe raised this issue in his appeal, Doc. No. 29-6 at 26, and Stonehill found that this violation was not one that resulted in "significant prejudice such that it impacted the outcome," Doc. No. 34 at 9. As the Court notes above, this statement from Witness #2 is cumulative evidence to the text message sent by Roe to Doe the morning after the incident that uses nearly identical language, and Doe has not alleged how the absence of this knowledge was prejudicial. The Final Report makes clear that Stonehill made its determination based on a variety of objective facts that Doe himself alleges. Ultimately, the reasonable expectation set by the Policy is that a student is entitled to a disciplinary process free from errors that cause significant prejudice and affect the outcome, not that a student is entitled to a process entirely

free from minor errors. Cf. Brown Univ. I, 210 F. Supp. 3d at 331 ("[A] student is not entitled to

a perfect disciplinary process, and it is not the Court's role to be an appeals court for Brown's

disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a

new disciplinary hearing or a review by this Court."). Doe does not successfully allege that his

reasonable expectations based on the Policy were not met by Stonehill.

## 2. Basic Fairness

Doe does not allege that Stonehill's disciplinary process was arbitrary and capricious or

made in bad faith such that it violated basic fairness. Doe's Amended Complaint alleges that he

was provided a variety of procedural protections: he was meaningfully represented by an

attorney throughout, Doc. No. 19 ¶ 258; he was able to explain his side of the story, review the

facts section of the report, meet with the investigators, and request follow-up questions or

interviews, id. ¶¶ 259–267; and he went through a full appeals process (in which Stonehill

accommodated two requests for extensions), id. ¶¶ 405–416. Compare Doe v. Brandeis Univ.,

177 F. Supp. 3d at 601–08 (finding no basic fairness where plaintiff was not permitted an

attorney, had no meaningful opportunity to appeal, could not examine evidence or witness

statements, and was not given any access to the final report). Doe alleges nonetheless that basic

fairness was violated because he was not provided a live hearing or the opportunity to cross-

examine Roe, Doc. No. 19 ¶ 501, but basic fairness under Massachusetts law does not entitle

parties to a live hearing or cross-examination, Boston Coll II, 942 F.3d at 534–36. As a federal

court sitting in diversity and applying state law, this Court must "take care not to extend state law

beyond its well-marked boundaries," id. (citation omitted), and must "take state law as it finds

it," Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989). In fact, Massachusetts courts have

found disciplinary proceedings with far fewer procedural protections than Stonehill's process to

satisfy basic fairness. <u>See, e.g.</u>, <u>Driscoll</u>, 873 N.E.2d at 1182, 1187 (disciplinary process where accused student had to immediately produce a written statement without seeking advice or counsel and was expelled the next day satisfied basic fairness); <u>Schaer</u>, 735 N.E.2d at 378, 380 (disciplinary process that did not allow the accused student to give any input during the investigation and admitted testimony that would have been excluded in a court proceeding provided basic fairness). As discussed more fully in the Title IX section, <u>supra</u>, Doe fails to allege that his proceedings were tainted in any way by bias or conflict, or that the Dean of Students unfairly failed to review the Final Report and the allegations therein before sanctioning him. From Doe's Amended Complaint, it is clear that Stonehill provided Doe with at least "some minimum level of fair play." Doe neither successfully alleges that Stonehill violated his reasonable expectations under the contract nor that he was denied basic fairness. Dismissal of Count II of the Amended Complaint is ALLOWED.

### C. Breach of Covenant of Good Faith and Fair Dealing (Count IX) and Breach of Common Law Duty of Fairness (Count X)

In Counts IX and X of the Amended Complaint, Doe alleges that Stonehill violated Massachusetts law by breaching the covenant of good faith and fair dealing and the common law duty of fairness by subjecting Doe to an unfair disciplinary process and sanctioning him with expulsion. Doc. No. 19 ¶¶ 548–57. As another session of this Court has noted, "this inquiry is essentially identical to the analysis under the breach of contract claim and the standard applied to the basic fairness of the proceedings." <u>Sonoiki</u>, 2020 WL 3416516, at *15; <u>see also</u> <u>Boston Coll. I</u>, 892 F.3d at 87 (stating that "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness"). Thus, for the reasons stated above as to Count II, the Court concludes that Doe has also not stated a plausible claim as to a breach of

implied covenant of good faith and fair dealing or common law duty of fairness in his contractual relationship with the school. Stonehill's Motion to Dismiss is ALLOWED as to Counts IX and X of Doe's Amended Complaint.

### D. Negligence (Count V) and Negligent Infliction of Emotional Distress (Count VIII)

Doe alleges that Stonehill was negligent because it breached a duty of care to Doe by failing to ensure that policies and procedures were fundamentally fair; failing to ensure that policies and procedures complied with federal and state law; failing to adequately train administrators, staff, and employees; and failing to ensure that administration, staff, and employees adhered to the policy. Doc. No. 19 ¶ 517. Doe further alleges negligent infliction of emotional distress based on the breach of these duties. Id. ¶¶ 541–47.

"To state a negligence claim under Massachusetts law, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached that duty; (3) damage resulted; and (4) the defendant's breach caused that damage." Saldivar v. Racine, 818 F.3d 14, 20–21 (1st Cir. 2016). "Whether a duty of care exists is a question of law . . . and an appropriate subject of a motion to dismiss pursuant to Rule 12(b)(6)." Leavitt v. Brockton Hosp., Inc., 907 N.E.2d 213, 215–16 (Mass. 2009). In Massachusetts, where the relationship between a student and a school is governed by a contract—here, the Sexual Misconduct Policy—and where disciplinary proceedings arise out of that contractual relationship, the school does not owe the student an additional duty in tort. Boston Coll. I, 892 F.3d at 94 (in sexual misconduct case, school "did not owe the [student] any additional independent duty outside of their existing contractual relationship" and "[a]ny remedy for a breach of this contractual obligation must sound in contract, not in tort"); see also Roe v. Northeastern Univ., No. CV 16-03335-C, 2019 WL 1141291, at *12 (Mass. Super. Mar. 8, 2019) ("a university has no duty in tort to its students

31

to conduct disciplinary proceedings with due care"); Amherst Coll., 238 F. Supp. 3d at 228
(noting that the court "does not find that currently existing social values or customs are
consistent with imposing a legal duty on college administrators, which would be owed directly to
students, relating to the implementation of student disciplinary proceedings"). Because Doe does
not allege that Stonehill has any duty of care towards him separate from contractual obligations
(and further, omits this issue entirely from his opposition), Doe's negligence claim must be
dismissed.

Doe also asserts a negligent supervision claim.[11] In Massachusetts, negligent supervision
"occurs when, during the course of employment, the employer becomes aware or should have
become aware of problems with an employee that indicated his unfitness, and the employer fails
to take further action such as investigating, discharge or reassignment." Doe v. Brandeis Univ.,
177 F. Supp. 3d at 613 (citing Foster v. The Loft, Inc., 526 N.E.2d 1309, 1310–11 (Mass. App.
Ct. 1988)). For a student to bring a negligent supervision claim against an administrator involved
in a Title IX proceeding, the student need not allege prior bad acts or omissions; rather, Doe
"needs only to allege facts that, if true, would show that [Stonehill] should have known there
were 'problems' with [the employees] indicating [their] 'unfitness' to oversee Doe's case, but
failed to take further action." Doe v. Brandeis Univ., 177 F. Supp. 3d at 614; see also
Northeastern Univ., 2019 WL 1141291, at *11 (applying Doe v. Brandeis Univ.). Doe's
Amended Complaint does not allege a single fact that, if true, would show Stonehill knew that

---

[11] While he does not state a claim for negligence, Doe's contractual relationship with Stonehill
may not necessarily preclude him from stating a claim for negligent supervision. See Doe v.
Brandeis Univ., 177 F. Supp. 3d at 613 (noting that negligent supervision "ordinarily relate[s] to
situations where employees are brought into contact with members of the public in the course of
an employer's business" and "[t]he existence of a private contractual relationship between the
parties . . . does not necessarily mean that the plaintiff is no longer a member of the 'public' for
the purposes of a negligent retention or supervision claim").

the Title IX team of Krentzman, Bamford, and Jordan was unfit to oversee Doe's case. Doe

alleges that Stonehill's Sexual Misconduct policy requires every staff member and investigator to

be annually trained on how to conduct an investigation. Doc. No. 19 ¶ 175. Nowhere does he

allege that this training did not occur or was deficient, or that the Title IX coordinator and

investigators were otherwise unfit. Rather, he makes the conclusory statement in his brief that

alleged procedural errors must mean that the investigators were either "acting deceptively" or

were "unsupervised, not properly trained, and incompetent." Doc. No. 29 at 35. This statement

does not sufficiently allege negligent supervision on the part of Stonehill especially in light of

the failure of his claims of procedural error. Because both of Doe's negligence theories fail,

dismissal of Count V is ALLOWED especially where, as here, it is unsupported by factual

allegations plausibly supporting the claim of negligence.

To state a claim for negligent infliction of emotional distress, a plaintiff must allege: "'(1)

negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective

symptomatology; and (5) that a reasonable person would have suffered emotional distress under

the circumstances of the case." Amherst Coll., 238 F. Supp. 3d at 228–29 (citing Rodriguez v.

Cambridge Housing Auth., 823 N.E.2d 1249, 1253 (Mass. 2005)). Because Doe has failed to

sufficiently allege negligence, as the Court discusses above, Doe cannot sufficiently allege a

claim for negligent infliction of emotional distress. Thus, dismissal of Count VIII is ALLOWED.

### E.  Defamation (Count VI)

Doe next brings a defamation claim. He alleges that by issuing the Final Report and later

denying his appeal, Stonehill made "numerous false and defamatory statements about John Doe,

including, but not limited, to that John Doe had engaged in sexual harassment and nonconsensual

sexual contact." Doc. No. 19 ¶ 530. In Massachusetts, to state a defamation claim, a plaintiff

must allege "[1] the defendant was at fault for the publication of a false statement regarding the plaintiff, [2] capable of damaging the plaintiff's reputation in the community, [3] which either caused economic loss or is actionable without proof of economic loss." Commonwealth v. Lucas, 34 N.E.3d 1242, 1250 (Mass. 2015) (citation omitted). To be actionable, the statement alleged "must be one of fact rather than of opinion." Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015). "Statements of pure opinion are constitutionally protected." King v. Globe Newspaper Co., 512 N.E.2d 241, 243 (Mass 1987); see also Driscoll, 873 N.E.2d at 1188 (noting that while opinions are "rarely 'pure' of facts," "[o]pinions clearly based on disclosed, nondefamatory facts are not actionable"). To determine whether a statement constitutes fact or opinion,

> the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.

Driscoll, 873 N.E.2d at 1188 (citing Cole v. Westinghouse Broad. Co., 435 N.E.2d 1021, 1025 (Mass. 1982)) (internal quotation marks omitted); see also Scholz, 41 N.E.3d at 45–46. Doe alleges that the following statement from the Final Report is defamatory: "The Investigators determined that based on a preponderance of the evidence it is more likely than not that [John Doe] violated Policy S1.14, specifically, non-consensual digital penetration of the vagina." Doc. No. 19 ¶ 375; Doc. No. 29 at 34. In particular, he focuses on the word "non-consensual" as false because "the issue of consent was never resolved." Doc. No. 29 at 34. He does not point to any specific defamatory statements in the letter denying his appeal. Defendant responds that this

statement is an opinion, or alternatively, that the Final Report and the letter denying his appeal are privileged. Doc. No. 23 at 29.[12]

Examining the challenged statement in the totality of the context in which it was published, the Court agrees with Defendant that this statement is an opinion. The statement clearly represents the recommendation—the opinion—of the Title IX investigators after conducting the investigation and reviewing the full factual record. It is accompanied by cautionary language ("more likely than not"). Finally, the statement is supported by disclosed, non-defamatory facts because it is accompanied by the full Final Report, which, as the Court discusses above, contains numerous facts that could support a finding that Doe "more likely than not" violated Stonehill's policy. See McKee v. Cosby 236 F. Supp. 3d 427, 440 (D. Mass. 2017) (finding no defamation claim where challenged letter "ostensibly recites all the facts supporting the opinions and provides no indication that the opinions are based upon undisclosed objective facts"); see also Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015) 785 F.3d (no defamation claim where "Defendant explained the circumstances of the encounter, thus providing [the listener] with the factual basis underlying his opinion of Plaintiff's conduct"). Doe does not sufficiently allege a defamation claim based on this statement.[13]

Doe alleges three additional defamation claims, but he fails to address them in his opposition to the Motion to Dismiss. Accordingly, he waives any argument that these allegations support a claim for defamation. In any event, they do not. He alleges that a statement in the Final report—that "[Doe] indicated that [Roe] did not give verbal consent, but rather, 'moaned' when

---

[12] Doe does not respond to the argument that this statement is an opinion; he simply states that it is not privileged because it does not further a legitimate business interest. Doc. No. 29 at 34–35.

[13] Because the statement is an opinion, the Court does not go on to analyze whether it is subject to privilege.

asked if the sexual activity was ok"—is "misleading and mischaracterized John Doe's statement because in their past sexual encounters, Jane Roe would moan when she was experiencing pleasure" and thus it was "reasonable" for Doe to believe he had consent. Doc. No. 19 ¶ 372. Much like the prior statement, this phrase represents the investigators' opinion and is supported by a series of disclosed, non-defamatory facts—Doe alleges and does not contest that he did not seek verbal consent prior to engaging in sexual activity and that he told the investigators Roe "did not answer" when he asked if she "liked what he was doing" but rather that she "moaned" instead. Id. ¶¶ 59, 263(D)–(E). He next alleges that he has "been compelled to self-publish [Stonehill's] false and defamatory adjudication as part of his application to complete his studies at another college." Doc. No. 19 ¶ 533. However, Massachusetts courts have rejected the theory of "self-publication" defamation. White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1035 (Mass. 2004). Doe's last allegation is that Stonehill is liable for Roe's allegedly defamatory statement (a text message to another student that Doe "raped" her), because the definitions in the Policy and Stonehill's decision to expel Doe "made it possible" for Roe to text this statement. Doc. No. 19 ¶ 447; see also id. ¶¶ 442–49. Doe is not bringing a defamation claim against Roe, nor is he alleging that Roe is Stonehill's agent. Stonehill is not responsible for statements it did not make. See Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 40 (1st Cir. 1991) (noting that "in order for a defendant to be found individually liable for slander, the defendant must have personally made a slanderous statement about the plaintiff") (emphasis original). These additional allegations fail. Stonehill's Motion to Dismiss is ALLOWED as to Count VI of Doe's Amended Complaint.

### F.  Waived Claims

Doe's Amended Complaint alleges claims of unjust enrichment (Count III), promissory estoppel (Count IV), and fraud (Count VII) but he fails to address them in his opposition to the Motion to Dismiss. Accordingly, he waives any argument that Stonehill's motion should be denied as to these counts. See, e.g., Vallejo v. Santini-Padilla, 607 F.3d 1, 7 n.4 (1st Cir. 2010) (noting that "[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver" and that "[p]laintiffs did not properly raise their arguments below"). Stonehill's Motion to Dismiss is ALLOWED as to Counts III, IV, and VII of Doe's Amended Complaint.

### G.  Rule 8

Under Fed. R. Civ. P. 8(a)(1), a complaint may be dismissed for failure to include "a short and plain statement of the claim showing that pleader is entitled to relief." Defendant additionally argues that Plaintiff's complaint violates Rule 8. Doc. No. 23 at 14 n.7. In light of the resolution of the Motion to Dismiss on the merits of the claims, the Court declines to address the Rule 8 argument advanced by Stonehill—though the Court notes that the Amended Complaint is 120 pages, contains nearly 570 numbered paragraphs, and includes, among other things, a sprawling history of Title IX, see, e.g., Doc. No. 19 ¶¶ 115–133.

As a final note, Doe's Amended Complaint includes three causes of action (Counts XI, XII, and XIII) that are remedies pled as claims.[14] Doe's "claims" for a declaratory judgment, permanent injunction, and attorneys' fees are not independent legal claims. They are conditioned

---

[14] Specifically, Counts XI requests a declaratory judgment that Stonehill violated Doe's rights, Count XII states that Doe is entitled to a permanent injunction compelling Stonehill to expunge his record, and Count XIII states that Doe is entitled to recover attorney's fees.

upon the success of an underlying legal claim. Because Doe has failed to state any underlying

legal claims, these "counts" are dismissed as well.

## IV.  CONCLUSION

For the foregoing reasons, Stonehill's Motion to Dismiss (Doc. No. 22) is ALLOWED as

to all counts of Doe's Amended Complaint. A judgment of dismissal shall enter with each side to

bear its own fees and costs.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge